**No. 15-12831**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

CHARLES L. HILL, JR.,

Plaintiff-Appellee,

v.

SECURITIES AND EXCHANGE
COMMISSION,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the Northern District of Georgia

_____

## APPENDIX

_____

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney General*

JOHN A. HORN
  *Acting United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MARK B. STERN
MARK R. FREEMAN
MEGAN BARBERO
  *(202) 532-4631*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7226*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

# <u>TABLE OF CONTENTS</u>

<u>**Docket/Tab#**</u>

District Court Docket Sheet ........................................................................Tab A

Order Instituting Cease-and-Desist Proceedings ................................. Dkt. 1-4/Tab 1-4

Administrative Law Judge Order Denying Respondent's Motion
    for Summary Disposition on Constitutional Issues .................. Dkt. 2-4/Tab 2-4

Amended Complaint.................................................................Dkt. 17/Tab 17

Order Granting Preliminary Injunction....................................................Dkt. 28/Tab 28

Notice of Appeal   .................................................................Dkt. 32/Tab 32

Declaration of Andrew Ceresny ..........................................................Dkt. 33-1/Tab 33-1

**Tab A**

8months,APPEAL,CLOSED,STAY,TRO

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:15-cv-01801-LMM

| | |
|---|---|
| Hill v. Securities And Exchange Commission | Date Filed: 05/19/2015 |
| Assigned to: Judge Leigh Martin May | Date Terminated: 08/04/2015 |
| Case in other court: USCA - 11th Circuit., 15-12831-CC | Jury Demand: None |
| Cause: 05:702 Administrative Procedure Act | Nature of Suit: 850 Securities/Commodities |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**Charles L. Hill, Jr.**                    represented by    **Akash Desai**
Kilpatrick Townsend & Stockton, LLP - ATL
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
404-815-6126
Email: adesai@kilpatricktownsend.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hillary D. Rightler**
Kilpatrick Townsend & Stockton, LLP - ATL
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
404-815-6584
Email: HRightler@Kilpatricktownsend.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Earl Hudson**
Kilpatrick Townsend & Stockton, LLP - ATL
1100 Peachtree Street N.E.
Suite 2800
Atlanta, GA 30309
404-815-6356
Fax: 404-541-3248
Email:

shudson@kilpatricktownsend.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Securities And Exchange Commission**                    represented by    **Adam A. Grogg**
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20001
202-514-2395
Email: adam.a.grogg@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jean Lin**
U.S. Department of Justice
Civil Division, Federal Programs
20 Massachusetts Ave., N.W.
Washington, DC 20530
(202)514-3716
Email: jean.lin@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Justin M. Sandberg**
United States Department of Justice
Civil Division, Federal Programs Branch
Room 7302
Washington, DC 20001
(202)514-5838
Email: justin.sandberg@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Matthew J. Berns**
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
(202) 616-8016
Email: matthew.j.berns@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Steven A. Myers**
United States Department of Justice
Civil Division

20 Massachusetts Ave. NW
Washington, DC 20530
(202)305-8648
Email: steven.a.myers@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/19/2015 | 1 | COMPLAINT filed by Charles L. Hill, Jr. ( Filing fee $ 400 receipt number 113E-5831893.) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Civil Cover Sheet)(ddm) Please visit our website at http://www.gand.uscourts.gov/forms to obtain Pretrial Instructions which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 05/20/2015) |
| 05/19/2015 | 2 | MOTION for Temporary Restraining Order, or in the alternative, MOTION for Preliminary Injunction by Charles L. Hill, Jr. (Attachments: # 1 Brief, # 2 Hudson Declaration)(ddm) (Additional attachment(s) added on 5/20/2015: # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13) (ddm). (Entered: 05/20/2015) |
| 05/20/2015 | 3 | Summons Issued as to Securities And Exchange Commission, U.S. Attorney and U.S. Attorney General. (Attachments: # 1 Summons, # 2 Summons)(ddm) (Entered: 05/20/2015) |
| 05/20/2015 | | Notification of Docket Correction re 2 MOTION - docket has been amended to add exhibits to motion. (ddm) (Entered: 05/20/2015) |
| 05/20/2015 | 4 | STANDING ORDER Regarding Civil Litigation in cases proceeding before Judge May. Signed by Judge Leigh Martin May on 5/20/15. (ddm) (Entered: 05/20/2015) |
| 05/20/2015 | 5 | ORDER Setting Hearing on Motion 2 MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction : The Motion Hearing is set for 5/27/2015 at 01:30 PM in ATLA Courtroom 2107 before Judge Leigh Martin May. Plaintiff is ORDERED to serve Defendant with a copy of this Order as soon as possible. See FED. R. Crv. P. 4(i). Plaintiff is also required to provide the SEC enforcement attorneys who are involved with Plaintiffs administrative action with a copy of this order today, May 20, 2015. Defendants are DIRECTED to file a Response Brief by Tuesday, May 26, 2015. Signed by Judge Leigh Martin May on 05/20/2015. (rvb) (Entered: 05/20/2015) |
| 05/20/2015 | 6 | Consent MOTION for Leave to File Excess Pages by Securities And Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Lin, Jean) (Entered: 05/20/2015) |
| 05/20/2015 | 7 | NOTICE of Appearance by Jean Lin on behalf of Securities And Exchange Commission (Lin, Jean) (Entered: 05/20/2015) |

| 05/21/2015 | 8 | ORDER granting 6 Defendant's Consent Motion to Exceed Page Limits. Signed by Judge Leigh Martin May on 5/21/15. (ddm) (Entered: 05/21/2015) |
|---|---|---|
| 05/26/2015 | 9 | Consent MOTION for Leave to File Excess Pages with Brief In Support by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 05/26/2015) |
| 05/26/2015 | 10 | Return of Service Executed by Charles L. Hill, Jr. Securities And Exchange Commission served on 5/20/2015, answer due 7/20/2015. (Hudson, Stephen) Modified on 5/27/2015 to edit answer date (ddm). (Entered: 05/26/2015) |
| 05/26/2015 | 11 | ORDER granting 9 Plaintiffs Consent Motion to Exceed Page Limits. Signed by Judge Leigh Martin May on 5/26/15. (ddm) (Entered: 05/26/2015) |
| 05/26/2015 | 12 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Securities And Exchange Commission. (Lin, Jean) (Entered: 05/26/2015) |
| 05/26/2015 | | Return of Service Executed by Charles L. Hill, Jr. Securities And Exchange Commission served on 5/20/2015, answer due 7/20/2015. (ddm) (Entered: 05/27/2015) |
| 05/27/2015 | 13 | REPLY to Response to Motion re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 05/27/2015) |
| 05/27/2015 | 20 | Minute Entry for proceedings held before Judge Leigh Martin May: Motion Hearing held on 5/27/2015. Oral argument was held on Plaintiff's Motion for Temporary Restraining Order, or, in the alternative, for Preliminary Injunction. A written order will follow. (Court Reporter Monty Vann)(rvb) (Entered: 06/01/2015) |
| 05/29/2015 | 14 | Emergency MOTION for Leave to File Supplemental Brief *in Support of Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction* with Brief In Support by Charles L. Hill, Jr. (Attachments: # 1 Hudson Declaration, # 2 Exhibit 1 to Hudson Dec., # 3 Exhibit 2 to Hudson Dec., # 4 Exhibit 3 to Hudson Dec.)(Hudson, Stephen) (Entered: 05/29/2015) |
| 05/29/2015 | 15 | RESPONSE in Opposition re 14 Emergency MOTION for Leave to File Supplemental Brief *in Support of Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction* filed by Securities And Exchange Commission. (Lin, Jean) (Entered: 05/29/2015) |
| 05/29/2015 | 16 | PROPOSED ORDER re: 14 Emergency MOTION for Leave to File Supplemental Brief *in Support of Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction*. (Hudson, Stephen) (Entered: 05/29/2015) |
| 05/29/2015 | 17 | AMENDED COMPLAINT against Securities And Exchange Commission, filed by Charles L. Hill, Jr. (Attachments: # 1 Supplemental Declaration of Stephen E. Hudson)(Hudson, Stephen) Please visit our website at http://www.gand.uscourts.gov/forms to obtain Pretrial Instructions which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 05/29/2015) |

| | | |
|---|---|---|
| 06/01/2015 | 18 | ORDER granting 14 Plaintiff's Motion to Supplement Brief in Support of Motion for a Temporary Restraining Order. Signed by Judge Leigh Martin May on 5/29/15. (ddm) (Entered: 06/01/2015) |
| 06/01/2015 | 19 | TRANSCRIPT of Proceedings held on 5/27/15, before Judge Leigh Martin May. Court Reporter/Transcriber Montrell Vann, Telephone number 404-215-1549. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/22/2015. Redacted Transcript Deadline set for 7/2/2015. Release of Transcript Restriction set for 8/31/2015. (Attachments: # 1 Appendix Notice of Filing of Transcript) (mv) (Entered: 06/01/2015) |
| 06/02/2015 | 21 | RESPONSE in Support re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 06/02/2015) |
| 06/04/2015 | 22 | NOTICE of Appearance by Matthew J. Berns on behalf of Securities And Exchange Commission (Berns, Matthew) (Entered: 06/04/2015) |
| 06/04/2015 | 23 | NOTICE of Appearance by Adam A. Grogg on behalf of Securities And Exchange Commission (Grogg, Adam) (Entered: 06/04/2015) |
| 06/04/2015 | 24 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction *(Response to Plaintiff's Supplemental Brief)* filed by Securities And Exchange Commission. (Lin, Jean) (Entered: 06/04/2015) |
| 06/04/2015 | 25 | NOTICE of Appearance by Steven A. Myers on behalf of Securities And Exchange Commission (Myers, Steven) (Entered: 06/04/2015) |
| 06/08/2015 | 26 | PROPOSED ORDER Defendant's Proposed Language and Brief Regarding Wording of a Potential Preliminary Injunction. (Lin, Jean) (Entered: 06/08/2015) |
| 06/08/2015 | 27 | PROPOSED ORDER Plaintiffs Brief on Proposed Injunction Language re: 2 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction. (Hudson, Stephen) (Entered: 06/08/2015) |
| 06/08/2015 | 28 | ORDER granting in part and denying in part Plaintiff Charles L. Hill, Jr.s Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction 2 . The parties are DIRECTED to confer on a timetable for conducting discovery and briefing the remaining issues. The parties are then DIRECTED to submit by June 15, 2015, a consent scheduling order to the Court for consideration. If the parties are unable to agree to the terms of a scheduling order, the parties can submit their alternative submissions. Signed by Judge Leigh Martin May on 6/8/15. (ddm) (Entered: 06/08/2015) |
| 06/10/2015 | 29 | Certificate of Interested Persons by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 06/10/2015) |
| 06/11/2015 | | Clerks Notation re 29 Certificate of Interested Persons, reviewed and approved by LMM. (rvb) (Entered: 06/11/2015) |

| 06/15/2015 | 30 | RESPONSE re 28 Order on Motion for TRO, Order on Motion for Preliminary Injunction,,,, *Regarding Further Proceedings in this Case* filed by Securities And Exchange Commission. (Lin, Jean) (Entered: 06/15/2015) |
|---|---|---|
| 06/15/2015 | 31 | Proposed Scheduling Order in Response to 28 Order filed by Charles L. Hill, Jr. (Hudson, Stephen) Modified on 6/16/2015 to edit docket text (ddm). (Entered: 06/15/2015) |
| 06/24/2015 | 32 | NOTICE OF APPEAL as to 28 Order on Motion for TRO, Order on Motion for Preliminary Injunction,,,, by Securities And Exchange Commission. Transcript Order Form due on 7/8/2015 (Lin, Jean) (Entered: 06/24/2015) |
| 06/24/2015 | 33 | MOTION to Stay *Preliminary Injunction Pending Appeal* by Securities And Exchange Commission. (Attachments: # 1 Affidavit (Declaration of Andrew Ceresney), # 2 Text of Proposed Order)(Lin, Jean) (Entered: 06/24/2015) |
| 06/25/2015 | 34 | NOTICE Of Filing Appeal Transmission Letter by Securities And Exchange Commission re: 32 Notice of Appeal. (kac) (Entered: 06/25/2015) |
| 06/25/2015 | 35 | Transmission of Certified Copy of Notice of Appeal, Order and Docket Sheet to US Court of Appeals re: 32 Notice of Appeal. (kac) (Entered: 06/25/2015) |
| 06/29/2015 | 36 | USCA Acknowledgment of 32 Notice of Appeal filed by Securities And Exchange Commission. Case Appealed to USCA - 11th Circuit. USCA Case Number 15-12831-C. (kac) (Entered: 06/29/2015) |
| 06/30/2015 | 37 | NOTICE Of Filing Supplemental Authority by Securities And Exchange Commission (Attachments: # 1 Exhibit Tilton v. SEC Opinion & Order, # 2 Exhibit Spring Hill v. SEC Opinion, # 3 Exhibit Spring Hill v. SEC Order) (Berns, Matthew) (Entered: 06/30/2015) |
| 07/13/2015 | | Submission of 33 MOTION to Stay *Preliminary Injunction Pending Appeal*, submitted to District Judge Leigh Martin May. (ddm) (Entered: 07/13/2015) |
| 07/13/2015 | 38 | RESPONSE in Opposition re 33 MOTION to Stay *Preliminary Injunction Pending Appeal* filed by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 07/13/2015) |
| 07/16/2015 | 39 | MOTION to Stay *Proceedings Pending Appeal* by Securities And Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Lin, Jean) (Entered: 07/16/2015) |
| 07/21/2015 | | Pursuant to F.R.A.P.11(c), the Clerk certifies that the record is complete for purposes of this appeal re: 32 Notice of Appeal. Case Appealed to USCA - 11th Circuit. USCA Case Number 15-12831-CC. The entire record on appeal is available electronically. (kac) (Entered: 07/21/2015) |
| 07/30/2015 | 40 | REPLY to Response to Motion re 33 MOTION to Stay *Preliminary Injunction Pending Appeal* filed by Securities And Exchange Commission. (Sandberg, Justin) (Entered: 07/30/2015) |
| 07/30/2015 | 41 | NOTICE of Appearance by Justin M. Sandberg on behalf of Securities And Exchange Commission (Sandberg, Justin) (Entered: 07/30/2015) |
| 07/31/2015 | | |

| | | |
|---|---|---|
| | | Submission of 33 MOTION to Stay *Preliminary Injunction Pending Appeal*, submitted to District Judge Leigh Martin May. (ddm) (Entered: 07/31/2015) |
| 08/03/2015 | 42 | RESPONSE re 39 MOTION to Stay *Proceedings Pending Appeal* filed by Charles L. Hill, Jr. (Hudson, Stephen) (Entered: 08/03/2015) |
| 08/03/2015 | 43 | NOTICE Of Filing Supplemental Authority by Charles L. Hill, Jr re 38 Response in Opposition to Motion (Attachments: # 1 Exhibit A)(Hudson, Stephen) (Entered: 08/03/2015) |
| 08/04/2015 | | Submission of 39 MOTION to Stay *Proceedings Pending Appeal*, submitted to District Judge Leigh Martin May. (ddm) (Entered: 08/04/2015) |
| 08/04/2015 | 44 | ORDER denying the SECs Motion to Stay Preliminary Injunction Pending Appeal 33 and granting the SECs Unopposed Motion to Stay Proceedings Pending Appeal 39 . The Clerk is DIRECTED to administratively close this case pending appeal. Within 30 days after the Eleventh Circuit issues its Opinion, the parties are DIRECTED to file a status report. Signed by Judge Leigh Martin May on 8/4/15. (ddm) (Entered: 08/05/2015) |
| 08/04/2015 | | Civil Case Terminated. (ddm) (Entered: 08/05/2015) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/10/2015 11:29:14 | | | |
| **PACER Login:** | julianaseanlee:4362300:4299065 | **Client Code:** | DOG |
| **Description:** | Docket Report | **Search Criteria:** | 1:15-cv-01801-LMM |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**Tab 1-4**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 74249 / February 11, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16383

| | |
|---|---|
| In the Matter of<br><br>CHARLES L. HILL, JR.,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND NOTICE OF HEARING |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Charles L. Hill, Jr. ("Hill" or the "Respondent").

II.

After an investigation, the Division of Enforcement alleges that:

A.  **SUMMARY**

1.      Hill engaged in insider trading, in violation of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, in connection with securities of Radiant Systems, Inc. ("Radiant").

2.      In May 2011, NCR Corporation ("NCR"), a point-of-sale technology company based in Duluth, Georgia, began discussions with Radiant, another point-of-sale technology company based in Alpharetta, Georgia, about NCR's potential acquisition of Radiant.  Radiant's Chief Operating Officer ("COO"), who first learned details about the acquisition in May 2011, discussed material, nonpublic information about the acquisition, ultimately structured to include a tender offer, in confidence with his close personal friend of approximately 40 years ("Radiant's COO's friend," or the "COO's friend").  Radiant's COO's friend, in turn, relayed the material, non-public information he learned from Radiant's COO to Hill.  Radiant's COO's friend had also been a close friend of Hill's for approximately 20 years.

3.      At the time Hill received material, non-public information concerning NCR's acquisition of Radiant from the COO's friend, Hill was aware of the friendship between Radiant's COO's friend and Radiant's COO, and of Radiant's COO's position at Radiant.

4.      Between June 1, 2011, and July 8, 2011, before news of the potential acquisition became public, Hill purchased 101,600 shares of Radiant stock for approximately $2.1 million.

5.      On July 11, 2011, after the close of the markets, NCR and Radiant announced that NCR would acquire Radiant in a tender offer. On July 12, 2011, Radiant's stock price increased by more than 30 percent on the news. That same day, Hill sold all of his Radiant stock, realizing gains of approximately $744,000.

**B.    RESPONDENT**

6.      **Hill**, age 54, is a resident of Atlanta, Georgia. Hill is a self-employed real estate developer. Hill has never been registered with the Commission.

**C.    OTHER RELEVANT INDIVIDUALS AND ENTITIES**

7.      **Radiant**, a Georgia corporation, was headquartered in Alpharetta, Georgia. Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ. On August 24, 2011, Radiant was acquired by NCR. In connection with the acquisition, Radiant's stock was delisted from NASDAQ and deregistered with the Commission.

8.      **NCR**, a Maryland corporation, is headquartered in Duluth, Georgia. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

9.      **Radiant's COO's friend**, age 52, is a resident of Brooklyn, New York. Between May 2011 and August 2011, Radiant's COO's friend resided in Atlanta, Georgia. Radiant's COO's friend is a self-employed artist. Radiant's COO's friend has never been registered with the Commission.

10.     **Radiant's COO**, age 50, is a resident of Atlanta, Georgia. Radiant's COO is currently a Senior Vice President at NCR. Radiant's COO has never been registered with the Commission.

**D.    RADIANT'S COO LEARNS DETAILS ABOUT THE CONTEMPLATED ACQUISITION OF RADIANT BY NCR**

11.    In early May 2011, NCR's Chief Executive Officer, ("NCR's CEO") called Radiant's Chief Executive Officer ("Radiant's CEO") to express an interest in a potential business combination.

12.    On May 12, 2011, NCR sent a letter to Radiant expressing a non-binding indication of interest concerning the acquisition of Radiant at a price of $24 to $26 per share, and requesting a period of exclusive negotiation rights.  At that time, Radiant was trading at approximately $20 per share.

13.    On May 24, 2011, Radiant's board of directors convened for a special meeting to discuss a potential transaction with NCR, and authorized continued negotiations with NCR, including allowing NCR to conduct due diligence, and the engagement of an investment bank to ascertain whether there were other parties interested in acquiring Radiant.

14.    On June 2, 2011, NCR began conducting due diligence in connection with the potential acquisition of Radiant.

15.    On June 13, 2011, NCR made a written offer to Radiant to acquire Radiant stock at $26 per share.

16.     On June 30, 2011, Radiant's board of directors approved a related exclusivity agreement with NCR.

17.    On July 11, 2011, Radiant and NCR executed a related merger agreement, which was structured to include a tender offer from NCR for Radiant stock.

18.    Radiant's COO first learned material, nonpublic information concerning NCR's contemplated acquisition of Radiant in early May 2011 after his brother, who then served as Radiant's CEO and as a member of Radiant's board of directors, told him about NCR's CEO's expression of interest in a potential business combination.

19.    Beginning in May 2011, Radiant's CEO continued to discuss details concerning the evolving transaction with Radiant's COO.  Radiant's COO was also directly involved in the related due diligence process during the negotiations between NCR and Radiant.

20.    In connection with the potential acquisition, Radiant's COO also negotiated his employment terms with NCR in the event the merger was consummated.

3

**E.   RADIANT'S COO SHARED MATERIAL, NON-PUBLIC INFORMATION WITH THE COO'S FRIEND**

21.   Radiant's COO and the COO's friend have maintained a close personal friendship since childhood. They both attended the University of Georgia, where they were members of the same fraternity. After college, they remained close personal friends, both residing in Atlanta, Georgia. Given this close relationship, Radiant's COO considered the COO's friend to be like a close family member. Radiant's COO and the COO's friend routinely shared confidential, personal information with each other.

22.   In 2011, Radiant's COO's friend was aware of Radiant COO's position at Radiant.

23.   During the period from early May to July 11, 2011 (the "relevant period"), Radiant's COO and the COO's friend frequently communicated via telephone or text message, and on some days exchanged multiple telephone calls and text messages. Also during the relevant period, Radiant's COO and the COO's friend, who both resided in the Atlanta metropolitan area, met in person.

24.   During the relevant period, Radiant's COO shared material, nonpublic information with the COO's friend concerning NCR's potential acquisition of Radiant.

**F.   RADIANT'S COO'S FRIEND  SHARED MATERIAL, NON-PUBLIC INFORMATION LEARNED FROM RADIANT'S COO WITH HILL**

25.   Radiant's COO's friend and Hill have been close friends for more than 20 years. During the relevant period, Radiant's COO's friend and Hill frequently communicated via telephone or text message, and on some days exchanged multiple telephone calls and texts. During the relevant period, Radiant's COO's friend and Hill also periodically met in person as they both resided in the Atlanta metropolitan area.

26.   During the relevant period, Hill was aware of the relationship between the COO's friend and Radiant's COO, as well as Radiant's COO's position at Radiant. The COO's friend also knew that Hill was an acquaintance of the Radiant COO.

27.   During the relevant period, Radiant's COO's friend shared material, non-public information that he had learned from Radiant's COO with Hill concerning the potential acquisition of Radiant by NCR.

28.   Hill knew or had reason to know that the information acquired from Radiant's COO's friend concerning NCR's potential acquisition of Radiant was nonpublic, and had been acquired directly or indirectly from Radiant, or an officer or employee thereof.

4

## G.    HILL TRADED RADIANT STOCK

29.    Prior to May 2011, Hill previously had never traded Radiant securities, and had not purchased a security for at least four years prior to purchasing Radiant stock.

30.    In late May 2011, Hill opened two new brokerage accounts, intending to purchase Radiant stock in those accounts.

31.    From June 1, 2011 through July 8, 2011, Hill purchased shares of Radiant stock in his two newly opened brokerage accounts, and in each of his three daughters' custodial brokerage accounts, for which Hill was authorized to make trading decisions.

32.    On June 1, 2011, Hill purchased 4,500 shares of Radiant stock.

33.    On June 3, 2011, Hill purchased 50,000 shares of Radiant stock.   These purchases represented over 10% of the total Radiant trading volume that day (467.4 thousand shares)

34.    On June 24, 2011, Hill purchased 13,000 shares of Radiant stock.

35.    On July 1, 2011, Hill purchased 20,000 shares of Radiant stock.

36.    On July 5, 2011, Hill purchased 4,100 shares of Radiant stock.

37.    On July 8, 2011, Hill purchased 10,000 shares of Radiant stock.

38.    Hill purchased all Radiant stock at prices ranging between approximately $19.97 per share and $21.95 per share.

39.    As of July 8, 2011, the last trading day before the acquisition announcement, Hill's Radiant shares, including those shares in his daughters' accounts, were valued at approximately $2.2 million dollars.  This represented a significant portion of both his liquid and his overall net worth, and was substantially more than his annual income.

40.    Hill purchased all Radiant stock while in possession of material information related to NCR's tender offer for Radiant stock.

41.    Hill purchased all Radiant stock knowing, or with reason to know, that the information concerning the tender offer was nonpublic.

42.    Hill purchased all Radiant stock knowing, or with reason to know, that the information had been acquired directly or indirectly from Radiant, or an officer, director or employee thereof.

43.    Hill purchased all Radiant stock after NCR had taken substantial steps to commence a tender offer for Radiant stock.

44.     On July 11, 2011, Radiant stock closed at $21.45 per share.  After market close, the merger agreement between Radiant and NCR was publicly announced via press releases.

45.     On July 12, 2011, Radiant stock price increased by more than 30 percent. That day, Hill sold the entirety of his 101,600 Radiant shares at prices ranging from $27.98 to $28.03, realizing illicit gains of approximately $744,000.

## H.    **VIOLATIONS**

46.     As a result of the conduct described above, Hill violated Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, which prohibit any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer.

### III.

In view of the allegations made by the Division of Enforcement, the Commission deems it appropriate that cease-and-desist proceedings be instituted to determine:

A.     Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondent an opportunity to establish any defenses to such allegations; and

B.     Whether, pursuant to Section 21C of the Exchange Act, Respondent should be ordered to cease and desist from committing or causing violations of and any future violations of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, whether Respondent should be ordered to pay a civil penalty pursuant to Section 21B(a) of the Exchange Act, and whether Respondent should be ordered to pay disgorgement, including prejudgment interest, pursuant to Sections 21B(e) and 21C(e) of the Exchange Act.

### IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be

deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondent as provided for in the Commission's Rules of Practice.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Brent J. Fields
Secretary

**Tab 2-4**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

ADMINISTRATIVE PROCEEDINGS RULINGS
Release No. 2675/May 14, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16383

| | |
|---|---|
| In the Matter of<br><br>CHARLES L. HILL, JR. | ORDER DENYING RESPONDENT'S MOTION FOR SUMMARY DISPOSITION ON CONSTITUTIONAL ISSUES |

The Securities and Exchange Commission initiated this proceeding under Section 21C of the Securities Exchange Act of 1934. The Division of Enforcement alleges that Respondent Charles L. Hill, Jr. "engaged in insider trading, in violation of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, in connection with" his purchase and sale of securities of Radiant Systems, Inc. Order Instituting Proceedings (OIP) at 1. A hearing is scheduled to begin on June 15, 2015, in Atlanta, Georgia.

Mr. Hill has moved for summary disposition, raising three constitutional issues.[1] First, he argues that this proceeding violates Article II of the Constitution because administrative law judges are protected by two layers of tenure protection. Mot. at 2-10. Second, Mr. Hill asserts that by giving the Commission the authority to pursue cases before administrative law judges, Congress violated the delegation doctrine in Article I of the Constitution. *Id.* at 11-15. Third, Mr. Hill argues that because he is an "unregulated individual[]," Congress violated his Seventh Amendment right to a jury trial by giving the Commission authority to bring this matter before an administrative law judge. *Id.* at 16-19. Although Mr. Hill styles his pleading as motion for summary disposition, the remedy he seeks is dismissal. *Id.* at 1, 10, 20.

For the reasons stated below, I DENY Mr. Hill's motion.

---

[1] This Order addresses only Mr. Hill's motion for summary disposition on constitutional issues. I previously ruled on Mr. Hill's motion for summary disposition on the merits. *See Charles L. Hill, Jr.*, Admin. Proc. Rulings Release No. 2649, 2015 SEC LEXIS 1789 (May 8, 2015).

1.      *Threshold issues*

A.   *Authority to entertain Mr. Hill's arguments*

Before considering Mr. Hill's arguments, I must determine whether I have the authority to address them.  *See Plaquemines Port, Harbor and Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 542 n.3 (D.C. Cir. 1988) ("Agency jurisdiction, like subject matter in the federal courts, cannot be achieved by consent of the parties.").  After receiving Mr. Hill's motion, I directed the parties to address "whether I have the authority to rule on Mr. Hill's constitutional challenges" and directed their attention to *Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2136-37 & n.8 (2012), and *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994).  *Charles L. Hill, Jr.*, Admin. Proc. Rulings Release No. 2564, 2015 SEC LEXIS 1473, at *1 (Apr. 21, 2015).  The Division responded that I have authority to rule on Mr. Hill's challenges.  Opp'n at 1-3.  Mr. Hill disagrees.[2]  Reply at 1-3.

Subsequent to instructing the parties to address my authority to rule on Mr. Hill's constitutional challenges, it came to my attention that the Commission has repeatedly held that it lacks the authority "to invalidate the very statutes that Congress has directed [it] to enforce." *Milton J. Wallace*, Exchange Act Release No. 11252, 1975 SEC LEXIS 2238, at *7 (Feb. 14, 1975); *see William J. Haberman*, Exchange Act Release No. 40673, 1998 SEC LEXIS 2466, at *10 n.14 (Nov. 12, 1998), *aff'd*, 205 F.3d 1345 (8th Cir. 2000); *Application of J. A. Sisto & Co.*, Exchange Act Release No. 2568, 1940 WL 36421, at *5 n.5 (July 1, 1940); *Walston & Co.*, Exchange Act Release No. 2150, 1939 SEC LEXIS 632, at *2 (June 14, 1939).  It has recently reaffirmed this interpretation of its authority.  *See* Regulation SBSR—Reporting and Dissemination of Security-Based Swap Information, Exchange Act Release No. 74244, 2015 SEC LEXIS 499, at *703 & n.1001 (Feb. 11, 2015).  The Commission thus operates on the assumption that its "governing statutes are constitutional" "[u]nless and until the courts declare otherwise."  *Milton J. Wallace*, 1975 SEC LEXIS 2238, at *7.

It follows from the foregoing that I lack the authority to rule on the constitutionality of particular provisions of the Exchange Act.  I therefore summarize Mr. Hill's arguments below, together with the Division's responses, before addressing those issues that I retain authority to address.  I have determined which arguments I may address by asking whether ruling in Mr. Hill's favor would necessarily require me to hold that a provision of the Exchange Act is unconstitutional.  If so, I lack the authority to address the issue presented.

B.   *The administrative law judge position*

Administrative law judges are creatures of statute, *see* 5 U.S.C. §§ 3105, 5372, who are insulated from agency influence by a number of statutes and regulations.  At the outset, agencies are limited in their ability to choose new administrative law judges.  An agency wishing to appoint a new administrative law judge must request a list of eligible candidates from the Office

---

[2]      Mr. Hill is raising the issues now in the event he must do so in order to preserve them for further review.

of Personnel Management (OPM) and must choose from among the "highest three eligible[]" candidates certified by OPM.[3]  5 U.S.C. § 3318(a); 5 C.F.R. § 332.404.  Once an individual is hired, he is not subject to evaluation by the agency and his rate of promotion is fixed by statute. 5 U.S.C. § 5372(b)(3)(A); 5 C.F.R. § 930.206(a).  An agency may not monetarily reward an administrative law judge for issuing decisions favorable to the agency or for any other reason.  5 C.F.R. § 930.206(b).  An agency is also barred from assigning administrative law judges to "perform duties inconsistent with their duties and responsibilities as administrative law judges." 5 U.S.C. § 3105.  Once hired, an administrative law judge may not be removed or disciplined except for good cause shown before the Merit Systems Protection Board.  5 U.S.C. § 7521(a); 5 C.F.R. § 930.211.  Congress further insulated administrative law judges from agency influence by giving agencies the power to review *de novo* an administrative law judge's decision, thereby removing an incentive to interfere with the administrative law judge's decisional process.  *See* 5 U.S.C. § 557(b) (stating that "[o]n appeal from or review of the initial decision, the agency has all the powers which it would have in making the initial decision").

2.   *Article II challenge*

A.   *Mr. Hill's position*

Principally relying on *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), Mr. Hill argues that because administrative law judges are protected by two layers of tenure protection, permitting an administrative judge to adjudicate this matter violates Article II of the Constitution.  Mot. at 2-10.  The argument proceeds in the following fashion.

Under the Constitution, there are two types of executive officers:  principal officers and inferior officers.  Mot. at 3; *see* U.S. Const., art. II, § 2, cl. 2; *Morrison v. Olson*, 487 U.S. 654, 670 (1988).  A person is an executive officer if he or she is appointed and "exercis[es] significant authority pursuant to the laws of the United States."  Mot. at 3 (quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991)) (modification in original).  "'Principal officers are selected by the President with the advice and consent of the Senate.  Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary.'"  *Morrison*, 487 U.S. at 670 (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976)).  In Mr. Hill's view, administrative law judges are inferior officers.  Mot. at 4-9 (relying on *Freytag*). And, he implicitly says, *cf.* Mot. at 9-10, inferior officers cannot be doubly insulated from presidential removal, *see Free Enterprise*, 561 U.S. at 501-02.

Advancing from this premise, Mr. Hill notes that administrative law judges may only be removed from office if the Commission shows good cause for removal before the Merit Systems Protection Board.  Mot. at 9.  Additionally, both the Commission's members and members of the Merit Systems Protection Board are removable only for "inefficiency, neglect of duty, or

---

[3]      Forcing agencies to choose from among the top three candidates is thought to prevent "agencies [from] hir[ing] ALJs with a more 'pro-enforcement attitude.'"  Kent Barnett, *Resolving the ALJ Quandary*, 66 Vand. L. Rev. 797, 805 (2013) (citation omitted).

malfeasance in office."  *Id.*; *see* 5 U.S.C. § 1202(d) (Merit Systems Protection Board).[4]
According to Mr. Hill, under *Free Enterprise*, "this dual-layer removal scheme" is
constitutionally infirm because it "precludes the President from exercising any oversight of
executive officers."  Mot. at 9-10 (relying on 561 U.S. at 484).  As a result of this alleged
infirmity, Mr. Hill argues that this proceeding must be dismissed.  *Id.* at 10.

### B.   The Division's position

The Division responds that Commission administrative law judges are employees of the
Commission and not executive officers, inferior or otherwise.  Opp'n at 6-14.  Even if
administrative law judges are inferior officers, the Division says the use of administrative law
judges does not violate Article II.  *Id.* at 15.  According to the Division, the Supreme Court stated
that its decision in *Free Enterprise* did not apply to administrative law judges.  *Id.*; *see* 561 U.S.
at 507 n.10.  In this respect, the Division points to the fact that an administrative law judge's
authority is only adjudicatory; an administrative law judge has no enforcement or policymaking
powers.  Opp'n at 15-16.  The Division believes this also serves to distinguish the Commission's
use of administrative law judges from the circumstance presented in *Free Enterprise*.  *Id.* at
16-19.

### C.   Dual-layer tenure protection does not violate the Constitution.

*Free Enterprise* concerned the Public Company Accounting Oversight Board.  Congress
"established the [Board], to oversee the audit of public companies that are subject to the
securities laws."  *See* Sarbanes-Oxley Act of 2002, Pub. L. 107-204, §101(a), 116 Stat. 745
(codified at 15 U.S.C. § 7211(a)).  Congress gave the Board "expansive powers" to "regulate
every detail of an accounting firm's practice."  *Free Enterprise*, 561 U.S. at 485.  The Board was
thus empowered to "promulgate[] . . . standards, perform[] routine inspections of all accounting
firms, demand[] documents and testimony, and initiate[] formal investigations and disciplinary
proceedings."  *Id.*  It was also given authority to "issue severe sanctions in its disciplinary
proceedings."  *Id.*  Although the Board was placed under the Commission's authority, its
members could only be removed "'for good cause shown,' 'in accordance with' certain
procedures."  *Id.* at 486.  And members of the Commission can only be removed for
"inefficiency, neglect of duty, or malfeasance in office."  *Id.* at 487.

The Supreme Court ultimately concluded that the double-layer of removal protection
afforded members of the Board violated the Constitution's separation of powers.  It noted that
the Sarbanes-Oxley Act not only protected "Board members from removal except for good
cause, but [it] withdr[ew] from the President any decision on whether that good cause exists" and
instead gave that authority to Commissioners who are not "subject to the President's direct
control."  561 U.S. at 495.  Under this regime, the Board was "not accountable to the President,

---

[4]      Section 4 of the Exchange Act does not say anything about the removal of members of
the Commission.  *See* 15 U.S.C. § 78d.  The Supreme Court in *Free Enterprise* took it as a given
that "the Commissioners cannot themselves be removed by the President except under the
. . . standard of 'inefficiency, neglect of duty, or malfeasance in office,'" set forth in *Humphrey's
Ex'r v. United States*, 295 U.S. 602, 620 (1935).  561 U.S. at 487.

and a President" was "not responsible for the Board." *Id.* And this situation presented a constitutional problem because it diminished the President's constitutional authority to execute the laws. *Id.* at 496. As the Supreme Court put it, the President "is not the one who decides whether Board members are abusing their offices or neglecting their duties. He can neither ensure that the laws are faithfully executed, nor be held responsible for a Board member's breach of faith." *Id.* at 496; *see id.* at 498 ("this Act subverts the President's ability to ensure that the laws are faithfully executed").

Having identified the constitutional violation, the Supreme Court concluded by clarifying that it was not the existence of the Board itself that violated the constitution. *Free Enterprise*, 561 U.S. at 508-09. Rather, it was the Board members' tenure protection in combination with the functions the Board performed that caused the violation. *Id.* Removal of the Board members' tenure protection thus served to remedy the separation of powers violation. *Id.*

Considering the foregoing and Mr. Hill's motion, it is apparent that his first argument is directed at the statute that grants administrative law judges certain protections from removal. Removal of administrative law judges is governed by 5 U.S.C. § 7521, which permits removal only on a showing of good cause before the Merits Systems Protection Board. A literal reading of Commission precedent suggests that because 5 U.S.C. § 7521 is not one of the "very statutes that Congress has directed [the Commission] to enforce," I have the authority to reach the merits of Mr. Hill's argument. *See Milton J. Wallace*, 1975 SEC LEXIS 2238, at *7. It would be incongruous, however, if I were unable to address the constitutionality of a provision of the Exchange Act, an Act I am regularly required to construe, but able to address the constitutionality of Section 7521, a provision I do not normally encounter. I therefore doubt that I have the authority to address this issue. Nonetheless, I resolve that doubt in favor of addressing this issue, operating under the assumption that I have authority to do so.

For purposes of this Order, I will assume that administrative law judges are inferior officers.[5] Even assuming administrative law judges are inferior officers, their tenure protections do not violate the Constitution's separation of powers.

As an initial matter, Congress can impose some "limited restrictions on the President's removal power." *Free Enterprise*, 561 U.S. at 495. Indeed, the question of whether limits on the President's power of removal are constitutional "will depend upon the character of the office" at issue. *Humphrey's Ex'r v. United States*, 295 U.S. 602, 631 (1935); *see id.* (contrasting the situation in *Myers v. United States*, 272 U.S. 52 (1926), involving an "officer . . . who was

---

[5]     Both parties have presented strong arguments in support of their positions. As has been recognized, "[t]he line between 'mere' employees and inferior officers is anything but bright." *Landry v. FDIC*, 204 F.3d 1125, 1132 (D.C. Cir. 2000). Cutting against the Division is the fact that Congress (1) has for certain purposes exempted administrative law judges from the definition of the term "employee," 5 U.S.C. § 4301(2)(D); and (2) has permitted the Commission to assign administrative cases to be heard before "a division of the Commission, an individual Commissioner, *an administrative law judge, or an employee* or employee board," 15 U.S.C. § 78d-1(a) (emphasis added). Cutting against Mr. Hill is the fact that administrative law judges issue only initial decisions subject to *de novo* review by the Commission.

responsible to the President, and to him alone, in a very definite sense," with that of an officer whose "duties . . . were not purely of an executive nature but partook of the judiciary quality as well"). As the Supreme Court explained in *Morrison*, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light." 487 U.S. at 691; *cf. Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985) ("The enduring lesson of [*Crowell v. Benson*, 285 U.S. 22 (1932)] is that practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.").

In that light, one can see that an administrative law judge's tenure protections do not violate the Constitution. The problem with the tenure protections in *Free Enterprise* was that the Board exercised quintessentially executive functions; it performed investigative, enforcement, and policymaking functions. *See* 561 U.S. at 485. Yet, the Sarbanes-Oxley Act did not "give[] the Commission effective power to start, stop, or alter individual Board investigations," which are "executive activities typically carried out by officials within the Executive Branch." *Id.* at 504. By stripping the President of his executive power "'of appointing, overseeing, and controlling those who execute the laws,'" 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789)), Congress violated the Constitution's separation of powers.

In contrast with members of the Board who exercise classically executive functions, the Commission's administrative law judges exercise only adjudicatory functions. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *aff'd in part and rev'd in part*, 561 U.S. 477 (2010); *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 756-57 (2002) (discussing the similarities between trial judges and administrative law judges and between "administrative adjudications and judicial proceedings"). Indeed, they are barred from performing any other functions. 5 U.S.C. § 3105. The Commission's administrative law judges are therefore not among "those who execute the laws."[6] *Free Enterprise*, 561 U.S. at 492. Furthermore, their jurisdiction is limited to a specific subject matter and they "lack[] policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691. As a result, the dual-tenure protection afforded administrative law judges does not unconstitutionally impair the President's ability to remove executive branch officials because those particular officials do not perform functions "central to the functioning of the Executive Branch." *Id.*

It is thus not surprising that the Supreme Court qualified its decision in *Free Enterprise*, saying that it did not apply to administrative law judges. 561 U.S. at 507 n.10. The Court explained that unlike Board members, "many administrative law judges . . . perform adjudicative rather than enforcement or policymaking functions, . . . or possess purely recommendatory powers." *Id.* (internal citation omitted). And this distinction matters because whereas enforcement or policymaking functions are "central to the functioning of the Executive Branch," *Morrison*, 487 U.S. at 691, adjudicating is not.

---

[6]       An administrative law judge is involved in an enforcement proceeding only to the same extent that a trial judge is involved in a prosecution. Like a trial judge, an administrative law judge does not investigate offenses, bring charges, or prosecute cases.

Indeed, although Congress gave the Commission no choice when it came to the Board, there is no requirement the Commission even use administrative law judges. *See* 5 U.S.C. § 556(b); 15 U.S.C. § 78d-1(a) (permitting the Commission to assign proceedings to "a division of the Commission, an individual Commissioner, an administrative law judge, or an employee or employee board"); *see also Free Enterprise*, 537 F.3d at 699 n.8 (Kavanaugh, J., dissenting). And when the Commission does use an administrative law judge, the administrative law judge does not issue a final agency decision but instead issues an initial decision that is subject to *de novo* review by the Commission.[7] *See* 5 U.S.C. § 557(b); 17 C.F.R. § 201.360(a). In this way, the Commission exercises complete control over the outcome and the administrative law judge in the way that matters most to a respondent.[8]

Furthermore, taken to its logical end, Mr. Hill's argument would mean that almost no independent agency could use administrative law judges. If "'a page of history is worth a volume of logic,'" however, it is unlikely this could be the case. *See Free Enterprise*, 537 F.3d at 699 (Kavanaugh, J., dissenting) (quoting *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.)).[9]

---

[7]     The Attorney General's Manual on the Administrative Procedures Act, "a source . . . give[n] 'considerable weight,'" *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986), *see Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979), explains that an initial decision is "advisory in nature," Attorney General's Manual on the Administrative Procedures Act 83 (1947). An "agency is in no way bound by [an initial] decision." *Id.*; *see JCC, Inc. v. Commodity Futures Trading Com'n*, 63 F.3d 1557, 1566 (11th Cir. 1995); *Starrett v. Special Counsel*, 792 F.2d 1246, 1252 (4th Cir. 1986). Rather, except to the extent an agency defers to an administrative law judge's credibility determination, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 494-97 (1951), "the function of" the initial decision is to "sharpen[] . . . the issues for subsequent proceedings," Attorney General's Manual at 84.

[8]     Mr. Hill says that an administrative law judge's initial decision can, in certain circumstances, be the Commission's final decision. Mot. at 8-9. While it is true that an administrative law judge's initial decision can become the Commission's final decision if a party fails to seek review by the Commission, *see* 17 C.F.R. § 201.360(d)(2), the initial decision will only become final if the Commission declines to *sua sponte* review the initial decision, *id.* And even in that instance, the initial decision only becomes final after the Commission issues an order to that effect. *Id.*; *cf. Stanley Jonathan Fortenberry*, Securities Act of 1933 Release No. 9742, 2015 SEC LEXIS 1271 (Apr. 7, 2015) (finality order). A Commission administrative law judge is powerless to cause his or her initial decision to become a final decision.

[9]     The Social Security Administration appears to employ about 1,300 administrative law judges who annually issue over 700,000 decisions. *See* http://www.ssa.gov/appeals/about_odar.html (last visited May 12, 2015). Its commissioner is removable only for "neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3). Many other independent agencies that use administrative law judges are also headed by officials who are removable only on similar grounds. *See* 15 U.S.C. § 41 (Federal Trade Commission); 29 U.S.C. § 661(b) (Occupational Safety and Health Review Commission); 30 U.S.C. § 823(b)(1) (Federal Mine Safety and Health Review Commission); 42 U.S.C. § 7171(b)(1) (Federal Energy

In the end, if 5 U.S.C. § 7521 were unconstitutional as applied to this situation, the solution would be for the Commission to assign this matter to "an employee or employee board," as authorized by 15 U.S.C. § 78d-1(a).  *See Free Enterprise*, 561 U.S. at 509-10.  This would, of course, represent a pyrrhic victory for Mr. Hill because his adjudicator would not be protected from Commission influence.[10]  *See* 5 U.S.C. §§ 5372(b), 7521(a); 5 C.F.R. § 930.206; *see also* 5 C.F.R. §§ 930.201(f)(3), (4), .207(c), .211.

### 3. Delegation challenge

#### A.  Mr. Hill's position

Mr. Hill argues that by giving the Commission the discretion to choose whether to seek civil penalties against unregulated individuals either administratively or in district court, Congress impermissibly delegated legislative power to the Commission.  Mot. at 11-15.  Mr. Hill supports his argument by pointing out that prior to the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010), the Commission had to bring an action in district court in order to seek civil penalties against an unregulated person.  *Id.* at 12.

Relying on *INS v. Chadha*, 462 U.S. 919 (1983), Mr. Hill asserts that the delegation at issue is legislative.  Mot. at 11-13; Reply at 5.  Mr. Hill also relies on *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).  Mot. at 13.  In *Whitman*, the Supreme said that because Congress may not delegate its legislative power, when it "confers decisionmaking authority upon agencies[,] [it] must 'lay down . . . an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).  According to Mr. Hill, in light of *Whitman*, "the need for substantial congressional direction is required" here because "Congress [has] confer[red] authority upon the Commission to institute enforcement actions for civil penalties against" unregulated individuals "in an administrative forum that lacks the procedural safeguards found in an Article III court."[11]  Mot. at 13.  Mr. Hill argues that because Congress has provided the Commission with no standard by which to judge whether to bring an action administratively or in district court, Congress violated Article I and contravened the Constitution's separation of powers.  *Id.* at 15; Reply at 6-8.

---

Regulatory Commission); 46 U.S.C. § 301(b)(5) (Federal Maritime Commission); 49 U.S.C. § 1111(c) (National Transportation Safety Board).

[10]    Mr. Hill's complaint about the tenure protections afforded administrative law judges is thus somewhat odd because those tenure protections are designed to protect him and every litigant appearing before an administrative law judge.

[11]    The "lack[] [of] procedural safeguards" is presumably a reference to the fact that hearsay is not *per se* inadmissible in administrative proceedings, *see* 5 U.S.C. § 556(d), 17 C.F.R. § 201.320, and the fact that although Mr. Hill has access to nation-wide subpoena authority, 17 C.F.R. § 201.232, his ability to depose witnesses is much more limited than would be the case in a federal district court, *see* 17 C.F.R. § 201.233.

### B.  The Division's position

The Division responds that "prosecuti[ng] . . . violations of federal law is" an "executive function."  Opp'n at 20.  To the Division, the implication of this fact is not that Congress has impermissibly delegated legislative power; rather it is that Congress has given the Commission "broad prosecutorial discretion."  *Id.* at 21.

Even if the decision where to bring an action is legislative, the Division asserts that no impermissible delegation occurred because Congress gave the Commission an "intelligible principle" to guide its decision.  Opp'n at 22.  The Division says that Mr. Hill ignores the statutory limits "on the Commission's ability to obtain civil penalties in administrative proceedings."  *Id.* at 23 (citing 15 U.S.C. § 78u-2).

### C.  I lack the authority to address this issue

In order to Rule in Mr. Hill's favor, I would necessarily have to find unconstitutional a provision of the Exchange Act.  Specifically, I would have to find that Section 21B of the Exchange Act, as amended by Section 929P(a)(2) of the Dodd-Frank Act, is unconstitutional.  *See* 15 U.S.C. § 78u-2.  Because Commission precedent bars me from taking this action, I lack the authority to rule on this issue.  *See Milton J. Wallace*, 1975 SEC LEXIS 2238, at *7; *see also Whitman*, 531 U.S. at 473 ("Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.").

### 4.  Seventh Amendment challenge

### A.  Mr. Hill's position

Mr. Hill argues that by giving the Commission authority to bring an administrative action against an unregulated individual, Congress infringed on his Seventh Amendment right to a jury trial.  Mot. at 16-17.  The Seventh Amendment provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."  U.S. Const. amend. VII.  Mr. Hill posits that the phrase "suits at common law" means "'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."  Mot. at 16 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989)).  Relying on *Granfinanciera*, he says that one first compares the present action with those brought in eighteenth century England and second determines whether the action is legal or equitable in nature.  *Id.*  Mr. Hill argues that this proceeding is akin to an action in debt which would have been tried before a jury in a court of law.  *Id.* at 17-18.

Granting that "Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment," Mot. at 18 (quoting *Granfinanciera*, 492 U.S. at 51), Mr. Hill argues that even if enforcement actions concern public rights created by Congress, until 2010 enforcement actions involving unregulated individuals had to be brought in district courts if the Commission sought civil penalties, *id.*  He thus argues that in the Dodd-Frank Act,

Congress did not create a *new* public right.[12]  *Id.* at 18-19; Reply at 10-12.  Based on this premise, he asserts that Congress has impermissibly "altered" his Seventh Amendment rights. Mot. at 19.

### B.   Division's position

The Division responds by principally relying on *Atlas Roofing Co. Inc. v. OSHA*, 430 U.S. 442 (1977).  Opp'n at 24-25.  In *Atlas Roofing*, the Supreme Court said that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency."  430 U.S. at 455.  The Supreme Court also said that the Seventh Amendment does not "prevent[]" Congress "from committing some new types of litigation to administrative agencies with special competence in the relevant field[,] . . . even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency."  *Id.*

Relying on the proposition that "'[p]ublic rights' cases are those that 'arise between the Government and persons subject to its authority,'" Opp'n at 24 (quoting *Atlas Roofing*, 430 U.S. at 457), the Division argues that Mr. Hill "has no right to a jury trial" because this matter "involv[es] statutorily created 'public rights,'" *id.*  The Division concludes that Congress could "commit[] all securities law matters" to an administrative forum.  *Id.* at 25.  The Division thus says Mr. Hill's claim fails.[13]  *Id.*

### C.    I lack the authority to address this issue

As with Mr. Hill's second issue, in order to rule in his favor, I would necessarily have to find unconstitutional Section 21B of the Exchange Act.  I lack the authority to do that.  *See Milton J. Wallace*, 1975 SEC LEXIS 2238 at *7.

### 5.    Conclusion

In light of the foregoing, I DENY Mr. Hill's motion for summary disposition.

_____
James E. Grimes
Administrative Law Judge

---

[12]    Mr. Hill's reference to "public rights" refers the Supreme Court's recognition that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency."  *Atlas Roofing Co. Inc. v. OSHA*, 430 U.S. 442 (1977); *see Crowell v. Benson*, 285 U.S. 22, 50-51 (1932).

[13]    Mr. Hill argues that the relevance of *Atlas Roofing* is confined to instances in which Congress creates new public rights, which he asserts is not the case here.  Reply at 10-12.

**Tab 17**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

CHARLES L. HILL, JR.,   )
            )
  Plaintiff,     )
            )   CIVIL ACTION FILE
   vs.      )
            )   NO. 1:15-cv-1801-LMM
SECURITIES AND EXCHANGE  )
COMMISSION,     )
            )
  Defendant.    )

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiff, Charles L. Hill, Jr. ("Mr. Hill" or "Plaintiff"), for his amended complaint against the Securities and Exchange Commission (the "SEC" or "Commission") respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.

Mr. Hill is an ordinary citizen unregistered with the Commission.  He is not a broker.  Nor is he an investment advisor.  Yet he was still compelled three months ago to participate in an unconstitutional administrative proceeding brought by the SEC to prosecute alleged insider trading violations and impose stiff civil penalties.  Instead of defending himself before an impartial arbiter in a federal

US2008 6374283

court providing fundamental procedural and constitutional safeguards, such as the right to a trial by jury and the right to conduct depositions and other discovery under the Federal Rules of Civil Procedure, Mr. Hill is forced to take part in a proceeding where the prosecutor, judge, and initial appeals court are all instruments in an SEC machinery that operates largely outside the judiciary's purview.  Addressing the SEC's pursuit of remedies in administrative proceedings, one federal judge recently remarked that "[o]ne might wonder: from where does the constitutional warrant for such unchecked and unbalanced administrative power derive?"[1]

## 2.

The SEC alleges that Mr. Hill engaged in insider trading with respect to his trading in Radiant Systems Inc. ("Radiant") in June and July 2011 prior to its acquisition by NCR Corporation ("NCR").  The SEC advances a purely speculative theory that Mr. Hill must have had access to inside information based merely on the timing and concentration of his purchases of Radiant stock and his contacts with a close friend (the "Artist") who is also a close friend of the Chief Operating Officer of Radiant ("Radiant COO").

---

[1] *S.E.C. v. Citigroup Global Markets Inc.*, 34 F. Supp.3d 379, 381 (S.D.N.Y. 2014) (Rakoff, J.).

US2008 6374283

3.

Following the lead of several federal district courts recently holding, at the SEC's vehement insistence no less,[2] that they lacked subject matter jurisdiction to hear constitutional attacks of the Commission's use of enforcement actions in an administrative forum, Mr. Hill chose to assert his constitutional challenges within the agency proceeding itself. Relying on the SEC's procedural rules, Mr. Hill moved for summary disposition and dismissal of the proceeding based on his constitutional affirmative defenses. But on May 14, 2015, the presiding Administrative Law Judge ("ALJ") held that he (and the Commission itself) lacked the authority to resolve two core constitutional challenges attacking the very statute that authorized the SEC to bring the administrative proceeding and doubted that he had power to rule on a third challenge implicating the SEC ALJ removal structure.[3]

---

[2] In fact, the SEC has sought dismissal of an action in this judicial district that challenges the constitutionality of the administrative proceeding, vigorously arguing that the plaintiff's constitutional attack must be brought "through the Commission's administrative process." *See* Declaration of Stephen E. Hudson ("Hudson Decl.") ¶ 4, Ex. 1 at 11. That declaration was filed concurrently with the original Complaint.

[3] *See* Hudson Decl. ¶ 5, Ex. 2 at 5, 9-10.

US2008 6374283

4.

Stripped of a forum that can decide these vital defenses, Mr. Hill now comes to this Court, less than one month before the final evidentiary hearing is to take place, to halt an administrative proceeding that is constitutionally infirm.

5.

Indeed, the proceeding is unconstitutional on several accounts:

- First, it is the product of a Congressional delegation of authority that lacks any intelligible principle to guide when the SEC is to bring a civil penalty enforcement action against an unregulated individual like Mr. Hill in an administrative forum, as opposed to a federal court.

- Second, the conferral of this authority is invalid because it abridges Mr. Hill's constitutional right to a jury trial.

- Third, the inferior officer overseeing that proceeding, the ALJ, is insulated from removal by two layers of good-cause tenure protection, thus impairing the President's ability to ensure that the laws are faithfully executed.

- Fourth, the ALJ was not appointed by the Commissioners who jointly are the head of the SEC.  That violates Article II, Section 2 of the

-4-

Constitution, which vests the President, the courts, and the "heads of

departments" the sole power to appoint "inferior officers" like ALJs.

6.

Declaratory and injunctive relief is thus necessary to prevent the SEC from

further subjecting Mr. Hill to an unconstitutional proceeding that he is otherwise

powerless to challenge in fundamental respects.  At a minimum, crucial

constitutional defenses raised by Mr. Hill in the administrative proceeding will go

unheard.  Indeed, the ALJ has already held that he "lack[s] the authority to rule on"

Mr. Hill's delegation challenge and "lack[s] the authority to address" his challenge

asserting a violation of the Seventh Amendment right to a jury trial.[4]  *See* Hudson

Decl. ¶ 5, Ex. 2 at 9-10.  And though the ALJ addressed Mr. Hill's challenge to the

ALJ removal structure, he did so only after expressing "doubt that [he had] the

authority to address this issue," yet still assuming "that [he] ha[d] authority to do

so." *See id.* at 5.

---

[4] In a separate administrative proceeding, an SEC ALJ remarked that he had "grave
doubts whether [an equal protection] claim is justiciable in this forum" and held
that he lacked the authority to address this claim.  *See* Hudson Decl. ¶ 6, Ex. 3 at
*72-73.

US2008 6374283

## JURISDICTION, VENUE, AND PARTIES

7.

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

8.

Mr. Hill is a natural person, a citizen of the State of Georgia, and a resident of Fulton County.  At all times relevant to this complaint, Mr. Hill has worked and resided in Georgia.

9.

The SEC is an agency of the United States government, headquartered in Washington, D.C.

10.

It is appropriate and necessary for this Court to exercise jurisdiction over Mr. Hill's claims because: (a) absent this Court's review at this stage, meaningful judicial review will be foreclosed; (b) Mr. Hill's claims are wholly collateral to the review provisions of the securities laws; and (c) Mr. Hill's claims fall outside the scope of the SEC's expertise.  *See Free Enter. Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 489-90 (2010).

US2008 6374283

11.

Absent this Court's intervention, Mr. Hill's constitutional challenges will escape meaningful judicial review. A Court of Appeals cannot enjoin the Commission from instituting an administrative proceeding that has already run its course. And, even if a Court of Appeals later vacates an adverse final Commission decision against Mr. Hill on constitutional grounds, it will be too late to unwind the harm that will have already befallen Mr. Hill in being compelled to participate in the very proceeding that he claimed from the beginning was unconstitutional. Were Mr. Hill thus compelled to await the conclusion of the administrative proceeding before seeking judicial intervention, his claims for injunctive and declaratory relief would be moot because the constitutional harm will have already occurred.

12.

The constitutional claims brought by Mr. Hill's invoke core federal questions over which a federal district court possesses original jurisdiction under 28 U.S.C. § 1331. These challenges have nothing to do with the merits of the allegations pending against Mr. Hill in the agency action. They are thus "wholly collateral" to the administrative proceeding.

-7-

13.

Mr. Hill's constitutional challenges also fall outside the domain of the SEC's expertise. These claims do not implicate the federal securities laws. Instead, they attack the existence and features of the administrative proceeding.

## BACKGROUND

14.

Mr. Hill has been a resident of Atlanta, Georgia since 1959. Mr. Hill is a self-employed commercial real estate developer. Specifically, Mr. Hill purchases old fast food restaurant sites and then develops and leases them to single-tenant restaurants.

15.

Mr. Hill has an extensive understanding of the restaurant business, and in particular fast food restaurants. This knowledge and experience has been developed not only through years of interacting with his tenants through his work, but because several members of his family have owned and operated a number of restaurants, with his Father having been a Wendy's franchisee for over thirty five years. Thus, Mr. Hill became familiar with the business model for restaurants. Specifically, the notion that the two main factors in a restaurant that affect profitability are food and labor costs.

-8-

16.

Mr. Hill's prefers to make large investments in a company or product that he knows and understands. Mr. Hill further prefers to invest in companies where he knows or has confidence in the people that are behind the companies.

17.

Radiant was a point-of-sale technology company based in Alpharetta, Georgia. Mr. Hill had a solid understanding of Radiant's product and knew the people who ran Radiant.

18.

Mr. Hill was familiar with the officers of Radiant. For example, around 2004, Mr. Hill met Radiant System's Chief Executive Officer ("Radiant CEO"). Mr. Hill's daughter knew a young man who was friends with Radiant CEO's son. Mr. Hill would frequently pick up his daughter at Radiant CEO's home where they all gathered often. During these occasions, Mr. Hill would casually converse with Radiant CEO about the general nature of Radiant CEO's company. Mr. Hill also developed a favorable and positive impression of Radiant CEO as a person and a businessman. In addition, Mr. Hill knows Radiant's Chief Financial Officer ("Radiant CFO") and spent time with him in 2010 in connection with assisting him in locating potential restaurant sites. Mr. Hill also knows the Radiant COO.

-9-

Around twenty years ago, he briefly assisted him in viewing potential sites for a real estate development idea that Radiant COO had and periodically bumps into Radiant COO around Atlanta.

19.

Mr. Hill became interested in Radiant because he believed that Radiant's point-of-sale machines and technology helped restaurants manage inventory control.  Mr. Hill also noticed that many of his tenants used Radiant machines and had for several years.  For example, every time one of Mr. Hill's tenants opens a new store, that tenant would use Radiant machines.  Mr. Hill observed that Radiant machines were in many other places of business that he frequented, such as various gas stations and fast food restaurants that he regularly visited.  Mr. Hill conducted his own market research by soliciting feedback on Radiant's machines from employees in many of these stores and always received a positive response.

20.

In addition to these observations, Mr. Hill began following Radiant's stock in the newspaper and watching Radiant's stock price for several years.

21.

In July 2001, Mr. Hill purchased around $10,000 of Radiant stock.

US2008 6374283

22.

Around mid-March 2011, the circumstances of Mr. Hill's commercial real estate business created an opportunity for Mr. Hill to heavily invest in Radiant. In February 2011, Mr. Hill sold a property for approximately $3.6 million. At the time that Mr. Hill sold this property, he had around $2.5 million committed to two separate projects that he had contracts on. By or around May 12, 2011, both of the projects had unexpectedly been terminated by the tenant he had in mind for both projects. This left Mr. Hill with around $3.4 million cash sitting in the bank, after commission and debt, which was no longer committed to any commercial real estate project.

23.

At the end of May 2011, Mr. Hill opened a new account with Vanguard and SunTrust with the intent to buy Radiant stock. On June 1, 2011, Mr. Hill purchased 1500 shares of Radiant in each of his daughters' Custodial Accounts. On June 3, 2011, Mr. Hill purchased 50,000 shares of Radiant in the SunTrust Account for a little over a million dollars. On June 24, 2011, Mr. Hill purchased 13,000 shares of Radiant in the Vanguard Account.[5] Mr. Hill testified that he

---

[5] On June 24, 2011, Mr. Hill also purchased 20,000 shares of another company he had been watching since 2007 worth approximately $250,000.

US2008 6374283

decided to purchase the additional shares because the price had gone down from his original basis.  On July 1, 2011, Mr. Hill purchased 20,000 additional shares of Radiant in the Vanguard Account.   On July 5, 2011, Mr. Hill purchased an additional 1,300 shares in each of the Custodial Accounts.  On July 8, 2011, Mr. Hill purchased 10,000 shares of Radiant for approximately $220,000 in the SunTrust Account.

24.

After the market closed on July 11, 2011, a merger agreement was announced between NCR and Radiant.

25.

Mr. Hill had no knowledge of NCR's acquisition of Radiant prior to the public announcement.  Mr. Hill first became aware of NCR's acquisition of Radiant on July 12, 2011 when the stock broker from Wells Fargo assigned to the Custodial Accounts called Mr. Hill to inform him of the acquisition.

26.

That same day, on the advice of the Wells Fargo broker, Mr. Hill sold all his Radiant stock in all of his brokerage accounts.  Mr. Hill's total gain was approximately $744,000.

US2008 6374283

27.

On or around March 2013, the Division of Enforcement of the SEC ("Division") began an investigation into whether Mr. Hill engaged in insider trading in connection with his purchases of Radiant stock.  At all times Mr. Hill has vigorously denied that he was ever in possession of any material, nonpublic information related to Radiant.  However, Mr. Hill has fully cooperated with the Division's every request.  He has testified three times and produced every document that the Division has requested.  He has never once declined to answer a single question asked by the Division, nor has he refused to produce any of the documents requested by the Division.

28.

Specifically, Mr. Hill has repeatedly and consistently explained in detail to the Division his valid and legitimate reasons for purchasing Radiant stock, including, *inter alia,* his knowledge of their product, his understanding of the value their machines could add based on his experience with the restaurant industry, his knowledge and positive impression of the CEO of the company, his observations regarding the stock's growth patterns despite the global financial crisis, and the circumstances that occurred in his commercial real estate business that caused Mr.

-13-

US2008 6374283

Hill to possess $3.6 million in capital that he no longer needed to commit to the projects that he had anticipated using the capital to fund.

29.

Not satisfied with this completely rational and uncontested explanation, the Division continued to try to unearth some evidence to support its purely speculative theory that Mr. Hill must have had access to inside information on Radiant based merely on the timing and concentration of his purchases.

30.

As part of the Division's nearly two-year investigation, the Division issued several other subpoenas for documents and testimony.  The Division interviewed Radiant's CEO and CFO once, Radiant's COO twice, a close friend of Radiant COO, the Artist, two times, and each of Mr. Hill's brokers once.  In total, the Division took 12 examinations, issued at least 13 subpoenas for documents and received tens of thousands of documents in response.

31.

The net sum of the Division's two-year investigation produced no direct evidence that Mr. Hill ever received any material nonpublic information prior to any of his purchases of Radiant stock.

-14-

32.

Although, Mr. Hill was familiar with Radiant CEO, Radiant COO and Radiant CFO, the Division's investigation did not produce any evidence that any of those individuals provided Mr. Hill with any material nonpublic information. The Division does not dispute this.

33.

Instead, the Division contends, even in the face of a complete absence of any direct evidence to support this theory, that Radiant COO provided material nonpublic information concerning Radiant's acquisition to Artist, who, in turn relayed the material non-public information he learned to Mr. Hill.

34.

Both the Radiant COO and the Artist deny this. The Radiant COO testified to the Division that he did not provide any material non-public information about Radiant to the Artist. Similarly, the Artist testified that he was not in possession of any material non-public information about Radiant and did not provide any material non-public information about Radiant to Mr. Hill.

35.

The Division has not identified any documents or testimony to contradict the Radiant COO's, the Artist's, or Mr. Hill's sworn testimony.

-15-

US2008 6374283

36.

Instead, the Division's speculative theory of insider trading rests on the conclusory allegation that because the Radiant COO and the Artist were close friends who frequently communicated with each other and the Artist and Mr. Hill were also close friends who frequently communicate with each other, that the Artist must have possessed material non-public information about Radiant's acquisition and shared that information with Mr. Hill.

37.

Although phone records indicate that the Radiant COO and Artist and the Artist and Mr. Hill communicated frequently during the May 2011 through July 2011 period when the Radiant acquisition was being negotiated, the frequency of this communication was completely consistent with the pattern that they had all followed for several years.

38.

Notably, the Division has not asserted any claim against the Radiant COO or the Artist, and apparently does not question their credibility because it intends to rely on their testimony at the final hearing.  The SEC did not even send a Wells Notice to the COO.  The Artist received a Wells Notice, but following his Wells Submission, he received a termination letter from the SEC.

-16-

US2008 6374283

## THE ADMINISTRATIVE PROCEEDING

39.

On February 17, 2015, the Commission served Mr. Hill with an Order

Instituting Cease-And-Desist Proceedings ("OIP") under Section 21C of the

Securities and Exchange Act of 1934 ("Exchange Act").[6]  According to the OIP,

the SEC alleges that Mr. Hill is liable for insider trading relating to his trading in

Radiant in 2011 in violation of Section 14(e) of the Exchange Act and Rule 14e-3

promulgated thereunder.  The Commission seeks a determination of, among other

things, whether Mr. Hill should be ordered to pay civil monetary penalties of

millions of dollars and disgorgement under Sections 21B(a), 21B(e), and 21C(e) of

the Exchange Act.

40.

Before the passage of the Dodd-Frank Wall Street Reform and Consumer

Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank

Act"), the SEC could bring an action against an unregulated individual like Mr.

Hill for the above-referenced remedies only in a federal district court, where Mr.

Hill would hold a Seventh Amendment right to a jury trial.

---

[6] *See* Hudson Decl. ¶ 7, Ex. 4.

-17-

41.

But under Section 929P(a) of the Dodd-Frank Act, the SEC now has unguided authority to bring the same action in an administrative Commission proceeding. This unfettered decisionmaking authority has been the centerpiece of the SEC's recent enforcement strategy.

42.

Following a string of recent losses in federal jury trials, Andrew Ceresney, the Director of the SEC's Division of Enforcement, announced that the SEC planned to bring more of its insider trading cases in its own administrative courts.[7] The SEC's motivation for depriving individuals of their right to a jury trial in federal district court and instead hailing them before its own judges is clear.

For one thing, threatening individuals with an administrative proceeding has compelled settlements. Mr. Ceresney has himself stated that "there have been a number of cases in recent months where we have threatened administrative proceedings, it was something we told the other we were going to do and they settled."[8]

---

[7] Hudson Decl. ¶ 8, Ex. 5.

[8] Hudson Decl. ¶ 9, Ex. 6.

US2008 6374283

43.

The SEC also enjoys a pronounced home-court advantage.  According to a recent Wall Street Journal analysis, the SEC has "won against 90% of defendants before its own judges in contested cases from October 2010 through March of this year."[9]  In stark contrast, it has only garnered a 69% success rate in cases litigated in federal court over the same period.[10]  U.S. District Judge, Jed Rakoff, remarked that in fiscal year 2014 alone, the SEC won 100% of its administrative enforcement actions, while its success rate in federal court reached only 61%.[11]

44.

This advantage also extends to appeals of ALJ decisions, which are heard by the SEC's Commissioners.  The same Wall Street Journal analysis found that, from January 2010 through this past March, the commissioners found for the SEC in 53 out of 56 appeals (or 95%).[12]  These results are hardly surprising.  Bradley Bondi, a former counsel to two former commissioners, recently stated that "[i]n an

---

[9] *See id.* ¶ 10, Ex. 7.

[10] *Id.*

[11] *See id.* ¶ 11, Ex. 8; ¶ 12, Ex. 9.

[12] Hudson Decl. ¶ 10, Ex. 7.

-19-

US2008 6374283

administrative law proceeding[,] the commission is akin to the prosecutor and then, in an appeal, the judge in the same case."[13]

45.

Besides this high success rate, the administrative process may also be set up with the deck stacked against defendants like Mr. Hill.  One former SEC ALJ, Lillian McEwen, recently told the Wall Street Journal that she believed the administrative review process was at times slanted against defendants.[14]  She stated that she retired because her "loyalty to the SEC" was questioned by the agency's Chief Administrative Law Judge after finding in favor of defendants in too many cases.[15]  Ms. McEwen also added that the expectation was for SEC judges to work under the assumption that "the burden was on the people who were accused to show that they didn't do what the agency said they did."[16]

46.

Fairness concerns even emanate from the SEC's attorneys and Commissioners themselves.  The General Counsel of the Commission, Anne K. Small, specifically acknowledged in a public forum last summer that the current

---

[13] Hudson Decl. ¶ 10, Ex. 7.

[14] Hudson Decl. ¶ 10, Ex. 7.

[15] *Id.*

[16] *Id.*

US2008 6374283

administrative proceeding rules are inadequately tailored to address the complexities raised by an insider trading case.[17]  In a question and answer session between Small and members of the District of Columbia Bar, Small stated to ensure that "the process is fair and reasonable," it was "entirely reasonable to wonder" if the administrative proceeding rules should be updated to adequately address the increasing number of insider trading and other complex cases being brought within the Commission.[18]

47.

More recently, a current Commissioner acknowledged that the SEC's "enforcement program could also benefit from a look through the lens of fairness."[19]  Indeed, to "avoid the perception that the Commission is taking its tougher cases to its in-house judges, and to ensure that all are treated fairly and equally," the Commissioner called for the SEC to establish guidelines to determine which enforcement actions should be brought in an administrative forum and which actions should be brought in federal court.[20]  Yet, instead of providing the "consistent set of guidelines" advocated by this Commissioner, the recently

---

[17] Hudson Decl. ¶ 13, Ex. 10.

[18] *Id.*

[19] Hudson Decl. ¶ 12, Ex. 9.

[20] *Id.*

US2008 6374283

published "Approach to Forum Selection in Contested Actions" from the SEC's Division of Enforcement[21] "shed[s] little light on how the decision will be made."[22]

48.

One consideration contained in the Division of Enforcement's guidance suggests that the SEC desires to exert more control over the development of complex legal questions. Indeed, when a case is "likely to raise unsettled and complex" issues, the guidance states that "consideration should be given to . . . obtaining a Commission decision on such issues, subject to appellate review in the federal courts [to] facilitate development of the law."[23] Before this guidance was issued, a former SEC Commissioner told the Wall Street Journal that in "bringing more cases in its own backyard, the agency is not only increasing its chances of winning but giving itself greater control over the future evolution of legal doctrine."[24] And the SEC's efforts to shape the law are helped by the limited appellate review of Commission interpretations of ambiguous securities law issues, which are entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984).

---

[21] Hudson Decl. ¶ 14, Ex. 11.

[22] *See id.* ¶ 15, Ex. 12.

[23] *See* Hudson Decl. ¶ 14, Ex. 11 at 3.

[24] *Id.* ¶ 10, Ex. 7.

US2008 6374283

49.

The target of this chorus of criticism and concern – the SEC administrative

proceeding – lacks the constitutional and procedural safeguards available in a

federal district court action.

50.

An administrative proceeding happens within the SEC's confines.  It is

prosecuted by SEC attorneys, governed by the SEC's Rules of Practice ("Rules of

Practice"), and is adjudicated by an SEC ALJ, who serves as the finder of fact and

law.

51.

Unlike a civil action in federal district court, a respondent in an

administrative proceeding has no right to a trial by jury.

52.

The Federal Rules of Civil Procedure are not applicable in an administrative

proceeding.

53.

The Federal Rules of Evidence are also not applicable in an administrative

proceeding.  Instead, any evidence that "can conceivably throw any light upon the

controversy," including hearsay, "normally" will be admitted in an administrative

US2008 6374283

proceeding. *In the Matter of Jay Alan Ochanpaugh*, Release No. 54363 (Aug. 25, 2006), 88 S.E.C. Docket 2510, 2006 WL 2482466, at *6 n.29.

54.

The discovery allowed in an administrative proceeding is far more limited than in federal court. Indeed, respondents are generally barred from taking depositions under Rules of Practice 233 and 234. Mr. Hill is thus prohibited from taking the equivalent of a Rule 30(b)(6) deposition of the SEC. Respondents may also obtain documents only through the issuance of a Subpoena under Rule of Practice 232.[25]

55.

Administrative proceedings run on a much faster timetable than civil cases in federal court. Under Rule of Practice 360, an evidentiary hearing must occur, at most, approximately four months after the SEC issues an OIP. The SEC even has the discretion to require that the hearing occur as early as one month after the OIP's issuance. And the SEC need not begin making available the limited discovery afforded to respondents in an administrative proceeding until seven days

---

[25] Significantly, while Mr. Hill has sought the issuance of a subpoena to the SEC for the production of documents relevant to the administrative proceeding, the Division of Enforcement has already signaled that they will move to quash the subpoena.

-24-

after the OIP's issuance.  At bottom, although the SEC enjoyed the benefit of

having two years to conduct its investigation of this complex case, Mr. Hill is

required to digest the investigative file and prepare for trial in a mere four months.

56.

Although a defendant in a federal civil action may assert counterclaims, the

Rules of Practice bar a respondent from doing so in an administrative proceeding.

57.

Nor do the Rules of Practice allow a respondent to file the equivalent of a

Rule 12 motion to dismiss to test the legal sufficiency of the allegations underlying

the SEC's administrative complaint.

58.

An appeal from the SEC ALJ's decision is heard by the SEC itself: the very

body that approved the administrative enforcement action in the first place.  The

Commission has the authority to hear or decline an appeal and to even impose

greater sanctions than those ordered by the ALJ.  Only after it becomes effective,

may a Commission's final order  be then appealed to a United States Court of

Appeals.  Of course, by that point, the unconstitutional administrative proceeding

will have already come to an end.

US2008 6374283

**CONGRESS' DELEGATION OF POWER TO THE SEC TO BRING
ADMINISTRATIVE CIVIL PENALTY ENFORCEMENT ACTIONS
<u>AGAINST UNREGULATED INDIVIDUALS VIOLATES ARTICLE I</u>**

59.

Article I, § 1 of the U.S. Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States."  U.S. Const. art. I, § 1.  As such, the Supreme Court has long insisted that "'the integrity and maintenance of our system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another Branch."  *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).  Despite this general prohibition, Congress may confer decisionmaking authority on an executive agency, so long as it provides an intelligible principle to which that agency is to conform.  *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).

60.

The Dodd-Frank Act's conferral of administrative enforcement authority to the Commission to seek civil penalties against unregulated individuals constitutes a delegation of legislative power because the SEC now possesses expanded authority to alter the rights, duties, and legal relations of individuals.  *See I.N.S. v. Chadha*, 462 U.S. 919, 952 (1983); *see also Metro. Wash. Airports Auth. v. Citizens for*

-26-

US2008 6374283

*Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 589 (1985).

61.

Before the enactment of the Dodd-Frank Act, enforcement actions against unregulated individuals for civil penalties had to be brought exclusively in an Article III court.[26] However, by virtue of the Dodd-Frank Act, the Commission now also possesses the authority to bring this action in an administrative proceeding that lacks the same procedural safeguards, such as the Seventh Amendment right to a jury trial, that are found in its Article III counterpart. *See* Pub. L. No. 111-203 §§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e) (allowing the Commission to seek civil penalties against "any person" in an administrative cease-and-desist proceeding initiated under the Securities Act, the Exchange Act, the Company Act, and the Investors Act).

62.

Despite the broad scope of power delegated to the Commission, the Dodd-Frank Act lacks any "intelligible principle" as to when an enforcement action for

---

[26] *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub L. 101-429 (1990) §§ 101, 201, 302, 402 (authorizing the Commission to bring suit against "any person" in a federal district court to seek civil penalties); *see also* 15 U.S.C. § 78u-1 (authorizing the Commission to bring an action in federal district court to seek civil penalties for insider trading).

-27-

US2008 6374283

civil penalties against an unregulated individual should be brought in an

administrative, rather than a judicial, forum.  *See*  Pub. L. No. 111-203

§§ 929P(a)(1), (a)(2)(E), (a)(3)(e), and (a)(4)(e).  The relevant legislative history is

also silent on this matter.  *See* H.R. Rep. No. 111-517, at 870-71 (2010) (Conf.

Rep.); H.R. Rep. No. 111-687, pt. 1, at 78 (2010).

63.

Even the Commission's attorneys and Commissioners have admitted the

lack of *any* congressional principal guiding the Commission's selection of a forum

in which to bring an enforcement action.  When previously asked by a court to

articulate "the criteria that the SEC uses to determine whether a matter is referred

to court, criminally or civilly, versus referred for administrative proceeding," a

Commission attorney responded:

> To start with, Congress gave the SEC two distinct paths
> that it can follow in pursuing a civil action: You can go
> into Federal District Court; you can bring it in an
> administrative proceeding.  *It did not provide any criteria
> as to when the Commission would or should do one
> versus the other.*  It's entirely left to the Commission's
> discretion.  The Commission decides – does not have
> formal criteria.
>
> The Commission decides on a case-by-case basis, based
> on everything before it, which route it might want to
> follow.

-28-

Tr. of Mot. for TRO at 66-67, *Jarkesy v. United States Sec. and Exchange Comm'n*, No. 1:14-cv-00114-BAH (D.D.C. June 11, 2014) (No. 22) (emphasis added).[27]

64.

And in light of the vacuum created by Congress, a Commissioner recently acknowledged the need to establish guidelines as to when enforcement actions should be brought in an administrative, as opposed to, a judicial forum. *See* para 47.  Although the Division of Enforcement has since issued this guidance, the considerations contained therein offer little clarity as to how the SEC goes about selecting the forum in which to bring an enforcement action.

65.

The admitted absence of a guiding principle from Congress renders the Dodd-Frank Act's delegation of expanded administrative enforcement authority unconstitutional as a violation of Article I.

---

[27] *See* Hudson Decl. ¶ 16, Ex. 13.

-29-

US2008 6374283

**THE CONFERRAL OF UNLIMITED AUTHORITY TO THE SEC TO BRING ADMINISTRATIVE CIVIL PENALTY PROCEEDINGS VIOLATES THE SEVENTH AMENDMENT OF THE CONSTITUTION**

66.

The Seventh Amendment states that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U.S. Const., amend. VII.

67.

The Supreme Court has "consistently interpreted the phrase 'suits at common law' to refer to suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (internal quotation marks and citations omitted). The Seventh Amendment also extends to "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Id.* at 42.

68.

An administrative civil penalty enforcement action is analogous to the 18th century common law cause of action in debt, "and federal courts have rightly

-30-

assumed that the Seventh Amendment required a jury trial." *Tull v. United States*,
481 U.S. 412, 420 (1987).

69.

Civil penalties intended to punish culpable individuals, like those sought by
the SEC here, is a type of "remedy at common law that could only be enforced in
courts of law."  The Seventh Amendment thus attaches to this type of proceeding.
*Tull*, 481 U.S. at 422-23.

70.

Even if this enforcement action involved a public right created by Congress,
*see Atlas Roofing Co. v. Occupational Safety and Health Comm'n*, 430 U.S. 442,
452 (1977), until 2010, Congress had exclusively assigned the adjudication of such
rights to an Article III court, in which a jury trial right attached.

71.

When enacted in 2010, the Dodd-Frank Act did not *create a new* public
right.  Indeed, it created neither a new cause of action nor remedies therefor.  *See
Granfinanciera, S.A.*, 492 U.S. at 60.  Instead, the Dodd-Frank Act simply
authorized the Commission to institute a preexisting type of government
enforcement action that was once the exclusive province of an Article III court in
an administrative forum as well.

-31-

72.

Thus, without creating any new public rights, Congress has eliminated the

exclusivity of the judicial forum where civil penalty enforcement actions against

unregulated individuals like Mr. Hill were adjudicated subject to constitutional

safeguards, such as the Seventh Amendment right to a jury trial.  The Dodd-Frank

Act now places an unregulated individual's once guaranteed right to a jury trial in

the unprincipled hands of the Commission.  Yet, a party's Seventh Amendment

right cannot be altered in this fashion.  *Cf. Granfinanciera, S.A.*, 492 U.S. at 60-61.

73.

Because the Dodd-Frank Act did not create a new public right, Congress

contravened the Seventh Amendment when it authorized the Commission to bring

civil penalty enforcement actions against unregulated individuals in an

administrative forum.

### THE ADMINISTRATIVE PROCEEDING VIOLATES ARTICLE II BECAUSE THE PRESIDING ALJ IS PROTECTED FROM REMOVAL BY TWO LAYERS OF GOOD-CAUSE TENURE PROTECTION

74.

Article II of the Constitution vests the executive power in the President, who

must "take Care that the Laws be faithfully executed."  U.S. Const. art. II § 1, cl. 1;

*id.* § 3.  In discharging this duty, the Constitution authorizes the President to rely

-32-

on the assistance of executive officers. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 483 (2010) ("*Free Enterprise*").

75.

SEC ALJs are inferior executive officers because they are appointees who exercise "significant authority pursuant to the laws of the United States." *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991). Indeed, an SEC ALJ's duties, salary, and means of appointment are all set forth by statute. The Exchange Act and SEC regulations similarly set forth an ALJ's broad authority to conduct administrative proceedings instituted by the Commission. Instead of performing mere ministerial tasks, SEC ALJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Freytag*, 501 U.S. at 881-82.

76.

SEC ALJs are also shielded from removal by two layers of good-cause tenure protection. First, an SEC ALJ may be removed by the Commission only upon a finding of good-cause by the Merit Systems Protection Board ("MSPB").[28] 5 U.S.C. § 7521(a)-(b). Second, SEC Commissioners and members of the MSPB

---

[28] An MSPB decision to remove an ALJ is subject to judicial review. 5 U.S.C. § 7703.

-33-

can be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." *Free Enterprise*, 561 U.S. at 487; 5 U.S.C. § 1202(d). This multi-layer good-cause protection is analogous to the tenure structure that was held to violate Article II in *Free Enterprise*. Indeed, like its counterpart in *Free Enterprise*, this removal scheme impairs the President's ability to ensure that the laws are faithfully executed. *Free Enterprise*, 561 U.S. at 498.

77.

Because the dual-layer removal scheme prevents the President from exercising any oversight over SEC ALJs, it unduly infringes the constitutional separation of powers.

## THE ADMINISTRATIVE PROCEEDING VIOLATES ARTICLE II BECAUSE ALJS ARE NOT APPOINTED BY THE PRESIDENT, THE COURTS, OR THE HEAD OF THE DEPARTMENT

78.

The Constitution's Article II, Section 2 states that only the following have authority to appoint "inferior officers" like ALJs: the President, the courts of law, or the "heads of departments." Art. II, § 2, cl. 2.

79.

The SEC is a "Department" under Article II, and its Commissioners are the Department "heads." Free Enterprise, 561 U.S. at 511-13 (2010).

-34-

US2008 6374283

80.

Despite their crucial role and extensive powers as inferior officers, see supra ¶ 75, the SEC ALJs are not appointed by the President, the Courts, or the Commissioners.  Instead, they are hired by the SEC's Office of Administrative Law Judges, with input from the Chief Administrative Law Judge, human resource functions, and the Office of Personnel Management.  In some cases, other federal agencies have simply transferred ALJs to the SEC.  The Commissioners themselves are not involved in appointing ALJs.  Thus the appointment of ALJs like the one presiding over Mr. Hill's administrative proceeding is unconstitutional.

81.

The SEC admits that the ALJ presiding over Mr. Hill's case "was not appointed by the SEC Commissioners."  [ECF No. 15 at 2].

82.

Likewise, a Department of Justice Attorney recently admitted that another SEC ALJ had not been appointed by the Commissioners and that the ALJ's appointment was likely unconstitutional if the ALJ was an "inferior officer" for purposes of Article II, Section 2.  *See*  Supplemental Declaration of Stephen E. Hudson  ¶ 4, Ex. A at 26, 29, which is being filed concurrently herewith.

US2008 6374283

83.

Because the ALJ presiding over Mr. Hill's administrative proceeding was appointed in violation of Article II, the proceeding is unconstitutional.

## ABSENT THIS COURT'S INTERVENTION, MR. HILL WILL SUFFER SEVERE AND IRREPARABLE HARM

84.

By virtue of the SEC ALJ's ruling on Mr. Hill's motion for summary disposition, Mr. Hill will be deprived of the opportunity to have core constitutional defenses challenging the existence of the administrative proceeding heard during the final hearing, which will take place on June 15, 2015.

85.

And absent this Court's intervention, Mr. Hill will be further subjected to the very proceeding that he claims is unconstitutional.    The lack of traditional procedural safeguards in the administrative proceeding only exacerbates that harm.

86.

Should Mr. Hill fail to prevail in the administrative proceeding, the damage could be severe and irreversible.  By the time Mr. Hill were to seek review of a final adverse Commission decision in a Court of Appeals, it will be too late to unwind the substantial expense, burden, and reputational harm that he will have already suffered in being compelled to participate in the administrative proceeding.

-36-

US2008 6374283

Any sanctions imposed could also damage Mr. Hill well before he could obtain judicial review of his constitutional challenges.

87.

Mr. Hill's participation in this unconstitutional proceeding cannot be redressed through legal relief either because the Commission is shielded from a suit for money damages by sovereign immunity doctrines.  Under Eleventh Circuit precedent, irreparable harm exists when a plaintiff has no monetary recourse on account of sovereign immunity.  Even if money damages were available, the reputational harm Mr. Hill would suffer should the SEC impose administrative sanctions would likely be impossible to monetize.

88.

The threatened injury to Mr. Hill outweighs any harm the Commission may suffer as a result of the temporary halting of the civil penalty administrative enforcement proceeding.  The SEC has already spent nearly two years investigating Mr. Hill for alleged securities violations.  Thus, the SEC cannot reasonably contend that it will be harmed by a pause in the administrative proceeding pending resolution of Mr. Hill's constitutional claims.  Indeed, any harm befalling the SEC could be immediately remedied by the SEC through the commencement of a proceeding against Mr. Hill in federal court.

-37-

## COUNT ONE
## APPLICATION FOR INJUNCTIVE RELIEF

89.

Mr. Hill re-alleges and incorporates paragraphs 1- 82 above, as if fully set forth herein.

90.

Mr. Hill's constitutional rights will be irreparably harmed if a permanent injunction (and, if necessary, a preliminary injunction and temporary restraining order) are not issued against the SEC's administrative proceeding.  Mr. Hill has a substantial likelihood of success on the merits of his claim.  Mr. Hill will be irreparably injured without injunctive relief, as described above, and the harm to him, absent injunctive relief, far outweighs any harm to the SEC should the requested relief be granted.  Finally, issuing an injunction will serve the public interest in ensuring that administrative enforcement schemes operate within constitutional boundaries.

## COUNT TWO
## DECLARATORY JUDGEMENT

91.

Mr. Hill re-alleges and incorporates paragraphs 1-84 above, as if fully set forth herein.

US2008 6374283

92.

Mr. Hill respectfully requests a declaratory judgment that: (i) the statutory provisions authorizing the SEC to bring administrative civil penalty enforcement actions against unregulated individuals are unconstitutional; (ii) the statutory and regulatory provisions providing for the position and tenure protections of SEC ALJs are unconstitutional; and (iii) the appointments of SEC ALJs, including the ALJ presiding over Mr. Hill's administrative proceeding, are unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(a)     An order and judgment declaring unconstitutional the statutory provisions authorizing the SEC to bring administrative civil penalty enforcement actions against unregulated individuals;

(b)     An order and judgment declaring unconstitutional the statutory and regulatory provisions providing for the  position and tenure protection of the SEC ALJ;

(c)     An order and judgment declaring unconstitutional the statutory and regulatory provisions and practices for the appointment of SEC ALJs.

(d)     An order and judgment enjoining the Commission from pursuing an administrative proceeding against Mr. Hill; and

-39-

(e)     Such other and further relief as this Court may deem just and proper,

including reasonable attorney's fees and the costs of this action.

Respectfully submitted, May 29, 2015.


|  |  s/  Stephen E. Hudson |
|---|---|
| KILPATRICK TOWNSEND & | Stephen E. Hudson |
| STOCKTON LLP | Georgia Bar No. 374692 |
| 1100 Peachtree Street, Suite 2800 | Hillary D. Rightler |
| Atlanta, Georgia 30309-4530 | Georgia Bar No. 572475 |
| Telephone:  (404) 815-6500 | Akash R. Desai |
| Facsimile:  (404) 815-6555 | Georgia Bar No. 338124 |
| shudson@kilpatricktownsend.com | |
| hrightler@kilpatricktownsend.com | |
| adesai@kilpatricktownsend.com | Attorneys for Plaintiff |

-40-

US2008 6374283

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2015, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will automatically send

email documentation of such filing to the following attorneys of record:

Jean Lin                               jean.lin@usdoj.gov
Senior Trial Counsel
U.S. Department of Justice


                                       __s/   Stephen E. Hudson___
KILPATRICK TOWNSEND &                  Stephen E. Hudson
    STOCKTON LLP                       Georgia Bar No. 374692
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone:  (404) 815-6500
Facsimile:  (404) 815-6555
shudson@kilpatricktownsend.com         Attorneys for Plaintiff

US2008 6374283

**Tab 28**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CHARLES L. HILL, JR., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:15-CV-1801-LMM |
| | : | |
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | |
| Defendant. | : | |

## ORDER

This case comes before the Court on Plaintiff Charles L. Hill, Jr.'s Motion for a Temporary Restraining Order, or in the Alternative, a Preliminary Injunction [2]. On May 19, 2015, Plaintiff filed this action in federal court, seeking to (1) declare an SEC administrative proceeding unconstitutional, and (2) enjoin the administrative proceeding from occurring until the Court issues its ruling. Plaintiff seeks a stay of the administrative proceeding prior to its June 15, 2015, scheduled evidentiary hearing to allow the parties to conduct limited discovery and brief the declaratory judgment claims. The Court heard oral argument on May 27, 2015. After a review of the record and due consideration, Plaintiff's Motion [2] is **GRANTED, in part** and **DENIED, in part** for the following reasons:

## I. Background[1]

Plaintiff Charles L. Hill, Jr. is unregistered with the Securities and
Exchange Commission ("SEC"). Am. Compl., Dkt. No. [17] ¶ 1. Plaintiff is a self-
employed real estate developer. Id. ¶ 14. In June and July 2011, Plaintiff
purchased and then sold a large quantity of Radiant Systems, Inc. ("Radiant")
stock, making a profit of approximately $744,000. Id. ¶¶ 23-26. The SEC alleges
that Plaintiff made these transactions because he received inside information
about a future merger between Radiant and NCR Corporation.  Id. ¶ 33.

Plaintiff contends he never received inside information and bought and
sold stock based upon (1) his personal knowledge of and experience with
Radiant's product and management, and (2) his stock broker's suggestion to sell.
See id. ¶¶ 2, 14-28. Plaintiff argues that the SEC (1) does not have any direct
evidence of insider trading, and (2) relies on a "speculative theory that Mr. Hill
must have had access to inside information on Radiant merely on the timing and
concentration of his purchases." Id. ¶¶ 29, 31.

The SEC conducted a "nearly two-year investigation" between March 2013
and February 2015. Id. ¶¶ 27, 30, 39. It took "12 examinations, issued at least 13
subpoenas for documents[,] and received tens of thousands of documents. . . ."
Id. ¶ 30. On February 17, 2015, the SEC served Plaintiff with an Order Instituting
Cease-And-Desist Proceedings ("OIP") under Section 21C of the Securities

---

[1] The following facts are drawn from the Amended Complaint unless otherwise
indicated, and any fact finding is made solely for the purposes of this Motion.

Exchange Act of 1934 ("Exchange Act"), alleging he is liable for insider trading in violation of Section 14(e) of the Exchange Act and Rule 14e-3. Ex. 4, Dkt. No. [2-6]. The SEC seeks a cease-and-desist order, a civil penalty, and disgorgement. Id.

### A. The Exchange Act

In 1990, through the Securities Enforcement Remedies and Penny Stock Reform Act, Pub. L. No. 101-429, 104 Stat. 931, 939 (1990), Congress first authorized the SEC to pursue "any person" for Exchange Act violations through an administrative cease-and-desist proceeding. See 15 U.S.C. § 78u-3. This proceeding allows the SEC to obtain an order enjoining violations of the Exchange Act. Id. In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), which authorized the SEC to seek civil monetary penalties from "any person"—both those registered and unregistered with the SEC—in an administrative hearing. See 15 U.S.C. § 78u-2.

Prior to the passage of Dodd-Frank in 2010, the SEC could not seek civil penalties from an unregistered individual like Plaintiff in an administrative proceeding; it could only have brought an administrative proceeding against "regulated person[s]" or companies. See Duka v. S.E.C., ___ F. Supp. 3d ___, No. 15 Civ. 357 (RMB) (SN), 2015 WL 1943245, at *2 (S.D.N.Y. Apr. 15, 2015) (citing Gupta v. S.E.C., 796 F. Supp. 2d 503, 507 (S.D.N.Y. 2011)). The earlier version of the statute allowed the SEC to pursue unregistered individuals like Plaintiff for civil penalties only in federal court where these individuals could invoke their

3

Seventh Amendment right to jury trial. In sum, the Exchange Act currently

authorizes the SEC to initiate enforcement actions against "any person"

suspected of violating the Act and gives the SEC the sole discretion to decide

whether to bring an enforcement action in federal court or an administrative

proceeding. See 15 U.S.C. §§ 78u(d), 78u-1, 78u-2, 78u-3.

### B. SEC Administrative Process

The Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq.*,

authorizes executive agencies, such as the SEC, to conduct administrative

proceedings before an Administrative Law Judge ("ALJ"). SEC administrative

proceedings vary greatly from federal court actions.

The Federal Rules of Civil Procedure and Evidence do not apply in SEC

administrative proceedings. Instead, the SEC uses its own Rules of Practice. 17

C.F.R. § 201.100(a).[2] "[A]ny evidence 'that can conceivably throw any light upon

the controversy, including hearsay, normally will be admitted in an

administrative proceeding.'" Am. Compl., Dkt. No. [17] ¶ 53 (quoting In re

Ochanpaugh, Exchange Act Release No. 54363, 2006 WL 2482466, at *6 n.29

(Aug. 25, 2006)) (internal quotations omitted). And respondents such as Plaintiff

"are generally barred from taking depositions under Rules of Practice 233 and

234," and can "obtain documents only through the issuance of a Subpoena under

---

[2] However, the SEC could order an "alternative procedure" or refuse to enforce a
rule if it determined "that to do so would serve the interests of justice and not
result in prejudice to the parties to the proceeding." 17 C.F.R. § 201.100(c).

Rule of Practice 232." Am. Compl., Dkt. No. [17] ¶ 54; see also 17 C.F.R. §§
201.232-234.

SEC administrative proceedings also occur much more quickly than federal
court actions. Following an OIP's issuance, an evidentiary hearing must occur
within four months. 17 C.F.R. § 201.360(a)(2).[3] The SEC also has discretion to
hold the evidentiary hearing as soon as one month following the OIP. See id.
Counterclaims are not permissible in administrative proceedings. Am. Compl.
Dkt. No. [1] ¶ 56. And the Rules of Practice do not allow for the equivalent of
12(b) motions in federal court which test the allegations' sufficiency. Id. ¶ 57.

The SEC's Rules of Practice, 17 C.F.R. § 201.100, et seq., provide that the
SEC "shall" preside over all administrative proceedings whether by the
Commissioners handling the matter themselves or delegating the case to an ALJ;
there is no right to a jury trial. 17 C.F.R. § 201.110. When an ALJ is selected by the
SEC to preside—as was done by the SEC in Plaintiff's case—the ALJ is selected by
the Chief Administrative Law Judge. Id. The ALJ then presides over the matter
(including the evidentiary hearing) and issues the initial decision. 17 C.F.R. §
201.360(a)(1). However, the SEC may on its own motion or at the request of a
party order interlocutory review of any matter during the ALJ proceeding;

---

[3] The SEC or ALJ can enlarge any time limit for "good cause shown," but the SEC
and ALJ are cautioned to "adhere to a policy of strongly disfavoring such
requests, except in circumstances where the requesting party makes a strong
showing that the denial of the request of motion would substantially prejudice
their case." 17 C.F.R. § 201.161(a)-(b).

"[p]etitions by parties for interlocutory review are disfavored," though. 17 C.F.R. § 201.400(a).

The initial decision can be appealed by either the respondent or the SEC's Division of Enforcement, 17 C.F.R. § 201.410, or the SEC can review the matter "on its own initiative." 17 C.F.R. § 201.411(c). A decision is not final until the SEC issues it. If there is no appeal and the SEC elects not to review an initial order, the ALJ's decision is "deemed the action of the Commission," 15 U.S.C. § 78d-1(c), and the SEC issues an order making the ALJ's initial order final. 17 C.F.R. § 201.360(d)(2).

If the SEC grants review of the ALJ's initial decision, its review is essentially *de novo* and it can permit the submission of additional evidence. 17 C.F.R. §§ 201.411(a), 201.452. However, the SEC will accept the ALJ's "credibility finding, absent overwhelming evidence to the contrary." In re Clawson, Exchange Act Release No. 48143, 2003 WL 21539920, at *2 (July 9, 2003); In re Pelosi, Securities Act Release No. 3805, 2014 WL 1247415, at *2 (Mar. 27, 2014) ("The Commission gives considerable weight to the credibility determination of a law judge since it is based on hearing the witnesses' testimony and observing their demeanor. Such determinations can be overcome only where the record contains substantial evidence for doing so.") (footnote and internal quotation marks omitted).

If a majority of the participating Commissioners do not agree regarding the outcome, the ALJ's initial decision "shall be of no effect, and an order will be

issued in accordance with this result." 17 C.F.R. § 201.411(f). Otherwise, the SEC will issue a final order at the conclusion of its review.

If a respondent such as Plaintiff loses with the SEC, he may petition for review of the SEC's order in the federal court of appeals (either his home circuit or the D.C. Circuit). 15 U.S.C. § 78y(a)(1). Once the record is filed, the court of appeals then retains "exclusive" jurisdiction to "to affirm or modify and enforce or to set aside the order in whole or in part." 15 U.S.C. § 78y(a)(3). The SEC's findings of facts are "conclusive" "if supported by substantial evidence." 15 U.S.C. § 78y(a)(4). The court of appeals may also order additional evidence to be taken before the SEC and remand the action for the SEC to conduct an additional hearing with the new evidence. 15 U.S.C. § 78y(a)(5). The SEC then files its new findings of facts based on the additional evidence with the court of appeals which will be taken as conclusive if supported by substantial evidence. Id.

### C. SEC ALJs

SEC ALJs are "not appointed by the President, the Courts, or the [SEC] Commissioners. Instead, they are hired by the SEC's Office of Administrative Law Judges, with input from the Chief Administrative Law Judge, human resource functions, and the Office of Personnel Management" ("OPM"). Am. Compl., Dkt. No. [17] ¶ 80; see also 5 C.F.R. § 930.204 ("An agency may appoint an individual to an administrative law judge position only with prior approval of OPM, except when it makes its selection from the list of eligibles provided by OPM. An administrative law judge receives a career appointment and is exempt

from the probationary period requirements under part 315 of this chapter."). An

ALJ's salary is set by statute. 5 U.S.C. § 5372.

Congress has authorized the SEC to delegate any of its functions to an ALJ.

15 U.S.C. § 78d-1(a). Pursuant to that authority, the SEC has promulgated

regulations, which set out its ALJ's powers. 17 C.F.R. § 200.14 makes ALJs

responsible for the "fair and orderly conduct of [administrative] proceedings" and

gives them the authority to: "(1) Administer oaths and affirmations; (2) Issue

subpoenas; (3) Rule on offers of proof; (4) Examine witnesses; (5) Regulate the

course of a hearing; (6) Hold pre-hearing conferences; (7) Rule upon motions;

and (8) Unless waived by the parties, prepare an initial decision containing the

conclusions as to the factual and legal issues presented, and issue an appropriate

order." 17 C.F.R. § 200.14(a);[4] see also 17 C.F.R. § 200.30–9 (authorizing ALJs to

make initial decisions).

---

[4] The SEC Rules of Practice provide a similar list of powers for "hearing officers,"
or ALJs. 17 C.F.R. § 201.101(a)(5) ("(5) Hearing officer means an administrative
law judge, a panel of Commissioners constituting less than a quorum of the
Commission, an individual Commissioner, or any other person duly authorized to
preside at a hearing"). 17 C.F.R. § 201.111 provides,

> The hearing officer shall have the authority to do all things necessary
> and appropriate to discharge his or her duties. No provision of these
> Rules of Practice shall be construed to limit the powers of the
> hearing officer provided by the Administrative Procedure Act, 5
> U.S.C. 556, 557. The powers of the hearing officer include, but are
> not limited to, the following:
>
> (a) Administering oaths and affirmations;

(b) Issuing subpoenas authorized by law and revoking, quashing, or modifying any such subpoena;

(c) Receiving relevant evidence and ruling upon the admission of evidence and offers of proof;

(d) Regulating the course of a proceeding and the conduct of the parties and their counsel;

(e) Holding prehearing and other conferences as set forth in § 201.221 and requiring the attendance at any such conference of at least one representative of each party who has authority to negotiate concerning the resolution of issues in controversy;

(f) Recusing himself or herself upon motion made by a party or upon his or her own motion;

(g) Ordering, in his or her discretion, in a proceeding involving more than one respondent, that the interested division indicate, on the record, at least one day prior to the presentation of any evidence, each respondent against whom that evidence will be offered;

(h) Subject to any limitations set forth elsewhere in these Rules of Practice, considering and ruling upon all procedural and other motions, including a motion to correct a manifest error of fact in the initial decision. A motion to correct is properly filed under this Rule only if the basis for the motion is a patent misstatement of fact in the initial decision. Any motion to correct must be filed within ten days of the initial decision. A brief in opposition may be filed within five days of a motion to correct. The hearing officer shall have 20 days from the date of filing of any brief in opposition filed to rule on a motion to correct;

(i) Preparing an initial decision as provided in § 201.360;

(j) Upon notice to all parties, reopening any hearing prior to the filing of an initial decision therein, or, if no initial decision is to be filed, prior to the time fixed for the filing of final briefs with the Commission; and

### D. Plaintiff's Administrative Proceeding

As stated <u>supra</u>, the SEC filed an OIP against Plaintiff on February 17, 2015. In the administrative proceeding, Plaintiff moved for summary disposition, asserting three constitutional arguments before the ALJ: (1) that the proceeding violates Article II of the Constitution because ALJs are protected by two layers of tenure protection; (2) that Congress's delegation of authority to the SEC to pursue cases before ALJs violates the delegation doctrine in Article I of the Constitution; and (3) that Congress violated his Seventh Amendment right to jury trial by allowing the SEC to pursue charges in an administrative proceeding. ALJ decision, Dkt. No. [2-4] at 2. ALJ James E. Grimes found on May 14, 2015, that he did not have the authority to address issues (2) and (3) and "doubt[ed] that [he had] the authority to address [] issue" (1). <u>Id.</u> at 7, 10-11. However, he did deny Plaintiff's Article II removal claim on the merits. <u>Id.</u>

Plaintiff's administrative evidentiary hearing is scheduled for June 15, 2015, before the ALJ. On May 19, 2015, Plaintiff filed his Complaint, asking this Court to (1) declare the administrative proceeding unconstitutional for the same reasons asserted in the administrative proceeding, and (2) enjoin the administrative proceeding from occurring until the Court can issue its ruling. The

---

       (k) Informing the parties as to the availability of one or more alternative means of dispute resolution, and encouraging the use of such methods.

17 C.F.R. § 201.111.

Court heard oral argument on May 27, 2015. On May 29, 2015, Plaintiff amended his Complaint, adding a claim that the SEC ALJ's appointment violated the Appointments Clause of Article II as the ALJ is allegedly an inferior officer and he was not appointed by the President, the courts of law, or a department head. See U.S. Const. art. II, § 2, cl. 2. The Court allowed Plaintiff and the SEC to file supplemental briefs on this issue following the hearing. Dkt. No. [18].

The SEC opposes Plaintiff's Motion, arguing that (1) this Court does not have subject matter jurisdiction, and (2) even if it does, Plaintiff has failed to meet his burden under the preliminary injunction standard.

## II. Discussion

### A. Subject Matter Jurisdiction

The SEC first contends that this Court does not have subject matter jurisdiction because the administrative proceeding, with its eventual review from a court of appeals, has exclusive jurisdiction over Plaintiff's constitutional claims. In other words, the SEC contends that its election to pursue claims against Plaintiff in an administrative proceeding, "channels review of Plaintiff's claims through the Commission's administrative process, with review in the courts of appeals." Def. Br., Dkt. No. [12] at 18; see 15 U.S.C. § 78y; supra at _____ (explaining the administrative review procedure). The SEC thus argues that § 78y is now Plaintiff's exclusive judicial review channel, and this Court cannot consider Plaintiff's constitutional claims; judicial review can only come from the

courts of appeal following the administrative proceeding and the SEC's issuance

of a final order in Plaintiff's case.

The SEC's position is in tension with 28 U.S.C. § 1331, which provides that

federal district courts "have original jurisdiction of all civil actions arising under

the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 2201,

which authorizes declaratory judgments. "[I]t is established practice for [the

Supreme] Court to sustain the jurisdiction of federal courts to issue injunctions to

protect rights safeguarded by the Constitution." Bell v. Hood, 327 U.S. 678, 684

(1946); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 491

n.2 (2010). And "injunctive relief has long been recognized as the proper means

for preventing entities from acting unconstitutionally." Corr. Servs. Corp. v.

Malesko, 534 U.S. 61, 74 (2001); see also 5 U.S.C. § 702 (stating that under the

Administrative Procedure Act, any "person suffering legal wrong because of

agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof" and may seek

injunctive relief).

To restrict the district court's statutory grant of jurisdiction under § 1331,

there must be Congressional intent to do so. The Supreme Court has held that,

"[p]rovisions for agency review do not restrict judicial review unless the 'statutory

scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at

issue 'are of the type Congress intended to be reviewed within th[e] statutory

structure.'" Free Enterprise, 561 U.S. at 489 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207, 212, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994)).

At the hearing, the SEC argued that despite statutory language providing that these types of enforcement actions could be heard in *either* the district court *or* administrative proceedings, once the SEC selected the administrative forum, Plaintiff was bound by that decision and § 78y became the exclusive judicial review provision. The SEC contends that Congress declared its intent for the administrative proceeding to be the exclusive forum for judicial review for these cases by allowing the SEC to make the administrative proceeding its forum choice.

The Court finds, however, that Congress's purposeful language allowing *both* district court and administrative proceedings shows a different intent. Instead, the clear language of the statute provides a choice of forum, and there is no language indicating that the administrative proceeding was to be an exclusive forum. There can be no "fairly discernible" Congressional intent to limit jurisdiction away from district courts when the text of the statute provides the district court as a viable forum. The SEC cannot manufacture Congressional intent by making that choice for Congress; Congress must express its own intent within the language of the statute. Similarly, in Free Enterprise, the Supreme Court held that the text of § 78y—the provision at issue here—"does not expressly limit the jurisdiction that other statutes confer on district courts. See, e.g., 28 U.S.C. §§ 1331, 2201. Nor does it do so implicitly." 561 U.S. at 489.

Here, the Court finds that because Congress created a statutory scheme which expressly included the district court as a permissible forum for the SEC's claims, Congress did not intend to limit § 1331 and prevent Plaintiff from raising his collateral constitutional claims in the district court. Congress could not have intended the statutory review process to be exclusive because it expressly provided for district courts to adjudicate not only constitutional issues but Exchange Act violations, at the SEC's option. See Elgin v. Dep't of Treasury, ___ U.S. ___, 132 S. Ct. 2126, 2133 (2012) ("To determine whether it is 'fairly discernible' that Congress precluded district court jurisdiction over petitioners' claims, we examine the [the Exchange Act]'s text, structure, and purpose.").

But even if Congress's intent cannot be gleaned from Congress's purposeful choice to include the district court as a viable forum, the Court still finds that jurisdiction would be proper as Congress's intent can be presumed based on the standard articulated in Thunder Basin, Free Enterprise, and Elgin. A court may "presume that Congress does not intend to limit jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) "if the suit is wholly collateral to a statute's review provisions"; and if (3) "the claims are outside the agency's expertise." Free Enterprise, 561 U.S. at 489 (quoting Thunder Basin, 510 U.S. at 212-213) (internal quotations omitted). A discussion of these factors follows.

14

### 1. Barring Plaintiff's Claims Would Prevent Meaningful Judicial Review.

The SEC first argues that because Plaintiff has a "certain path" to judicial review through a court of appeals, Plaintiff cannot demonstrate he lacks meaningful judicial review. Def. Br., Dkt. No. [12] at 20. But the Court finds that requiring Plaintiff to pursue his constitutional claims following the SEC's administrative process "could foreclose all *meaningful* judicial review" of his constitutional claims. Free Enterprise, 561 U.S. at 489 (emphasis added) (quoting Thunder Basin, 510 U.S. at 212-213); see Duka, 2015 WL 1943245, at *5.

Plaintiff's claims go to the constitutionality of Congress's entire statutory scheme, and Plaintiff specifically seeks an order enjoining the SEC from pursuing him in its "unconstitutional" tribunals. If Plaintiff is required to raise his constitutional law claims following the administrative proceeding, he will be forced to endure what he contends is an unconstitutional process. Plaintiff could raise his constitutional arguments only after going through the process he contends is unconstitutional—and thus being inflicted with the ultimate harm Plaintiff alleges (that is, being forced to litigate in an unconstitutional forum). By that time, Plaintiff's claims would be moot and his remedies foreclosed because the Court of Appeals cannot enjoin a proceeding which has already occurred.

The SEC argues that Plaintiff's argument "boils down to the assertion that administrative respondents need not wait for actual adjudication of their cases in order to challenge their legality," and the Eleventh Circuit has "rejected precisely

this argument." <u>See</u> Def. Br., Dkt. No. [12] at 21 (quoting <u>Chau v. U.S. S.E.C.</u>, ___ F. Supp. 3d ___, No. 14-CV-1903 LAK, 2014 WL 6984236, at \*12 (S.D.N.Y. Dec. 11, 2014) (internal quotation marks omitted)); <u>see also</u> Def. Br., Dkt. No. [12] at 21 (citing <u>Doe v. F.A.A.</u>, 432 F.3d 1259, 1263 (11th Cir. 2005)). However, this Court does not read those Eleventh Circuit decisions so broadly.

In <u>Doe</u>, thirteen aircraft mechanics sued the FAA, seeking a preliminary injunction "instructing the FAA how to proceed in its process of reexamination." 432 F.3d at 1260. An investigation revealed that the school where plaintiffs received their airmen certificates had fraudulently examined and certified some mechanics who were unqualified to hold the certification. <u>Id.</u> Because the FAA was unable to determine which certifications were fraudulent, the FAA wrote all relevant mechanics requiring them to recertify. <u>Id.</u> "The parties agreed that the FAA ha[d] the power to reexamine airmen and to suspend and revoke their certificates." <u>Id.</u> at 1262. But the plaintiffs sought and received an injunction on the basis that their due process rights would be violated by the FAA pursuing its administrative procedure.

The Eleventh Circuit reversed, finding that the Court did not have subject matter jurisdiction. The Court held that the mechanics' constitutional arguments were "inescapably intertwined" with the merits of an FAA order. <u>Id.</u> at 1263 ("The mechanics' constitutional claims (that the FAA has infringed upon their due process rights by failing to observe statutory and administrative processes) necessarily require a review of the procedures and actions taken by the FAA with

regard to the mechanics' certificates. Therefore, the constitutional claims fall within the ambit of the administrative scheme, and the district court is without subject-matter jurisdiction."); see also Green v. Brantley, 981 F.2d 514, 521 (11th Cir. 1993) (holding that the Circuit lacked subject matter jurisdiction because "the merits of [plaintiff's] claims are inescapably intertwined with a review of the procedures and merits surrounding the FAA's order."). The Court therefore held that "delayed judicial review (that is, review by a federal court of appeals after determination by the administrative commission rather than initial review by a federal district court)" was still meaningful in those circumstances. Doe, 432 F.3d at 1263.

The Court finds that Doe is distinguishable. The plaintiffs in Doe conceded the FAA had the authority to initiate administrative proceedings, but claimed that because the FAA had not yet initiated administrative proceedings against them, they were not required to go through the administrative process. Id. at 1262. The FAA did not have a forum selection decision, and the plaintiff conceded the FAA's ability to pursue reexamination. The Eleventh Circuit found that plaintiff's due process challenges were "inescapably intertwined" with the merits of the FAA's actions.

Here, Plaintiff's claims rise or fall regardless of what has occurred or will occur in the SEC administrative proceeding; Plaintiff does not challenge the SEC's conduct in that proceeding or the allegations against him—he challenges the proceeding *itself.* See Free Enterprise, 561 U.S. at 490 ("But petitioners object

17

to the Board's existence, not to any of its auditing standards."); Touche Ross &
Co. v. SEC, 609 F.2d 570, 577 (2d Cir. 1979) ("While the Commission's
administrative proceeding is not 'plainly beyond its jurisdiction,' nevertheless to
require appellants to exhaust their administrative remedies would be to require
them to submit to the very procedures which they are attacking.").

Plaintiff's claims here are not "inescapably intertwined" with the merits of
the SEC's insider trading claims against him. Therefore, while the delayed
judicial review in Doe was acceptable because the constitutional claims depended
on how long the FAA took to complete an admittedly constitutional *process*,
delayed judicial review here will cause an allegedly unconstitutional *process* to
occur.

Waiting until the harm Plaintiff alleges cannot be remedied is not
*meaningful* judicial review.[5] See LabMD, Inc. v. F.T.C., 776 F.3d 1275, 1280 (11th

---

[5] The cases the SEC cites from other districts on this issue can be distinguished
from the facts here. Chau, Jarkesy v. S.E.C., 48 F. Supp. 3d 32 (D.D.C. 2014), and
Altman v. U.S. S.E.C., 768 F. Supp. 2d 554 (S.D.N.Y. 2011), all addressed
substantive challenges to the merits of the administrative proceedings. See Chau,
2014 WL 6984236 (challenging the SEC's conduct within the administrative
proceeding, such as failing to postpone a hearing following a document dump);
Jarkesy, 48 F. Supp. 3d at 32 (claiming that he could not obtain a fair hearing
before the SEC because the SEC's settlements with two others stated that the
plaintiff was liable for securities fraud); Altman, 768 F. Supp. 2d at 561 (involving
a challenge to the SEC's own rules and stating that this was not a case where the
plaintiff disputed the SEC had the expertise to hear challenges to its own rules
and noted that the plaintiff did not challenge the "existence" of the proceeding
but rather the "extent of the SEC's ability to sanction attorneys under the SEC's
own rules").

Cir. 2015) ("We have consistently looked to how 'inescapably intertwined' the constitutional claims are to the agency proceeding, reasoning that the harder it is to distinguish them, the less prudent it is to interfere in an ongoing agency process.") (citing <u>Doe</u>, 432 F.3d at 1263; <u>Green</u>, 981 F.2d at 521). Therefore, the Court finds that § 78y does not provide meaningful judicial review under these circumstances.

### 2. Plaintiff's Claims Are Wholly Collateral to the SEC Proceeding.

---

The Court also notes that <u>Chau</u>'s reasoning supports this Court's ruling. Specifically, The <u>Chau</u> court stated,

> There is an important distinction between a claim that an administrative scheme is unconstitutional in all instances—a facial challenge—and a claim that it violates a particular plaintiff's rights in light of the facts of a specific case—an as-applied challenge. As between the two, courts are more likely to sustain pre-enforcement jurisdiction over "broad facial and systematic challenges," such as the claim at issue in <u>Free Enterprise Fund</u>. This tendency is not a hard-and-fast rule, as "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Rather, it is a recognition that the <u>Thunder Basin</u> and <u>Free Enterprise</u> factors militate against jurisdiction when a pre-enforcement constitutional claim relates to factual issues that are the subject of a pending administrative adjudication.

<u>Chau v. U.S. S.E.C.</u>, No. 14-CV-1903 LAK, 2014 WL 6984236, at *6 (S.D.N.Y. Dec. 11, 2014) (footnotes omitted) (quoting <u>Elk Run Coal Co. v. Dep't of Labor</u>, 804 F. Supp. 2d 8, 21 (D.D.C. 2011) (describing <u>Free Enterprise</u> as a "broad facial and systemic challenge"); <u>Elgin</u>, 132 S. Ct. at 2135 (explaining that the as-applied vs. facial distinction is not talismanic)).

The SEC also argues that Plaintiff's claims are not wholly collateral to the SEC proceeding because it is possible that Plaintiff may not be found liable in the administrative proceeding or he may eventually obtain relief on appeal. The SEC cites Elgin and argues that "Plaintiff's claims are not collateral to the statutory provisions governing review of SEC administrative proceedings because they are the means by which Plaintiff seeks to halt his SEC proceeding." Def. Br., Dkt. No. [12] at 22 (citing Elgin, 132 S. Ct. at 2139). But Elgin is distinguishable.

In Elgin, the plaintiffs had been terminated from their civil service jobs for failing to register for the selective service. Rather than appealing their terminations to the Merit Systems Protective Board or the Court of Appeals for the Federal Circuit, as required by the Civil Service Reform Act, plaintiffs filed an action in federal district court, claiming that their termination was unconstitutional. The Supreme Court ruled that the plaintiffs' claim was not "wholly collateral to the CSRA scheme," but was "a challenge to CSRA-covered employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords,"—i.e., reversal of employment decisions, reinstatement, and awarding back pay. Elgin, 132 S. Ct. at 2139-40 (internal quotation marks omitted).

Plaintiff is not challenging an agency decision; Plaintiff is challenging whether the SEC's ability to *make* that decision was constitutional. What occurs at the administrative proceeding and the SEC's conduct there is irrelevant to this proceeding which seeks to invalidate the entire statutory scheme. See Free

20

<u>Enterprise</u>, 561 U.S. at 490 ("But petitioners object to the Board's existence, not to any of its auditing standards."); <u>Duka</u>, 2015 WL 1943245, at *6; <u>Gupta</u>, 796 F. at 513 (noting the plaintiff would state a constitutional claim "even if [plaintiff] were entirely guilty of the charges made against him in the OIP"). Accordingly, Plaintiff's constitutional claims are wholly collateral to the administrative proceeding.

### 3. Plaintiff's Constitutional Claims Are Outside the Agency's Expertise.

The SEC claims that Plaintiff's challenges "fall within the Commission's expertise," and the "SEC is in the best position to interpret its own policies and regulations in the first instance." Dkt. No. [12] at 13. The Court finds that Plaintiff's Article I, Seventh Amendment, and Article II claims are outside the agency's expertise.[6]

Plaintiff's constitutional claims are governed by Supreme Court jurisprudence, and "the statutory questions involved do not require technical considerations of agency policy." <u>Free Enterprise</u>, 561 U.S. at 491 (alteration and internal quotations omitted) (quoting <u>Johnson v. Robison</u>, 415 U.S. 361, 373 (1974)); <u>see also</u> <u>Thunder Basin</u>, 510 U.S. at 215 ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.") (quoting <u>Johnson</u>, 415 U.S. at 368). These claims are not part and parcel of an ordinary securities fraud case, and

---

[6] The SEC ALJ agrees with this conclusion. <u>See</u> ALJ decision, Ex. 2, Dkt. No. [2-4].

there is no evidence that (1) Plaintiff's constitutional claims are the type the SEC "routinely considers," or (2) the agency's expertise can be "brought to bear" on Plaintiff's claims as they were in Elgin. Elgin, 132 S. Ct. at 2140.

The Court finds that as to this factor, Plaintiff's constitutional claims are outside the SEC's expertise, and that this Court has subject matter jurisdiction.

## B. Preliminary Injunction

To obtain a preliminary injunction, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) granting the injunction would not be adverse to the public interest. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." United States v. Jefferson Cnty., 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting Canal Auth. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974)). The same factors apply to a temporary restraining order. Ingram v. Ault, 50 F.3d 898, 900 (11th Cir. 1995). The Court first analyzes whether Plaintiff has met his burden to demonstrate a substantial likelihood to succeed on the merits of each of his constitutional arguments.

### 1. Non-Delegation Doctrine

Plaintiff first argues that the Dodd-Frank Act violates Article I of the Constitution because it gives the SEC unfettered discretion to select its forum. As stated <u>supra</u>, prior to the Dodd-Frank Act, the SEC could not have brought an administrative proceeding seeking civil penalties against unregistered individuals such as Plaintiff. Now, the SEC may choose between two forums for violations: federal district court or an SEC administrative proceeding. [7] Plaintiff argues that the Dodd-Frank Act violates Article I of the Constitution because it "delegates decisionmaking authority to the Commission to bring an administrative proceeding for civil penalties against unregulated individuals . . . without any intelligible principle as to when the Commission is to bring an enforcement action against an unregulated individual in an administrative forum." Pl. Br., Dkt. No. [2-1] at 9.

Article I, § 1 of the U.S. Constitution vests, "[a]ll legislative Powers herein granted . . . in a Congress of the United States." Pursuant to the delegation doctrine, Congress may delegate this legislative decisionmaking power to agencies, but only if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." <u>Whitman v. Am. Trucking Assocs.</u>, 531 U.S. 457, 472 (2001) (quoting <u>J.W. Hampton Jr., & Co. v. United States</u>, 276 U.S. 394, 409 (1928)). "Whether the statute delegates

---

[7] At the hearing, the SEC noted that available penalties vary slightly based on choice of forum. Hr'g Tr., Dkt. No. [19] at 99:4-7 (noting that treble damages are only available in federal court and not in an administrative proceeding).

legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer." Whitman, 531 U.S. at 473. Exercise of legislative power depends not on form but upon "whether [the actions] contain matter which is properly to be regarded as legislative in its character and effect." I.N.S. v. Chadha, 462 U.S. 919, 952 (1983) (quoting S. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897)).

The SEC contends that the non-delegation doctrine is inapplicable because the "Executive [Branch] does not act in a legislative capacity by selecting the forum in which to enforce a law; that authority is a part of the Executive power itself." Def. Br., Dkt. No. [12] at 24; see also U.S. Const. art. II, § 3 (stating the Executive "shall take Care that the Laws be faithfully executed"). The SEC argues that its forum selection decision is no different from any other decision made by prosecutors, and courts consistently reject non-delegation challenges to prosecutorial-discretion-related decisions. See United States v. Batchelder, 442 U.S. 114, 126 (1979) (rejecting a non-delegation challenge where "the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws."); United States v. I.D.P., 102 F.3d 507, 511 (11th Cir. 1996) (noting that the Government's "authority to decide whether to prosecute a case in a federal forum [is the] type of decision [that] falls squarely within the parameters of prosecutorial discretion . . . ."). This Court agrees.

In <u>Batchelder</u>, the Supreme Court was asked to resolve whether the Government's "unfettered" prosecutorial discretion to decide between two identical statutes except for their penalty provisions was constitutional, when one statute had a much higher sentencing range. 442 U.S. at 116-17, 125. The defendant had been convicted under the statute with the higher penalty, and the defendant challenged Congress's delegation of authority to prosecutors to (1) decide between the statutes, and (2) thus choose a higher sentencing range for identical conduct. The court of appeals had remanded the case to the district court for resentencing, finding that the defendant could only be subject to the maximum sentence under the statute with the lower penalty. The court of appeals found that the "prosecutor's power to select one of two statutes that are identical except for their penalty provisions implicated important constitutional protections." 442 U.S. at 117 (internal quotations omitted).

The Supreme Court reversed, finding that there is a "settled rule" in prosecutorial choice, 442 U.S. at 124, and "[m]ore importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements." 442 U.S. at 125. "Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which

he will be sentenced." Id. The Court specifically rejected defendant's delegation

argument, finding that:

> [t]he provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek to impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty.

442 U.S. at 126.

The Court finds that this case is similar to Batchelder. Just as the Supreme

Court held that the defendant in Batchelder could not choose the statute of his

indictment, Plaintiff here may not choose his forum when Congress has dedicated

that decision to the Executive. See United States v. Allen, 160 F.3d 1096, 1108

(6th Cir. 1998) (rejecting defendant's "attempt to end-run the doctrine of

prosecutorial discretion" by arguing the prosecutor's charging decision violated

the non-delegation doctrine); see also Whitman, 531 U.S. at 474-475 ("In short,

we have almost never felt qualified to second-guess Congress regarding the

permissible degree of policy judgment that can be left to those executing or

applying the law.") (internal quotations omitted). When the SEC makes its forum

selection decision, it is acting under executive authority and exercising

prosecutorial discretion. See Chadha, 462 U.S. at 951 ("When the Executive acts,

it presumptively acts in an executive or administrative capacity as defined in Art.

II.").

Plaintiff argues that unlike Batchelder, where the Supreme Court found that Congress set out clear parameters as to the possible punishments, Dodd-Frank does not provide the SEC any criteria to make its forum selection decision. Pl. Reply, Dkt. No. [13] at 12-13. However, just as the prosecutor was allowed to select between two statutes which prevented identical conduct but provided different possible penalties in Batchelder, the Court finds that the SEC may select between two statutes which allow for different forum choices. The statutes in Batchelder did not tell the prosecutor what factors to consider in making his decision between the statutes, and the effect of the prosecutor's decision in Batchelder was equally paramount to Plaintiff's claims here—the defendant there would spend more time incarcerated if the prosecutor selected the higher penalty statute.

Congress has advised the SEC through the enactment of specific statutes as to what conduct may be pursued in each forum. It is for the enforcement agency to decide where to bring that claim under its exercise of executive power. Because the SEC has been made aware of the permissible forums available under each statute, "Congress has fulfilled its duty." Batchelder, 442 U.S. at 126.

Plaintiff also argues that the SEC's forum decision is an improper exercise of legislative power. Specifically, the SEC contends that "by virtue of the Act, the SEC received additional power from Congress to alter the rights, duties, and legal relations of individuals," and that under Chadha, this action constituted legislative action not executive action. Pl. Reply, Dkt. No. [13] at 10-11.

In <u>Chadha</u>, the Supreme Court found that the one-House veto provision was unconstitutional, but it did so without using the non-delegation doctrine. 462 U.S. at 959. In invalidating the statute, the Supreme Court first noted the presumption that "[w]hen any Branch acts, it is presumptively exercising the power the Constitution has delegated to it." <u>Id.</u> at 951. Beginning with that presumption, the Court held that the one-House veto was legislative in effect because "[i]n purporting to exercise power defined in Art. I, § 8, cl. 4 to 'establish an uniform Rule of Naturalization,' the House took action that had the purpose and effect of altering the **legal rights, duties, and relations of persons**, including the Attorney General, Executive Branch officials and Chadha, all outside the legislative branch." <u>Id.</u> at 952 (emphasis added). Plaintiff seizes on the bolded language above to claim that because the SEC's forum selection decision affects him—specifically, his ability to assert his 7th Amendment rights— the SEC has been delegated legislative authority.

The Court does not agree with Plaintiff's reading of <u>Chadha</u>. Instead, <u>Chadha</u> stands for the basic proposition that when *Congress* acts pursuant to its Article I powers, the action is legislative. If Plaintiff's broad reading were true as to actions of the executive branch, that would mean any SEC decision which affected a person's "legal rights, duties, and relations of persons"—to include charging decisions which the Supreme Court has held involve prosecutorial discretion, <u>see</u> <u>Batchelder</u>, 442 U.S. at 124 —would be legislative actions. <u>See</u> <u>Chadha</u>, 462 U.S. at 953 n.16 (noting that when the head of an executive agency

28

performs his duties pursuant to statute, "he does not exercise 'legislative' power.") (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-214 (1976)).

Plaintiff's reading does not comport with the Executive's constitutional role in faithfully executing the laws. Because Congress has properly delegated power to the executive branch to make the forum choice for the underlying SEC enforcement action, the Court finds that the Plaintiff cannot prove a substantial likelihood of success on the merits on his non-delegation claim.

## 2. Seventh Amendment

Plaintiff next argues that the SEC's decision to prosecute the claims against him in the administrative proceeding rather than the district court violates his Seventh Amendment right to a jury trial. Pl. Br., Dkt. No. [2-1] at 15. The Seventh Amendment provides, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." "The phrase 'Suits at common law' has been construed to refer to cases tried prior to the adoption of the Seventh Amendment in courts of law in which jury trial was customary as distinguished from courts of equity or admiralty in which jury trial was not." Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 449 (1977) (citing Parsons v. Bedford, 3 Pet. 433, 7 L.Ed. 732 (1830)). "[T]he Seventh Amendment also applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard

by courts of equity or admiralty." <u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33,
42 (1989) (citing <u>Curtis v. Loether</u>, 415 U.S. 189, 193 (1974)).

> The form of [the Court's] analysis is familiar. "First, we compare the
> statutory action to 18th-century actions brought in the courts of
> England prior to the merger of the courts of law and equity. Second,
> we examine the remedy sought and determine whether it is legal or
> equitable in nature." <u>Tull v. United States</u>, 481 U.S. 412, 417–418
> (1987) (citations omitted). The second stage of this analysis is more
> important than the first. <u>Id.</u>, at 421. If, on balance, these two factors
> indicate that a party is entitled to a jury trial under the Seventh
> Amendment, we must decide whether Congress may assign and has
> assigned resolution of the relevant claim to a non-Article III
> adjudicative body that does not use a jury as factfinder.

<u>Granfinanciera</u>, 492 U.S. at 42.

The SEC does not dispute Plaintiff's argument that an enforcement action
for civil penalties is "clearly analogous to the 18th-century action in debt," <u>Tull</u>,
481 U.S. at 420, and this remedy is legal in nature. <u>See</u> <u>Tull</u>, 481 U.S. at 422 ("A
civil penalty was a type of remedy at common law that could only be enforced in
courts of law. Remedies intended to punish culpable individuals, as opposed to
those intended simply to extract compensation or restore the status quo, were
issued by courts of law, not courts of equity.").

Rather, the SEC contends that "Plaintiff's claim fails because it is firmly
established that Congress 'may assign th[e] adjudication' of cases involving so-
called 'public rights' to 'an administrative agency with which a jury trial would be
incompatible[] without violating the Seventh Amendment[] . . . even if the
Seventh Amendment would have required a jury where the adjudication of those
rights is assigned instead to a federal court of law.'" Def. Br., Dkt. No. [12] at 26

(alteration in the original) (quoting <u>Atlas Roofing</u>, 430 U.S. at 455). This Court agrees.

"Public rights" cases are those which "arise between the Government and persons subject to its authority 'in connection with the performance of the constitutional functions of the executive or legislative departments.'" <u>Atlas Roofing</u>, 430 U.S. at 457 (internal quotation omitted) (quoting <u>Crowell v. Benson</u>, 285 U.S. 22, 31 (1932)). Plaintiff does not dispute that this SEC enforcement action involves a public right. <u>See</u> Pl. Reply, Dkt. No. [13] at 19-20. Because the SEC is acting as a sovereign in the performance of its executive duties when it pursues an enforcement action, the Court also agrees that this is a public rights case.

Despite this being a public rights case, Plaintiff argues that Congress must make the decision as to whether or not a new cause of action will contain a right to a jury trial when Congress originally creates the cause of action. That is, Plaintiff contends that the Seventh Amendment right can only be taken away at the time Congress is creating the "*new* public right." <u>Id.</u> at 17-21 (emphasis added). Plaintiff seizes on language from <u>Atlas Roofing</u> and <u>Granfinanciera</u> that the public right must be "new" or "novel," to be excluded from the Seventh Amendment's protections. <u>See</u> <u>Atlas Roofing</u>, 430 U.S. at 455 ("[W]hen Congress creates *new* statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved'

31

in 'suits at common law.'") (emphasis added); <u>Granfinanciera</u>, 492 U.S. at 51
("Congress may devise *novel* causes of action involving public rights free from the
strictures of the Seventh Amendment if it assigns their adjudication to tribunals
without statutory authority to employ juries as factfinders.") (emphasis added).
This Court disagrees.

Plaintiff's argument puts form over substance and defines "new" in a way
that the Supreme Court did not intend. <u>See</u> <u>Tull</u>, 481 U.S. at 418 n.4 ("[T]he
Seventh Amendment is not applicable to administrative proceedings.").
Plaintiff's position is that Congress could have sent all enforcement actions for
unregistered persons to an administrative proceeding at the time the original
statute was drafted—because at that time, the public right was "new." But once it
decided unregistered persons such as Plaintiff would get a jury trial, as it initially
did in the Exchange Act, Plaintiff became "vested" with a Seventh Amendment
right that Congress is now powerless to remove.

The Court does not find Plaintiff's argument persuasive. In <u>Atlas Roofing</u>,
the Supreme Court stated, the "Government could commit the enforcement of
statutes and the imposition and collection of fines to the judiciary, in which event
jury trial would be required . . . , but [] the United States could also validly opt for
administrative enforcement, without judicial trials." 430 U.S. at 460 (internal
citation omitted). For cases involving public rights, Congress has the choice as to
whether or not a jury trial will be required. Congress does not tie its hands when
it initially creates a cause of action. Plaintiff cites no authority which specifically

holds that Congress may not change its mind and reassign *public rights* to

administrative proceedings.[8]

> As the Supreme Court has stated,

> The point is that the Seventh Amendment was never intended to
> establish the jury as the exclusive mechanism for factfinding in civil
> cases. It took the existing legal order as it found it, and there is little
> or no basis for concluding that the Amendment should now be
> interpreted to provide an impenetrable barrier to administrative
> factfinding under otherwise valid federal regulatory statutes. We
> cannot conclude that the Amendment rendered Congress powerless
> when it concluded that remedies available in courts of law were
> inadequate to cope with a problem within Congress' power to
> regulate to create new public rights and remedies by statute and
> commit their enforcement, if it chose, to a tribunal other than a court
> of law such as an administrative agency in which facts are not found
> by juries.

Atlas Roofing, 430 U.S. at 460.

In enacting Dodd-Frank, Congress specifically noted that it was doing so in

response to the financial crisis. Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat.

1376 (2010) (stating the statute was enacted "[t]o promote the financial stability

of the United States by improving accountability and transparency in the

financial system, to end 'too big to fail', to protect the American taxpayer by

ending bailouts, to protect consumers from abusive financial services practices . .

. ."). Congress thus decided that to carry out its mission to "clean up" the financial

---

[8] Plaintiff argues under Granfinanciera that Congress may not reclassify or
relabel a cause of action to avoid the Seventh Amendment. See Pl. Reply, Dkt. No.
[13] at 18. However, Granfinanciera involved Congress relabeling a *private*
right—to which the Seventh Amendment always attaches, see Atlas Roofing, 430
U.S. at 458—to create a supposed *public right*. See Granfinanciera, 492 U.S. at
60-61. It is undisputed that even the pre-Dodd-Frank claim involved a public
right.

system, it would allow the SEC to bring actions in administrative proceedings "to administrative agencies with special competence in the relevant field." Atlas Roofing, 430 U.S. at 455. Congress found that the prior scheme was not working, and it redrafted the legislation. Because the legislation related to public rights, the Seventh Amendment does not prevent Congress from doing so. See Atlas Roofing, 430 U.S. at 460; id. at 461 ("Congress found the common-law and other existing remedies for work injuries resulting from unsafe working conditions to be inadequate to protect the Nation's working men and women. It created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved. The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law."). The Court finds that Plaintiff cannot prove a substantial likelihood of success on the merits on his Seventh Amendment claim as this claim involves a public right, and Congress has the right to send public rights cases to administrative proceedings.

### 3. Article II

Plaintiff next brings two claims under Article II of the Constitution: (1) that the ALJ's appointment violates the Appointments Clause of Article II because he was not appointed by the President, a court of law, or a department head, and (2) the ALJ's two-layer tenure protection violates the Constitution's separation of powers, specifically the President's ability to exercise Executive power over his inferior officers. Both of Plaintiff's arguments depend on this Court finding that

the ALJ is an inferior officer who would trigger these constitutional protections.

See U.S. Const. art. II § 2, cl. 2; Freytag v. Comm'r of Internal Revenue, 501 U.S.

868, 880 (1991); Free Enterprise, 561 U.S. at 484, 506. Therefore, the Court will

consider this threshold issue first.

### a. Inferior Officer

The issue of whether the SEC ALJ is an inferior officer or employee for

purposes of the Appointments Clause depends on the authority he has in

conducting administrative proceedings. The Appointments Clause of Article II of

the Constitution provides:

> [The President] shall nominate, and by and with the Advice and
> Consent of the Senate, shall appoint Ambassadors, other public
> Ministers and Consuls, Judges of the supreme Court, and all other
> Officers of the United States, whose Appointments are not herein
> otherwise provided for, and which shall be established by Law: but
> the Congress may by Law vest the Appointment of such inferior
> Officers, as they think proper, in the President alone, in the Courts of
> Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. The Appointments Clause thus creates two classes of

officers: principal officers, who are selected by the President with the advice and

consent of the Senate, and inferior officers, whom "Congress may allow to be

appointed by the President alone, by the heads of departments, or by the

Judiciary." Buckley v. Valeo, 424 U.S. 1, 132 (1976). The Appointments Clause

applies to all agency officers including those whose functions are "predominately

quasi judicial and quasi legislative" and regardless of whether the agency officers

are "independent of the Executive in their day-to-day operations." Id. at 133

(quoting Humphrey's Executor v. United States, 295 U.S. 602, 625-26 (1935)).

"[A]ny appointee exercising significant authority pursuant to the laws of

the United States is an 'Officer of the United States,' and must, therefore, be

appointed in the manner prescribed by § 2, cl. 2, of [Article II]." Freytag, 501 U.S.

at 881 (quoting Buckley, 424 U.S. at 126) (alteration in the original). By way of

example, the Supreme "Court has held that district-court clerks, thousands of

clerks within the Treasury and Interior Departments, an assistant surgeon, a

cadet-engineer, election monitors, federal marshals, military judges, Article I

[Tax Court special trial] judges, and the general counsel for the Transportation

Department are inferior officers." Kent Barnett, Resolving the ALJ Quandary, 66

Vand. L. Rev. 797, 812 (2013) (citing Free Enterprise, 561 U.S. at 540 (Breyer, J.,

dissenting) (citing cases)).

Plaintiff claims that SEC ALJs are inferior officers because they exercise

"significant authority pursuant to the laws of the Unites States" while the SEC

contends ALJs are "mere employees" based upon Congress's treatment of them

and the fact that they cannot issue final orders and do not have contempt power,[9]

inter alia. The Court finds that based upon the Supreme Court's holding in

Freytag, SEC ALJs are inferior officers. See also Duka, 2015 WL 1943245, at *8

---

[9] ALJs can find people in contempt, but cannot compel compliance with their order. See 17 C.F.R. § 201.180 (noting an ALJ can punish "[c]ontemptuous conduct"); Def. Br., Dkt. No. [12] at 24 (stating ALJs lack "contempt power" and stating an ALJ cannot compel compliance with any subpoenas he issues).

("The Supreme Court's decision in <u>Freytag v. Commissioner</u>, 501 U.S. 868, 111 (1991), which held that a Special Trial Judge of the Tax Court was an 'inferior officer' under Article II, would appear to support the conclusion that SEC ALJs are also inferior officers.").

In <u>Freytag</u>, the Supreme Court was asked to decide whether special trial judges ("STJ") in the Tax Court were inferior officers under Article II. 501 U.S. at 880. The Government argued, much as the SEC does here, that STJs do "no more than assist the Tax Court judge in taking the evidence and preparing the proposed findings and opinion," <u>id.</u>, and they "lack authority to enter a final decision." <u>Id.</u> at 881; <u>see also</u> Def. Br., Dkt. No. [12] at 30-33 (arguing that SEC ALJs are not inferior officers because they cannot enter final orders and are subject to the SEC's "plenary authority"). The Supreme Court rejected that argument, stating that the Government's argument

> ignores the significance of the duties and discretion that special trial judges possess. The office of special trial judge is "established by Law," Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute. <u>See</u> <u>Burnap v. United States</u>, 252 U.S. 512, 516–517 (1920); <u>United States v. Germaine</u>, 99 U.S. 508, 511–512 (1879). These characteristics distinguish special trial judges from special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute. Furthermore, special trial judges perform more than ministerial tasks. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the special trial judges exercise significant discretion.

<u>Freytag</u>, 501 U.S. at 881-82.

37

The Court finds that like the STJs in <u>Freytag</u>, SEC ALJs exercise "significant authority." The office of an SEC ALJ is established by law, and the "duties, salary, and means of appointment for that office are specified by statute." <u>Id.</u>; <u>see</u> <u>supra</u> (setting out the ALJ system, to include the establishment of ALJs and their duties, salary, and means of appointment). ALJs are permanent employees—unlike special masters—and they take testimony, conduct trial, rule on the admissibility of evidence, and can issue sanctions, up to and including excluding people (including attorneys) from hearings and entering default. 17 C.F.R. §§ 200.14 (powers); 201.180 (sanctions).

Relying on <u>Landry v. Federal Deposit Insurance Corp.</u>, 204 F.3d 1125 (D.C. Cir. 2000), the SEC argues that unlike the STJs who were inferior officers in <u>Freytag</u>, the SEC ALJs do not have contempt power and cannot issue final orders,[10] as the STJs could in limited circumstances. In <u>Landry</u>, the D.C. Circuit considered whether FDIC ALJs were inferior officers. The D.C. Circuit found FDIC ALJs, like the STJs, were established by law; their duties, salary, and means of appointment were specified by statute; and they conduct trials, take testimony,

---

[10] Plaintiff argues that SEC ALJ's can issue final orders because if the respondent does not petition the SEC to review the ALJ's initial order and the SEC does not decide to review the matter on its own, the action of the ALJ will be "deemed the action of the Commission." 15 U.S.C. § 78d-1(c). The SEC argues that the SEC retains plenary authority over ALJs and the regulations make clear that only when the SEC itself issues an order does the decision become final. Def. Br., Dkt. No. [24] at 2-3 (citing 17 C.F.R. § 201.360(d)(2)). This Court agrees with the SEC. Because the regulations specify that the SEC itself must issue the final order essentially "confirming" the initial order, the Court finds that SEC ALJs do not have final order authority.

rule on evidence admissibility, and enforce discovery compliance. 204 F.3d at

1133-34. And it recognized that <u>Freytag</u> found that those powers constituted the

exercise of "significant discretion . . . a magic phrase under the <u>Buckley</u> test." <u>Id.</u>

at 1134 (internal citation omitted).

Despite the similarities of the STJs and the FDIC ALJs, the <u>Landry</u> court

applied <u>Freytag</u> as holding that whether the entity had the authority to render a

final decision was a dispositive factor. According to the D.C. Circuit, <u>Freytag</u>

"noted that [(1)] STJs have the authority to render the *final* decision of the Tax

Court in declaratory judgment proceedings and in certain small-amount tax

cases," and (2) the "Tax Court was required to defer to the STJ's factual and

credibility findings unless they were clearly erroneous." <u>Landry</u>, 204 F.3d at 1133

(emphasis in original). While recognizing that the <u>Freytag</u> court "introduced

mention of the STJ's power to render final decisions with something of a shrug,"

<u>Landry</u> held that FDIC ALJ's were not inferior officers because did not have the

"power of final decision in certain classes of cases." <u>Id.</u> at 1134.

The concurrence rejected the majority's reasoning, finding that <u>Freytag</u>

"cannot be distinguished" because "[t]here are no relevant differences between

the ALJ in this case and the [STJ] in <u>Freytag</u>." <u>Id.</u> at 1140, 1141. After first

explaining that the Supreme Court actually found the Tax Court's deference to

the STJ's credibility findings was irrelevant to its analysis,[11] the concurrence

---

[11] The Supreme Court stated that Tax Court Rule 183, which established the deferential standard, was "not relevant to [its] grant of certiorari," and noted that

stated that the majority's "first distinction of <u>Freytag</u> is thus no distinction at all." <u>Id.</u> at 1142. The concurrence also noted that the majority's holding in <u>Landry</u> (which ultimately relied on the FDIC ALJ's lack of final order authority) was based on an *alternative* holding from <u>Freytag</u> as the Supreme Court had already determined the STJs were inferior officers before it analyzed the final order authority issue. <u>Landry</u>, 204 F.3d at 1142.

   Similarly, this Court concludes that the Supreme Court in <u>Freytag</u> found that the STJs powers—which are nearly identical to the SEC ALJs here—were independently sufficient to find that STJs were inferior officers. <u>See also</u> <u>Butz v. Economou</u>, 438 U.S. 478, 513 (1978) ("There can be little doubt that the role of the . . . administrative law judge . . . is 'functionally comparable' to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: He may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions."); <u>see also</u> <u>Edmond v. United States</u>, 520 U.S. 651, 663 (1997) ("[W]e think it evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."). Only after it concluded STJs were inferior officers did <u>Freytag</u> address the STJ's ability to issue a final order; the STJ's limited authority to issue final orders was only an additional reason, not *the* reason. Therefore, the Court finds

_____

it would say no more about the rule than to say that the STJ did not have final authority to decide Petitioner's case. <u>Freytag</u>, 501 U.S. at 874 n.3; <u>see also</u> <u>Landry</u>, 204 F.3d at 1142 (Randolph, J., concurring).

that <u>Freytag</u> mandates a finding that the SEC ALJs exercise "significant authority" and are thus inferior officers.

The SEC also argues that this Court should defer to Congress's apparent determination that ALJs are inferior officers. In the SEC's view, Congress is presumed to know about the Appointments Clause, and it decided to have ALJs appointed through OPM and subject to the civil service system; thus, Congress intended for ALJs to be employees according to the SEC. <u>See</u> Def. Br. [12] at 33-37. But "[t]he Appointments Clause prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." <u>Freytag</u>, 501 U.S. at 880. Congress may not "decide" an ALJ is an employee, but then give him the powers of an inferior officer; that would defeat the separation-of-powers protections the Clause was enacted to protect. The Court finds that SEC ALJs are inferior officers.

### b. Appointments Clause Violation

Because SEC ALJs are inferior officers, the Court finds Plaintiff has established a likelihood of success on the merits on his Appointments Clause claim. Inferior officers must be appointed by the President, department heads, or courts of law. U.S. Const. art. II § 2, cl. 2. Otherwise, their appointment violates the Appointments Clause.

The SEC concedes that Plaintiff's ALJ, James E. Grimes, was not appointed by an SEC Commissioner. <u>See</u> Def. Br., Dkt. No. [15] at 2; <u>see also</u> <u>Free Enterprise</u>, 561 U.S. at 511-512 (finding that the SEC Commissioners jointly

constitute the "head" of the SEC for appointment purposes). The SEC ALJ was not appointed by the President, a department head, or the Judiciary. Because he was not appropriately appointed pursuant to Article II, his appointment is likely unconstitutional in violation of the Appointments Clause.[12]

### 4. Remaining Preliminary Injunction Factors

The Court finds that Plaintiff has also satisfied the remaining preliminary injunction factors. First, Plaintiff will be irreparably harmed if this injunction does not issue because if the SEC is not enjoined, Plaintiff will be subject to an unconstitutional administrative proceeding, and he would not be able to recover monetary damages for this harm because the SEC has sovereign immunity. See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1289 (11th Cir. 2013) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable.") (collecting cases); see also Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). If the administrative proceeding is not enjoined, Plaintiff's requested relief here would also become

---

[12] Because the Court finds Plaintiff can establish a likelihood of success on his Appointments Clause claim, the Court declines to decide at this time whether the ALJ's two-layer tenure protections also violate Article II's removal protections. However, the Court has serious doubts that it does, as ALJs likely occupy "quasi-judicial" or "adjudicatory" positions, and thus these two-layer protections likely do not interfere with the President's ability to perform his duties. See Duka, 2015 WL 1943245, at *8-10; see also Humphrey's Executor, 295 U.S. at 628-29, 631-32.

42

moot as the Court of Appeals would not be able to enjoin a proceeding which has already occurred. See supra at 15, 18-19 (explaining Plaintiff's harm).

Second, the Court finds that the public interest and the balance of equities are in Plaintiff's favor. The public has an interest in assuring that citizens are not subject to unconstitutional treatment by the Government, and there is no evidence the SEC would be prejudiced by a brief delay to allow this Court to fully address Plaintiff's claims. The SEC claims that the public interest weighs in its favor because the SEC is charged with "protect[ing] investors and maintain[ing] the integrity of the securities markets." Def. Br., Dkt. No. [12] at 44 (citing Duka, 2015 WL 1943245, at *7 n.13). But the Court does not find that it is ever in the public interest for the Constitution to be violated. The Supreme Court has held that the Appointments Clause "not only guards against [separation-of-powers] encroachment but also preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power." Freytag, 501 U.S. at 878. Both are important to the public interest. The Court further notes that the SEC is not foreclosed from pursing Plaintiff in federal court or in an administrative proceeding before an SEC Commissioner, and thus any small harm which it might face could be easily cured by the SEC itself.

### III. Conclusion

Because the Court finds Plaintiff has proved a substantial likelihood of success on the merits of his claim that the SEC has violated the Appointments Clause as well as the other factors necessary for the grant of a preliminary

injunction, the Court finds a preliminary injunction is appropriate to enjoin the SEC administrative proceeding and to allow the Court sufficient time to consider this matter on the merits.

The Court notes that this conclusion may seem unduly technical, as the ALJ's appointment could easily be cured by having the SEC Commissioners issue an appointment or preside over the matter themselves. However, the Supreme Court has stressed that the Appointments Clause guards Congressional encroachment on the Executive and "preserves the Constitution's structural integrity by preventing the diffusion of appointment power." Freytag, 501 U.S. at 878. This issue is "neither frivolous or disingenuous." Id. at 879. The Article II Appointments Clause is contained in the text of the Constitution and is an important part of the Constitution's separation of powers framework.

In addition, the Appointments Clause may not be waived, not even by the Executive. Id. at 880 ("Neither Congress nor the Executive can agree to waive this structural protection."). As this likely Appointment Clause violation "goes to the validity of the [administrative] proceeding that is the basis for this litigation," id. at 879, it is hereby **ORDERED** that Defendant, the Securities and Exchange Commission, is preliminarily enjoined from conducting the administrative proceeding brought against Plaintiff, captioned In the Matter of Charles L. Hill, Jr., Administrative Proceeding File No. 3-16383 (Feb. 11, 2015), including the hearing scheduled for June 15, 2015, before an Administrative Law Judge who has not been appointed by the head of the Department. This order shall remain in

effect until it is further modified by this Court or until resolution of Plaintiff's claim for permanent injunctive relief, whichever comes first.

The parties are **DIRECTED** to confer on a timetable for conducting discovery and briefing the remaining issues. The parties are then **DIRECTED** to submit by June 15, 2015, a consent scheduling order to the Court for consideration. If the parties are unable to agree to the terms of a scheduling order, the parties can submit their alternative submissions.

**IT IS SO ORDERED** this 8th day of June, 2015.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

**Tab 32**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

CHARLES L. HILL, JR.,

       *Plaintiff,*

    v.

U.S. SECURITIES AND
    EXCHANGE COMMISSION,

       *Defendant.*

No. 15-cv-1801

## NOTICE OF APPEAL

Please take notice that Defendant the Securities and Exchange Commission

hereby appeals to the United States Court of Appeals for the Eleventh Circuit

from the Court's Order of June 8, 2015 [ECF No. 28] granting a preliminary

injunction in this matter.

Dated:  June 24, 2015

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney
   General

JOHN A. HORN
Acting United States Attorney

KATHLEEN R. HARTNETT
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

SUSAN K. RUDY
Assistant Director, Federal Programs
    Branch

 /s/ *Jean Lin*                                
JEAN LIN
JUSTIN M. SANDBERG
ADAM GROGG
STEVEN A. MYERS
MATTHEW J. BERNS
U.S. Department of Justice
Civil Division, Federal Programs
    Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2015, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jean Lin*
JEAN LIN

**Tab 33-1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

CHARLES L. HILL, JR.,

                        *Plaintiff,*

          v.                                      No. 15-cv-1801

U.S. SECURITIES AND
          EXCHANGE COMMISSION,

                        *Defendant.*

## DECLARATION OF ANDREW CERESNEY

I, ANDREW CERESNEY, declare as follows:

1.      I am the Director of the Division of Enforcement ("Division") for the Securities and Exchange Commission (the "SEC" or "Commission") and have held this position since April 2013.  The Division has approximately 1,300 investigators, accountants, trial attorneys and other staff members who are responsible for conducting investigations into possible violations of the federal securities laws, recommending that the Commission authorize the filing or institution of enforcement actions, and prosecuting the Commission's civil suits in the federal courts as well as in administrative proceedings. I have personal knowledge of the subject matter of this declaration.

2.      I have reviewed the Amended Complaint filed in the above captioned case as well as this Court's June 8, 2015 decision granting a

preliminary injunction to enjoin the administrative proceeding that the SEC has instituted against Plaintiff.  I submit this declaration in support of the SEC's motion to stay the preliminary injunction issued by this Court.

3.      The Court's injunction impedes several of the benefits of administrative proceedings from the standpoint of deterrence and investor protection.  In appropriate cases, the administrative forum facilitates the prompt airing, and in turn notice to the public, of alleged securities law violations.  First, an administrative law judge generally has no more than 300 days from when a matter is instituted to issue an initial decision, typically following a hearing where evidence is presented by both sides.  By contrast, cases in district court often move at a much slower pace, and can still be at the motion to dismiss stage or in the midst of discovery at the 300-day mark, with any trial still far down the road.

4.      Second, administrative proceedings typically result in presentation of evidence when it is relatively fresh.  With the passage of time, witnesses' memories might fade and some types of evidence can become stale.  Thus, because hearings in administrative proceedings usually occur much sooner than trials in district court actions, the evidence is presented closer in time to the conduct at issue.  And this, in turn, facilities the SEC's strong interests in deterrence and in protecting investors and the integrity of the securities markets.

5.      Finally, in appropriate cases, pursuing an enforcement proceeding administratively allows the agency to bring to bear its significant expertise in adjudicating individual cases; indeed, the Commission has developed expert

knowledge of the securities laws, and the types of entities, instruments, and

practices that frequently appear in those cases.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the

foregoing is true and correct.

Executed on June 24, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2015, I electronically filed the foregoing appendix with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Megan Barbero*
Megan Barbero