No. 15-12831
_____

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CHARLES L. HILL, JR.,

*Plaintiff/Appellee,*

vs.

## SECURITIES AND EXCHANGE COMMISSION,

*Defendant/Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division
District Court Docket No. 1:15-cv-01801-LMM
The Honorable Leigh Martin May
_____

## SUPPLEMENTAL APPENDIX

Stephen E. Hudson
Hillary D. Rightler
Akash R. Desai
Josh C. Hess
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree Street, NE Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Counsel for Plaintiff/Appellant*

## INDEX TO SUPPLEMENTAL APPENDIX

| Description | Tab No. |
| --- | --- |
| Order Instituting Cease-And-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 and Notice of Hearing, filed in *In the Matter of Charles L. Hill, Jr.*, Administrative Proceeding File No. 3-16383 (February 11, 2015) | 2-6 |
| Sarah N. Lynch, *U.S. SEC to File Some Insider-Trading Cases in its In-House Court*, Reuters, June 11, 2014, available at http://www.reuters.com/article/ 2014/06/11/sec-insidertrading-idUSL2N0OS1AT20140611 | 2-7 |
| Jean Eaglesham, *SEC Wins With In-House Judges*, Wall St. J., May 6, 2015 | 2-9 |
| Michael S. Piwowar, Remarks at the "SEC Speaks" Conference 2015: A Fair, Orderly, and Efficient SEC (Feb. 20, 2015), http://www.sec.gov/news/speech/022015-spchcmsp.html | 2-11 |
| Daniel Wilson, *SEC Administrative Case Rules Likely Out of Date, GC Says*, Law360, June 17 2014, available at http://www.law360.com/banking/articles/548907/sec-gc-praises-analysis-improvements-after-rule-disputes | 2-12 |
| U.S. Securities and Exchange Commission, *Division of Enforcement Approach to Forum Selection in Contested Actions*, available at https://www.sec.gov/divisions/ enforce/enforcement-approach-forum-selection-contested-actions.pdf | 2-13 |
| Peter J. Henning, *Choosing the Battlefield in S.E.C. Cases*, N.Y. Times, Dealbook, White Collar Watch, May 11, 2015, available at http://www.nytimes.com/2015/05/12/ business/dealbook/choosing-the-battlefield-in-sec-cases.html | 2-14 |

# Tab 2-6

# Exhibit 4

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 74249 / February 11, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16383

| | |
|---|---|
| In the Matter of<br><br>CHARLES L. HILL, JR.,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND NOTICE OF HEARING |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Charles L. Hill, Jr. ("Hill" or the "Respondent").

## II.

After an investigation, the Division of Enforcement alleges that:

A.   **SUMMARY**

1.      Hill engaged in insider trading, in violation of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, in connection with securities of Radiant Systems, Inc. ("Radiant").

2.      In May 2011, NCR Corporation ("NCR"), a point-of-sale technology company based in Duluth, Georgia, began discussions with Radiant, another point-of-sale technology company based in Alpharetta, Georgia, about NCR's potential acquisition of Radiant. Radiant's Chief Operating Officer ("COO"), who first learned details about the acquisition in May 2011, discussed material, nonpublic information about the acquisition, ultimately structured to include a tender offer, in confidence with his close personal friend of approximately 40 years ("Radiant's COO's friend," or the "COO's friend"). Radiant's COO's friend, in turn, relayed the material, non-public information he learned from Radiant's COO to Hill. Radiant's COO's friend had also been a close friend of Hill's for approximately 20 years.

3.      At the time Hill received material, non-public information concerning NCR's acquisition of Radiant from the COO's friend, Hill was aware of the friendship between Radiant's COO's friend and Radiant's COO, and of Radiant's COO's position at Radiant.

4.      Between June 1, 2011, and July 8, 2011, before news of the potential acquisition became public, Hill purchased 101,600 shares of Radiant stock for approximately $2.1 million.

5.      On July 11, 2011, after the close of the markets, NCR and Radiant announced that NCR would acquire Radiant in a tender offer.  On July 12, 2011, Radiant's stock price increased by more than 30 percent on the news.  That same day, Hill sold all of his Radiant stock, realizing gains of approximately $744,000.

**B.**      **RESPONDENT**

6.      **Hill**, age 54, is a resident of Atlanta, Georgia. Hill is a self-employed real estate developer.  Hill has never been registered with the Commission.

**C.**      **OTHER RELEVANT INDIVIDUALS AND ENTITIES**

7.      **Radiant**, a Georgia corporation, was headquartered in Alpharetta, Georgia. Its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ.  On August 24, 2011, Radiant was acquired by NCR.  In connection with the acquisition, Radiant's stock was delisted from NASDAQ and deregistered with the Commission.

8.      **NCR**, a Maryland corporation, is headquartered in Duluth, Georgia.  Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

9.      **Radiant's COO's friend**, age 52, is a resident of Brooklyn, New York. Between May 2011 and August 2011, Radiant's COO's friend resided in Atlanta, Georgia. Radiant's COO's friend is a self-employed artist.  Radiant's COO's friend has never been registered with the Commission.

10.      **Radiant's COO**, age 50, is a resident of Atlanta, Georgia.  Radiant's COO is currently a Senior Vice President at NCR.  Radiant's COO has never been registered with the Commission.

**D.    RADIANT'S COO LEARNS DETAILS ABOUT THE CONTEMPLATED ACQUISITION OF RADIANT BY NCR**

11.    In early May 2011, NCR's Chief Executive Officer, ("NCR's CEO") called Radiant's Chief Executive Officer ("Radiant's CEO") to express an interest in a potential business combination.

12.    On May 12, 2011, NCR sent a letter to Radiant expressing a non-binding indication of interest concerning the acquisition of Radiant at a price of $24 to $26 per share, and requesting a period of exclusive negotiation rights.  At that time, Radiant was trading at approximately $20 per share.

13.    On May 24, 2011, Radiant's board of directors convened for a special meeting to discuss a potential transaction with NCR, and authorized continued negotiations with NCR, including allowing NCR to conduct due diligence, and the engagement of an investment bank to ascertain whether there were other parties interested in acquiring Radiant.

14.    On June 2, 2011, NCR began conducting due diligence in connection with the potential acquisition of Radiant.

15.    On June 13, 2011, NCR made a written offer to Radiant to acquire Radiant stock at $26 per share.

16.    On June 30, 2011, Radiant's board of directors approved a related exclusivity agreement with NCR.

17.    On July 11, 2011, Radiant and NCR executed a related merger agreement, which was structured to include a tender offer from NCR for Radiant stock.

18.    Radiant's COO first learned material, nonpublic information concerning NCR's contemplated acquisition of Radiant in early May 2011 after his brother, who then served as Radiant's CEO and as a member of Radiant's board of directors, told him about NCR's CEO's expression of interest in a potential business combination.

19.    Beginning in May 2011, Radiant's CEO continued to discuss details concerning the evolving transaction with Radiant's COO.  Radiant's COO was also directly involved in the related due diligence process during the negotiations between NCR and Radiant.

20.    In connection with the potential acquisition, Radiant's COO also negotiated his employment terms with NCR in the event the merger was consummated.

**E.    RADIANT'S COO SHARED MATERIAL, NON-PUBLIC INFORMATION WITH THE COO'S FRIEND**

21.    Radiant's COO and the COO's friend have maintained a close personal friendship since childhood. They both attended the University of Georgia, where they were members of the same fraternity. After college, they remained close personal friends, both residing in Atlanta, Georgia. Given this close relationship, Radiant's COO considered the COO's friend to be like a close family member. Radiant's COO and the COO's friend routinely shared confidential, personal information with each other.

22.    In 2011, Radiant's COO's friend was aware of Radiant COO's position at Radiant.

23.    During the period from early May to July 11, 2011 (the "relevant period"), Radiant's COO and the COO's friend frequently communicated via telephone or text message, and on some days exchanged multiple telephone calls and text messages. Also during the relevant period, Radiant's COO and the COO's friend, who both resided in the Atlanta metropolitan area, met in person.

24.    During the relevant period, Radiant's COO shared material, nonpublic information with the COO's friend concerning NCR's potential acquisition of Radiant.

**F.    RADIANT'S COO'S FRIEND  SHARED MATERIAL, NON-PUBLIC INFORMATION LEARNED FROM RADIANT'S COO WITH HILL**

25.    Radiant's COO's friend and Hill have been close friends for more than 20 years. During the relevant period, Radiant's COO's friend and Hill frequently communicated via telephone or text message, and on some days exchanged multiple telephone calls and texts. During the relevant period, Radiant's COO's friend and Hill also periodically met in person as they both resided in the Atlanta metropolitan area.

26.    During the relevant period, Hill was aware of the relationship between the COO's friend and Radiant's COO, as well as Radiant's COO's position at Radiant. The COO's friend also knew that Hill was an acquaintance of the Radiant COO.

27.    During the relevant period, Radiant's COO's friend shared material, non-public information that he had learned from Radiant's COO with Hill concerning the potential acquisition of Radiant by NCR.

28.    Hill knew or had reason to know that the information acquired from Radiant's COO's friend concerning NCR's potential acquisition of Radiant was nonpublic, and had been acquired directly or indirectly from Radiant, or an officer or employee thereof.

## G.   HILL TRADED RADIANT STOCK

29.     Prior to May 2011, Hill previously had never traded Radiant securities, and had not purchased a security for at least four years prior to purchasing Radiant stock.

30.     In late May 2011, Hill opened two new brokerage accounts, intending to purchase Radiant stock in those accounts.

31.     From June 1, 2011 through July 8, 2011, Hill purchased shares of Radiant stock in his two newly opened brokerage accounts, and in each of his three daughters' custodial brokerage accounts, for which Hill was authorized to make trading decisions.

32.     On June 1, 2011, Hill purchased 4,500 shares of Radiant stock.

33.     On June 3, 2011, Hill purchased 50,000 shares of Radiant stock.   These purchases represented over 10% of the total Radiant trading volume that day (467.4 thousand shares)

34.     On June 24, 2011, Hill purchased 13,000 shares of Radiant stock.

35.     On July 1, 2011, Hill purchased 20,000 shares of Radiant stock.

36.     On July 5, 2011, Hill purchased 4,100 shares of Radiant stock.

37.     On July 8, 2011, Hill purchased 10,000 shares of Radiant stock.

38.     Hill purchased all Radiant stock at prices ranging between approximately $19.97 per share and $21.95 per share.

39.     As of July 8, 2011, the last trading day before the acquisition announcement, Hill's Radiant shares, including those shares in his daughters' accounts, were valued at approximately $2.2 million dollars.  This represented a significant portion of both his liquid and his overall net worth, and was substantially more than his annual income.

40.     Hill purchased all Radiant stock while in possession of material information related to NCR's tender offer for Radiant stock.

41.     Hill purchased all Radiant stock knowing, or with reason to know, that the information concerning the tender offer was nonpublic.

42.     Hill purchased all Radiant stock knowing, or with reason to know, that the information had been acquired directly or indirectly from Radiant, or an officer, director or employee thereof.

43.     Hill purchased all Radiant stock after NCR had taken substantial steps to commence a tender offer for Radiant stock.

44.     On July 11, 2011, Radiant stock closed at $21.45 per share.  After market close, the merger agreement between Radiant and NCR was publicly announced via press releases.

45.     On July 12, 2011, Radiant stock price increased by more than 30 percent. That day, Hill sold the entirety of his 101,600 Radiant shares at prices ranging from $27.98 to $28.03, realizing illicit gains of approximately $744,000.

## H.   **VIOLATIONS**

46.     As a result of the conduct described above, Hill violated Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, which prohibit any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer.

## III.

In view of the allegations made by the Division of Enforcement, the Commission deems it appropriate that cease-and-desist proceedings be instituted to determine:

A.     Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondent an opportunity to establish any defenses to such allegations; and

B.     Whether, pursuant to Section 21C of the Exchange Act, Respondent should be ordered to cease and desist from committing or causing violations of and any future violations of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, whether Respondent should be ordered to pay a civil penalty pursuant to Section 21B(a) of the Exchange Act, and whether Respondent should be ordered to pay disgorgement, including prejudgment interest, pursuant to Sections 21B(e) and 21C(e) of the Exchange Act.

## IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be

deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondent as provided for in the Commission's Rules of Practice.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Brent J. Fields
Secretary

7

# Tab 2-7

# Exhibit 5



FEI.JJPQ  V/T/

SIGN IN | REGISTER                Search Reuters

HOME   BUSINESS   MARKETS   WORLD   POLITICS   TECH   OPINION   BREAKINGVIEWS   MONEY   LIFE   PICTURES   VIDEO

---

Funds | Wed Jun 11, 2014 4:09pm EDT                Related: STOCKS, REGULATORY NEWS, MARKETS, MUTUAL FUND CENTER

# U.S. SEC to file some insider-trading cases in its in-house court

X BTI JOHLJPO, KVOF 22 | BY SARAH N. LYNCH

The U.S. Securities and Exchange Commission expects to start filing some insider-trading cases in an in-house court rather than federal court, dismissing concerns by defense lawyers that this shift from past practice would be unfair.

"I do think we will bring insider-trading cases as administrative proceedings in appropriate cases," Andrew Ceresney, head of the SEC enforcement division, told the District of Columbia Bar on Wednesday. "We have in the past. It has been pretty rare. I think there will be more going forward."

The SEC has historically filed insider-trading cases in federal courts because the law barred it from seeking penalties in its own court against employees of firms it did not regulate directly, such as brokerages.

But that changed in 2010, when the Dodd-Frank law granted the regulator power to seek financial penalties against a wider array of defendants, including public company employees.

That has given the SEC greater incentive to file more administrative cases, though few so far have involved insider trading. One, against former Goldman Sachs Group Inc director Rajat Gupta, was originally filed administratively, but later dismissed and re-filed in federal court.

Defense lawyers often complain that SEC administrative proceedings lack procedural protections available in federal courts, including the ability to take depositions, spend more time gathering evidence, and present cases to juries.

"Administrative proceedings lack these important features," said Stephen Crimmins, a partner at K&L Gates in Washington, D.C. and former SEC trial attorney.

"Prosecuting insider trading cases in administrative proceedings would be a significant change."

Critics also say the administrative proceedings process is conflicted because defendants must appear before the same five-member commission that authorized enforcement actions before they can appeal to a federal court.

Ceresney dismissed such concerns, saying administrative proceedings are fair.

The SEC's planned shift follows a string of recent trial losses involving insider trading.

OFX T


**No support for gay marriage**


**Is nicotine all bad?**

5/19/2015                                    SEC to file some insider-trading cases in-house | Reuters

Case 1:15-cv-01801-LMM   Document 2-7   Filed 05/19/15   Page 3 of 3
Case 1:15-cv-01801-LMM   Date Filed: 05/15/2015   Page: 15 of 51

On June 6, a federal jury found that Manoj Narayan, a former executive at computer storage device company sTec Inc, not liable for trading on inside information ahead of a secondary stock offering.

About a week earlier, a Manhattan federal jury found Wynnefield Capital Inc fund manager Nelson Obus not liable on an SEC claim that he traded on inside information about a takeover, in a case that had dragged on for a decade.

Obus told Reuters in an interview Wednesday he was "shocked" and said administrative proceedings are a "kangaroo court."

"It makes me feel that they can't win in court with a jury of one's peers," he said.

Ceresney said filing insider-trading cases administratively is not a reaction to recent losses, and the SEC will still use federal courts because it can win higher penalties there.

But he conceded that even the threat of bringing cases in-house has had an impact.

"There have been a number of cases in recent months where we had threatened administrative proceeding ... and they settled," he said, referring to defendants. (Reporting by Sarah N. Lynch in Washington; additional reporting by Nate Raymond in New York; editing by Jonathan Stempel and Tom Brown)

□□□ EXPAND

## More From Reuters

· Ukraine says Russia tried to kill captured Russian soldiers
   | 18 May

· Missing Penn State student found after parents at graduation learn he dropped out
   | 11 May

· Why this Ukrainian 'revolution' may be doomed, too   | 17 May

· Special Report: Russian soldiers quit over Ukraine   | 10 May

· Alabama woman who ran granddaughter to death gets life in prison   | 11 May

## Sponsored Financial Content    ✉ (?)

· This Extremely Brilliant Way to Pay Off Mortgage Has Banks On Edge  Bills.com

· 1 little-known Apple supplier holds nearly unlimited growth potential  The Fool

· The 10 highest-returning small cap dividend stocks, revealed...  Oxford Club

· What your Annuity Salesman wants to keep a secret. Gain insights now.  Fisher Investments

· Investors will pay the price if regulators declare funds risky.  ICI

USFŒJCH PO SFVUFST

X feejoh ebuj  pgCajt upmQxrjo, ebvhi uf s pgTbsbi
Qxrjo, jt  domrfe pgg                                    2

Dpoevdups i vsujo Ql jrbef mjq jb usbjo ef sbjm f ou
t vf t  Bn usbl                                          3

M bsojoh gspn  Vodrh Tbn ; up Svt t jbll
boopzbooff , VT/ i pof t  VI sbjojbo ghi ljoh t l jmh     4

Svtt jb dpdf  qvojt in f ougas rbdl  pgsf t qf duup
Dboboeb                                                  5

J+ ojdpxjof  bmscbe@                                      6

## From The Web              Sponsored Links by Taboola







Relax, It's Covered: Purchase Protection Kicks In When Life...
CHASE® Credit Cards

How This Razor is Disrupting a $13 Billion Industry
Dollar Shave Club

New Rule Georgia "DMV" Doesn't Want You To Know
Provide Insurance Quotes

# Tab 2-9

# Exhibit 7

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

http://www.wsj.com/articles/sec-wins-with-in-house-judges-1430965803

U.S.

# SEC Wins With In-House Judges

Agency prevails against around 90% of defendants when it sends cases
to its administrative law judges



Joel Shapiro, the head of an investment firm, lost a hearing on an SEC civil enforcement action before an agency in-house judge who has never fully cleared a defendant. Mr. Shapiro's appeal will be heard by the SEC commissioners—the same body that earlier decided the case against him should go forward. *PHOTO: DUSTIN CHAMBERS FOR THE WALL STREET JOURNAL*

By JEAN EAGLESHAM

May 6, 2015 10:30 p.m. ET

Joel Shapiro faced an uphill battle when he fought the Securities and Exchange Commission in an Atlanta court last year.

The investment-firm chief executive came before an SEC administrative law judge who has never fully cleared a defendant. In August, the judge found Mr. Shapiro had violated securities law, showing "reckless disregard" for his duty to investors.

The odds are once more against Mr. Shapiro as he challenges this ruling. His appeal will be decided by the SEC's five commissioners, the same body that decided the case against him should go forward in the first place.

Mr. Shapiro, who denies any wrongdoing, called the process "the most unfair, the worst thing I've ever gone through." The SEC declined to comment on his case.

An analysis by The Wall Street Journal of hundreds of decisions shows how much of a home-court advantage the SEC enjoys when it sends cases to its own judges rather than federal courts. That is a practice the agency increasingly follows, the Journal has found.

The SEC won against 90% of defendants before its own judges in contested cases from October 2010 through March of this year, according to the Journal analysis. That was markedly higher than the 69% success the agency obtained against defendants in federal court over the same period, based on SEC data.

Going back to October 2004, the SEC has won against at least four of five defendants in front of its own judges every fiscal year.

The SEC says its judges are impartial and the process is fair. It attributes the difference in outcomes partly to case mix. For instance, most of its complicated insider-trading cases have been heard in federal court, not by its in-house judges.

The Journal analysis also reveals the SEC's high success rate in appeals of its administrative law judges' rulings—the appeals its own commissioners hear.

The commissioners decided in their own agency's favor concerning 53 out of 56 defendants in appeals—or 95%—from January 2010 through this past March, the Journal found. Five other cases were sent back to in-house SEC judges to reconsider.

"In an administrative law proceeding" at the SEC, said Bradley Bondi, a former counsel to two former SEC commissioners, "the commission is akin to the prosecutor and then, in an appeal, the judge in the same case."

Defendants who appealed risked making their situations even worse. During the same stretch, the SEC commissioners reduced financial sanctions imposed on one defendant but increased the sanctions for seven others.

SEC officials believe appeals within the agency aren't as one-sided as the Journal's analysis suggests, according to people close to the agency. Several appeals involved cases where the underlying conduct wasn't in dispute, such as appeals of industry bans. Stripping those out, the SEC decided appeals in its own favor 88% of the time, rather than 95%.

For comparison, U.S. attorneys had an average win rate of 84% before federal appellate courts in the past three fiscal years, according to Justice Department data. That rate applies to criminal cases, in contrast to the SEC's civil cases.

Case 1:15-cv-01801-LMM   Document 2-9   Filed 05/19/15   Page 4 of 8
Case: 15-12831   Date Filed: 09/15/2015   Page: 20 of 51

Mary Jo White, the head of the SEC, has termed its in-house adjudication system "very fair." Enforcement chief Andrew Ceresney said the SEC's "excellent record in administrative proceedings reflects the strength of the evidence presented in each case, and not our choice of venue."

The SEC brought more than four out of five of its enforcement actions as administrative proceedings, rather than federal-court cases, in the fiscal year ended Sept. 30. That was up from less than half of them a decade earlier.



**Home-Court Advantage**

The Securities and Exchange Commission is sending more cases to in-house judges, rather than federal court, and wins more often when it does.

Note: Fiscal years end Sept. 30.  *How often the agency wins against defendants in contested cases
Source: Wall Street Journal analysis of Securities and Exchange Commission data

THE WALL STREET JOURNAL.

While many such cases are settled by agreement with defendants or address straightforward matters, SEC officials say they also are sending increasing numbers of contested lawsuits to their own judges, reflecting enhanced powers granted by the 2010 Dodd-Frank financial legislation. The law allowed the SEC to seek financial penalties in administrative proceedings from firms and people not under its regulatory purview.

"It is a fundamental change," said Joseph Grundfest, a former SEC commissioner who is now a law professor at Stanford University. "By bringing more cases in its own backyard, the agency is not only increasing its chances of winning but giving itself greater control over the future evolution of legal doctrine."

SEC officials said the agency has used its in-house court since the 1940s. It isn't a guarantee of success, Ms. White noted last year: "We don't win them all."

Still, no defendant has escaped unscathed before SEC Judge Cameron Elliot, the judge who heard Mr. Shapiro's case. In Mr. Elliot's four years as an SEC judge, he has found all of the 28 defendants who came before him in contested cases liable on at least some of the charges the SEC enforcement arm had brought against them.

This compares to an 85% SEC win rate in cases before another in-house judge, Carol Foelak, and 87% in cases heard by the agency's chief administrative law judge, Brenda Murray.

## Bias allegation

One former SEC judge said she thought the system was slanted against defendants at times. Lillian McEwen, who was an SEC judge from 1995 to 2007, said she came under fire from Ms. Murray for finding too often in favor of defendants.

"She questioned my loyalty to the SEC," Ms. McEwen said in an interview, adding that she retired as a result of the criticism.

Ms. McEwen said the SEC in-house judges were expected to work on the assumption that "the burden was on the people who were accused to show that they didn't do what the agency said they did."

A spokeswoman for the SEC judges declined to comment, and the judges declined to be interviewed.

The judges have their offices on the second floor of SEC headquarters in Washington, along with the agency's press office and a staff health club, according to people close to the agency.

"The SEC appoints the judges, the SEC pays the judges, they are subject to appeal to the SEC," U.S. District Judge Jed Rakoff said. "That can create an appearance issue, even if the judges are excellent, as I have every reason to believe they are."

John Flannery and James Hopkins say their encounter with the SEC has cast a long shadow on their lives.

In a closely watched case, the two former executives of investment adviser State Street Corp. beat the odds by winning before SEC chief judge Murray, only to have the SEC commissioners partially reverse her ruling three years later.

The agency in 2010 charged that before the financial crisis, Messrs. Flannery and Hopkins misled fund investors about exposure to subprime bonds. State Street, which paid more than $300 million to settle related charges without admitting wrongdoing, declined to comment.

In 2011, after an 11-day hearing with 19 witnesses and about 500 exhibits, Judge Murray tossed out all of the charges against the two executives, calling them credible witnesses who showed "candor [and] conviction."

Case 1:15-cv-01801-LMM   Document 2-9   Filed 05/19/15   Page 6 of 8
Case: 15-12831   Date Filed: 09/15/2015   Page: 22 of 51

"What they alleged was such an assault on my integrity and ethics," said Mr. Flannery, a former State Street chief investment officer.

The SEC's enforcement staff appealed the SEC judge's rejection of charges against the two. They then had to wait more than three years for the SEC commissioners to decide the appeal.

"The SEC says the process is streamlined, but that's not true if there's an appeal," said Mr. Hopkins, who had been a product engineer at State Street.

He said he hasn't worked since the charges were filed more than four years ago. Firms overseen by the SEC appear wary of employing someone in a dispute with it, he said.

"Even though their chief judge said I've done nothing wrong, they've still put me in a box. They're punishing me by keeping me out of a career I love and I've spent 35 years in," Mr. Hopkins said.

In December 2014, the SEC commissioners, in a 3-2 vote, agreed with Judge Murray in rejecting many of the counts, but ruled against both men on some charges of misrepresenting information to investors—Mr. Hopkins in a slide in a presentation, and Mr. Flannery in two letters. The commissioners ordered Mr. Hopkins to pay a $65,000 civil penalty and Mr. Flannery $6,500, and suspended both from the investment industry for a year.

"They're continuing to bully me," Mr. Hopkins said.

A spokesman for the SEC declined to comment on the case.

## U.S. court deference

Mr. Hopkins and Mr. Flannery now are asking a federal appellate court to reverse the SEC commissioners.

That is a tall order, according to legal experts. "The appeals courts tend to go along with the SEC unless there's an egregious error," said Thomas Gorman, a former SEC attorney now at Dorsey & Whitney LLP.

Supreme Court Justice Antonin Scalia said in November he was worried that deference to the SEC by federal appeal courts means the agency "can in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." He made the remark in a statement, joined by Justice Clarence Thomas, during a criminal-case appeal.

Case 1:15-cv-01801-LMM   Document 2-9   Filed 05/19/15   Page 7 of 8
Case: 15-12831   Date Filed: 09/15/2015   Page: 23 of 51

SEC officials said federal courts retain the final say. "I do not think that you are taking away from the courts the ability to shape the law," Mr. Ceresney, the enforcement chief, said at a congressional hearing in March.

The SEC added two new administrative law judges last year, bringing the number to five. The budget for their office has risen 44% this fiscal year to $2.5 million.

Some are calling for formal constraints on the SEC's growing use of its internal tribunal. The trend "has the appearance of the Commission looking to improve its chances of success," said Michael Piwowar, a Republican SEC commissioner, at a February conference.

He said the agency should create guidelines on its choice of courts "to avoid the perception that the Commission is taking its tougher cases to its in-house judges." The SEC is considering such guidelines, said agency officials.

A number of suits in recent months have challenged the SEC's use of administrative law judges, arguing that the system is unconstitutional or unfairly denies defendants the same rights afforded by federal courts. The SEC's Mr. Ceresney said the agency's administrative proceedings "have procedural protections that are not available to defendants in district court proceedings." The legal challenges have so far been unsuccessful. Lawyers say it could take years for courts to resolve the issues.

SEC officials say that in addition to being fair, their in-house adjudication, with a 300-day deadline for many decisions, is much more efficient than using federal courts that can take years to resolve a case.

It can still be expensive for defendants, though. Mr. Shapiro, the Atlanta executive who lost before the SEC's Judge Elliot and is appealing to the SEC commissioners, said he and fellow defendants have spent nearly $6 million on legal fees.

In 2013, the SEC leveled charges against Timbervest LLC—a manager of timber-related investments of which Mr. Shapiro is CEO—as well as Mr. Shapiro and three other executives. The four were accused of defrauding a pension-fund client by making unauthorized asset sales and paying themselves more than a million dollars in undisclosed fees.

After an eight-day hearing last year, Judge Elliot found against the executives on most of the charges and ordered them to pay sanctions totaling $1.9 million.

Case 1:15-cv-01801-LMM   Document 2-9   Filed 05/19/15   Page 8 of 8
Case: 15-12881   Date Filed: 09/15/2015   Page: 24 of 51

He didn't bar them from participating in the investment industry, saying the conduct had occurred outside the five-year statutory limit for such a penalty. The SEC enforcement staff is appealing that part of his decision, saying defendants' "highly calculated schemes to defraud their client" warranted being barred from the industry.

Timbervest, in its appeal, cited what it described as SEC Judge Elliot's "record of utter deference" to the agency that employs him. The defendants also said the disputed transactions benefited clients and the fees were properly disclosed.

The battle could be a long one. The SEC commissioners are due to hear the appeal on June 8. If they back the SEC judge, the defendants plan to ask a federal appellate court to step in, said Stephen Councill, a lawyer for the defendants. "We're hellbent on fighting this all the way," he said.

Write to Jean Eaglesham at jean.eaglesham@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# Tab 2-11

# Exhibit 9

# Remarks at the "SEC Speaks" Conference 2015: A Fair, Orderly, and Efficient SEC

## Commissioner Michael S. Piwowar

**Washington DC**

**Feb. 20, 2015**

Good afternoon.  Thank you, Keith [Higgins], for that wonderful introduction.  I appreciate the opportunity to be here today with so many of the SEC staff, former SEC staff, and other members of the securities community.  "SEC Speaks" provides us with the chance to reflect on all of the Commission's accomplishments in the past year, which are the result of the hard work and dedication of the staff.  At the same time, it is also an appropriate venue for considering what else we can do to effectively carry out our mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.  I would suggest that the answer to how we can build upon the accomplishments of the past year is to apply the same objective that we have for the markets we regulate—that they be fair, orderly, and efficient--to ourselves.  And so, I would like to discuss how we can make the SEC a more fair, orderly, and efficient agency.

Before going any further, lest you think that what I say necessary reflects the views of the Commission or my fellow Commissioners, I want to assure all of you that the views I express today are solely my own.

**Fair**

The backbone of our securities laws is disclosure.  The SEC requires public companies and key participants in the securities world to disclose meaningful, accurate, and timely information to the public.  Access to this information provides investors with a common pool of basic facts that allows them to determine whether and in what to invest.  Given that we extoll the virtues of clear disclosure in our markets, and place so many requirements on others to provide useful information, it only seems fair that the Commission apply the same standards to itself.  Before we make a final determination on any matter, we should provide both sufficient information to market participants such that they will understand how they will be impacted by our decisions, and a set of clear guidelines ensuring that our regulations will be applied consistently to all.

Rulemaking:  Fairness demands that the Commission not act arbitrarily or capriciously.  Those we regulate therefore should know the rules and standards to which they will be held.  While we cannot guarantee that everyone has actual knowledge and understanding of our entire rule set, it is incumbent upon us to make sure that those we regulate are on notice as to the rules and standards by which they must operate.  In particular, we must ensure that the rules do not change day-to-day on the whims of the Commission and/or its staff.  This means that, as required by the Administrative Procedure Act[1], the Commission must not adopt any new rule or rule amendments without proper notice and an opportunity for comment by the public.  The corollary of this principle is that the Commission and staff must not engage in rulemaking by

5/19/2015                    SEC.gov | Remarks at the "SEC Speaks" Conference 2015: A Few Priorities and Practical SEC
Case 1:15-cv-01801-LMM    Document 2-11    Filed 05/19/15    Page 3 of 9
Case: 15-12831      Date Filed: 09/15/2015      Page: 28 of 51

enforcement or through examinations of regulated entities.  For example, we must resist the temptation to include undertakings in enforcement settlements or principles in examination reports that serve as de facto rule requirements.

Another issue with our rulemaking process that raises fairness concerns is the increasing length of the releases that accompany and explain our rules.  As many in this room can attest, it is becoming the norm that our adopting rule releases number well over 500 pages.  While some of this length can be attributed to a more robust economic analysis, a significant portion is simply an attempt to explain the new rule(s) or amendments.  Where 500 or 1,000 pages are required to explain the rules we have adopted, the Commission must ask itself whether our rule text is too complex for market participants to reasonably understand and apply.    Moreover, the sheer length may discourage many from even attempting to read the rules, which is a significant problem for an agency seeking to promote compliance with its own rules.

The voluminous nature of many recent releases also suggests that rather than merely explaining our rules, these documents now include extensive guidance akin to rulemaking, which can create entirely separate fairness concerns.  For example, the most recent amendments to our money market fund rule included key guidance akin to rulemaking for *all* mutual funds, not just money market funds, which was buried in a footnote within an almost 900-page release.[2]  We must reduce the size of our releases.  I know that our rules can be quite complex, but perhaps we can start by breaking rulemakings into smaller pieces contained in multiple releases rather than in one omnibus rulemaking.

Litigation:  Our enforcement program could also benefit from a look through the lens of fairness.  In order to ensure that the Commission does not engage in arbitrary or capricious conduct in enforcement matters, the Commission should formulate and adhere to a consistent set of guidelines when conducting our enforcement proceedings.

Commission staff has recently indicated that they will recommend instituting more enforcement matters, including insider trading cases, through administrative proceedings rather than going through the federal district courts.[3]  Announcement of this plan to increase the use of administrative proceedings in insider trading cases followed the Commission's loss in two insider trading cases in federal district courts.  Regardless of whether these circumstances are linked, this change has the appearance of the Commission looking to improve its chances of success by moving cases to its in-house administrative system.

Even prior to the staff announcement, more cases were being brought in administrative proceedings as a result of the enactment in 2010 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).  Prior to the Dodd-Frank Act, the Commission only had the authority to seek monetary penalties in administrative proceedings against regulated entities and would have needed to file an action in federal court to obtain a monetary penalty against any other person.

In administrative proceedings, there is no jury and cases are presented to administrative law judges that are employees of the Commission.  In addition, discovery available to defendants is more limited.  The Commission has an extremely high success rate when litigating through administrative proceedings.  One Article III federal judge has stated that in fiscal year 2014 the SEC won 61 percent of federal court trials but was successful in 100 percent of its administrative proceedings.[4]  To avoid the perception that the Commission is taking its

tougher cases to its in-house judges, and to ensure that all are treated fairly and equally, the Commission should set out and implement guidelines for determining which cases are brought in administrative proceedings and which in federal courts.

Two other areas in the litigation context that also would benefit from the consistent application of public stated guidelines or factors are the imposition of corporate penalties and the issuance of waivers. In 2006, the Commission unanimously issued a statement concerning financial penalties that addressed whether, and if so, to what extent, to impose civil penalties against a corporation.[5] The statement was issued because the "Commission believe[d] it important to provide the maximum possible degree of clarity, consistency, and predictability in explaining the way that its corporate penalty authority will be exercised."[6]

The framework described in the Commission's 2006 statement turns principally on two considerations: one, the presence or absence of a direct benefit to the corporation as a result of the violation and, two, the degree to which the penalty will recompense or further harm the injured shareholders. The statement also discussed seven additional non-principal factors that would be appropriate for consideration in determining whether to impose a corporate penalty. However, the application of the 2006 factors is now in doubt.[7] As I have previously stated, I have become concerned by the increasing number of staff recommendations that have not been accompanied by analysis of the principal factors described in the 2006 penalty statement and would welcome a discussion about our analytical framework for corporate penalties so that we can once again give market participants the clarity they deserve in this area.[8]

A similar concern exists in the determination of whether to issue waivers. Certain violations of securities regulations result in the automatic disqualification of the violator or related entities from participating in certain aspects of the securities industry or from relying on certain exemptions in the securities regulations. Frequently, the violator and its affiliates will apply to the Commission or Commission staff for relief from the disqualification. For many of these waiver requests, guidelines and policies have been developed by the staff to determine if the applicants should be granted a waiver from the applicable disqualification.

However, recently and with increasing frequency, Commissioners have been ignoring the established staff guidelines and staff's efforts to apply them. Although the Commission is not bound to staff guidelines, nevertheless it is important that there be an established policy or guidelines that would allow a party to determine if it would be eligible for applicable waivers. Having established guidelines is particularly important in the context of settlement negotiations to allow a party that is considering a settlement offer to determine whether if it settles it will be able to obtain the necessary waivers to continue to engage in certain business activities. This does not mean that the guidelines can never change.[9] However, where we have established guidelines we must follow them. I note that my fellow Commissioner Dan Gallagher gave a thoughtful speech on a potential path forward last week.[10]

SEC Speaks: Given my focus on fairness, one final point merits attention. "SEC Speaks" has become an annual tradition. In order to prepare today's presentations and other materials, substantial taxpayer-funded Commission resources and staff hours were expended. Given the use of taxpayer resources, the Commission should consider whether this valuable information should also be made freely available to general public, perhaps through archived webcasts.

**Orderly**

5/19/2015                SEC.gov | From a Maine "SEC Speaks" Conference 2015: A Few Priority and Practical SEC
Case 1:15-cv-01801-LMM    Document 2-11    Filed 05/19/15    Page 5 of 9
Case: 15-12831      Date Filed: 09/15/2015      Page: 30 of 51

I recently became aware of a joke that is making the rounds with the SEC-regulated community. "Did you hear that the SEC has invented a new stove? It has fifty front burners." Not every Commission task can be on the proverbial "front burner." In order for the Commission to function in an orderly manner, we need to have policies to prioritize what we will focus on in rulemakings, enforcement actions, and examinations. The Commission also must have in place procedures that ensure that exemptive applications are dealt with in an orderly and timely manner, as well as a process for determining the appropriate deployment of Commission resources.

There are numerous Congressionally-mandated rulemakings that the Commission must implement within an impractical timeframe. Concurrently, other urgent issues arise that also need to be addressed through rulemaking in order for the Commission to effectively discharge its duty to oversee our securities markets. It is impossible for the Commission to address all of these potential rulemakings at the same time.

There are a number of ways we could prioritize rulemakings. We could, for example, base our rulemaking calendar on the degree of political pressure, the degree of contentiousness, the speed with which a rule could be dealt, the sensibleness of the rule, the expected net benefits of the rule, or the degree to which the rule would be a good use of the Commission's resources. As effective as some of these might be, I believe that the first step in prioritization of our rulemakings should be a determination of whether each rulemaking advances the core mission of the Commission: protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation. Those that do not advance the core mission, or that in fact would inhibit our core mission by merely advancing the agenda of special interests seeking to achieve their own objectives, such as the pay ratio and conflict minerals rulemakings, should fall to the bottom of the list or off of the list altogether. This would at least free up precious resources at the Commission to focus on the myriad issues that do meet our core mission.

Prioritization is also necessary in the enforcement context. As I have previously stated, a "broken windows" approach to enforcement does not work.[11] If you create an environment in which regulatory compliance is the most important objective for market participants, rather than enabling vital and important economic activity, we will have unnecessarily shackled it. The Commission must prioritize which enforcement actions to pursue. Enforcement efforts should be closely aligned with the priorities developed by our policy-making divisions. In addition, decisions on the use of investigative discretion must complement these efforts, rather than serve as an independent source of policy. It is important therefore that the Commission's senior leadership provide appropriate guidance to staff on the use of investigative discretion.

One area in which the Commission has made significant progress in setting priorities is in our examination program. Our staff in the Office of Compliance Inspections and Examinations (OCIE) utilizes a rigorous, data-driven approach to decision-making when setting their annual examination priorities. OCIE staff works with other groups, such as our Division of Economic and Risk Analysis (DERA), Division of Trading and Markets, and Division of Investment Management, to determine which areas may present heightened risks. Part of this process involves a review of data and information available to the Commission, from both internal and external sources. Once draft priorities for the upcoming year have been identified, the Commissioners are briefed on the proposed priorities and their supporting analyses and are

invited to provide appropriate feedback to OCIE. This process provides for an orderly determination of those to inspect, more efficient use of the limited number of examiners that the Commission has, and heightens the effectiveness of our inspection program.

Another area in which a lot of progress has been made is the timely processing of exemptive applications. Of course, the amount of time for resolution of an application is highly dependent on the responsiveness of the applicant. Still, staff has effectively reduced the amount of time from the filing of an application until its resolution. While much progress has been made, more can and needs to be done. There are still instances when applications drag on for years. As an example, it took *over six years* for an actively managed, non-transparent exchange-traded fund (ETF) application ultimately to be denied. While this application involved an ETF that would differ from the typical ETF, this still should have never happened.

A significant part of the solution to the length of the application process lies with the Commission's setting of priorities in its rulemaking. Again, using ETFs as an example, the Commission long ago should have adopted a rule that would have allowed most ETFs to operate without the need for an exemptive order. Such a rule would significantly lessen the number of exemptive applications, leaving more time for staff to deal with novel applications such as the actively managed, non-transparent ETF. In fact, the Commission proposed an ETF rule in March 2008. The rule has yet to be adopted. The ETF rule would advance the Commission's core mission, is sensible, would be a good use of Commission resources, and could be adopted in a short period of time.

Finally, the Commission has to come up with a process to appropriately deploy its financial and human resources. The securities industry is not stagnant. In fact, it is constantly changing. Deployment of the Commission's limited resources also must change in response to changes in the industry. For example, Wall Street firms are increasingly moving their back offices outside of New York. This change results in many firms' records being located outside of New York and into the geographic footprint of our other regional offices. Therefore, the Commission needs a process in place that takes industry changes into consideration when determining the staffing of regional offices.

**Efficient**

The Commission must use its limited taxpayer resources in an efficient and prudent manner. There are a number of areas where the Commission has already implemented strategies for improving its efficiency. At the same time, there are still other areas where we can do better.

One tool which the Commission has used and can continue to deploy to increase our efficiency is strategic investments in cutting-edge technology. Perhaps the best example of this was our investment in and implementation of the Market Information Data Analytics System, or MIDAS. MIDAS, which was launched in 2013, provides the SEC with data about every displayed order posted on national exchanges. The information comes from the consolidated tapes and proprietary feeds of each exchange. This data greatly improves our understanding of the way today's markets function. Benefits from this information cut across the different divisions and offices within the Commission. MIDAS can help us monitor and understand mini-flash crashes, pick up on possibly troublesome or illegal behavior, reconstruct market events, and more importantly, provide dramatically better insight into the functioning of a market that moves many millions of dollars in thousandths of a second.

Another area through which we have and can continue to increase efficiency is through well designed reorganizations and reallocations of our resources. In 2010, we undertook an effective and efficient reorganization of the Division of Enforcement. The reorganization created five national specialized units that are dedicated to particular highly specialized and complex areas of securities law and a new Office of Market Intelligence that is responsible for the collection, analysis, and monitoring of the voluminous number of tips, complaints, and referrals that the SEC receives each year. The reorganization created the Asset Management, Market Abuse, Complex Financial Instruments (formerly known as Structured and New Products), Foreign Corrupt Practices, and the Municipal Securities and Public Pensions Units.

The specialized units allow for improved understanding of complex products and markets, earlier and better capability to detect emerging fraud and misconduct, and an increase in expertise within the Enforcement Division. In addition, because these units operate nationally, there is more consistency in the handling of enforcement cases. Other areas of enforcement have also seen recent efficiencies. The Office of Market Intelligence enables the Enforcement Division to better focus resources on those tips and referrals with the greatest potential for uncovering wrongdoing.

While the Commission has made good use of the tools I just discussed to increase efficiency, there are a number of other tools available to the Commission that it could use with greater frequency. These tools include increasing the usage of investor testing, pilot programs, and retrospective reviews of existing rules. They also include earlier involvement by our in-house DERA economists in the rulemaking and enforcement processes, as well as improved engagement and collaboration with academic and industry experts.

Better use of these tools could significantly help the Commission determine the effectiveness of current rules and programs, the potential utility of new rules or rule amendments, and identify new issues that might require Commission action.[12] For example, investor testing can help us determine weaknesses in our current disclosure requirements as well as what information would be most helpful to investors and in what format. Pilot programs, such as the one that we are currently considering to assess stock market tick size impact for smaller companies, enable us to test hypotheses and use the results to determine whether change is needed without causing harm to investors.

Engaging with academics, attorneys, and others from the securities industry who work outside the SEC could greatly enhance our ability and effectiveness in identifying changes to improve our regulatory regime. This type of engagement provided immense assistance to the Commission in 1961 when Congress directed the Commission to investigate the adequacy of the rules of national securities exchanges and national securities associations utilizing individuals from private law practice, academia, and industry. As Milton Cohen, the director of this study stated, "[i]f the Commission members themselves were to have gone as deeply into each of these processes as the Special Study has done, either the scope of the Study would have had to be narrower, or the time longer, or the recommendations very much less specific."[13] The Commission should reinstitute the process that Mr. Cohen utilized to review our current market structure. The Commission also should continue and expand its hiring of academics, attorneys, and members of the securities industry as fellows in different parts of the Commission, which allows the Commission to tap their expertise in areas of specific concern to the Commission on a temporary basis.

The broad study I previously mentioned is one form of retrospective analysis of our rules. In general, a retrospective analysis of our rules would help us identify which if any of our current rules should be modified, streamlined, expanded, or repealed for the purpose of making our regulatory regime more effective or less burdensome in achieving our core mission. While President Obama signed an Executive Order requiring such a retrospective analysis more than three years ago, the Commission has not yet undertaken a serious effort to conduct this type of analysis of our existing rules.[14] In order for the Commission to administer its regulatory program more efficiently, this must change.

Finally, including DERA in rulemaking and enforcement cases early in the process would increase the efficiency of the rulemaking and enforcement processes just as it has helped make our examination program more efficient. DERA's involvement early in the rulemaking process can provide rulemaking staff with DERA's analysis of whether the issue staff is seeking to address through rulemaking is one that requires Commission action at that time. Early involvement by DERA also could help staff identify multiple alternatives to address the issue and the costs and benefits of each at the outset of the rulemaking process prior to the staff locking in on a particular solution. In the enforcement context, early DERA participation can help determine materiality, harm to investors (if any), ill-gotten gains (if any), whether the benefits of pursuing a particular enforcement action outweigh the costs, and whether it would be prudent to pursue alternative enforcement actions.

*   *   *

Let me finish by thanking the staff for the incredible work being done right now. The Commission's staff works tirelessly to support and protect our nation's capital markets, for the benefit of the entire investing public. I am thankful for their dedication, and I thank you for being a wonderful audience. Enjoy the rest of the conference.

[1] 5U.S.C. Sec. 551 *et seq.*

[2] Money Market Fund Reform; Amendments to Form PF, Investment Company Act Release No. 31166 (July 23, 2014) [79 FR 47736 (Aug. 14, 2014)] at n. 873.

[3]*See* Ronald E. Wood, *SEC May Ramp Up Administrative Proceeding*, Daily Journal Supplement (July 23, 2014), at 7, available at http://www.proskauer.com/files/uploads/Documents/Ron-Wood-article.pdf ; Sarah N. Lynch, *U.S. SEC to File Some Insider-Trading Cases in its In-House Court*, Reuters (June 11, 2014), available at http://www.reuters.com/article/2014/06/11/sec-insidertrading-idUSL2N0OS1AT20140611; James Meyers, *SEC Gives Itself Home-Court Advantage*, Law 360 (Aug. 5, 2014), available at http://www.law360.com/articles/563274/sec-gives-itself-home-court-advantage.

[4] *See* Nate Raymond, *U.S. Judge Criticizes SEC Use of In-House Court for Fraud Cases*, Reuters (Nov. 5, 2014), available at http://www.reuters.com/article/2014/11/05/us-sec-fraud-rakoff-idUSKBN0IP2EG20141105.

[5] SEC Press Release No. 2006-4, *Statement of the Securities and Exchange Commission Concerning Financial Penalties* (Jan. 4, 2006), available at http://www.sec.gov/news/press/2006-4.htm.

[6] *Id.*

[7] *See* Mary Jo White, *Deploying the Full Enforcement Arsenal* (Sept. 26, 2013), available at http://www.sec.gov/News/Speech/Detail/Speech/1370539841202.

[8] *See* Michael S. Piwowar, *Remarks to the Securities Enforcement Forum 2014* (Oct. 14, 2014), available at http://www.sec.gov/News/Speech/Detail/Speech/1370543156675.

[9] For example, upon my request, the guidelines regarding waivers from ineligible issuer status (WKSI Waiver) were amended to remove "too big to fail" as a consideration in granting such a waiver.  *See* Sarah N. Lynch, *SEC Alters Waiver Policy to Remove 'Too Big to Fail' Concern* (June 17, 2014), available at http://www.reuters.com/article/2014/06/17/us-sec-waiver-piwowar-idUSKBN0ES2UT20140617.

[10] *See* Daniel M. Gallagher, *Why is the SEC Wavering on Waivers? Remarks at the 37th Annual Conference on Securities Regulation and Business Law* (Feb. 13, 2015), available at http://www.sec.gov/news/speech/021315-spc-cdmg.html.

[11] Michael S. Piwowar, *Remarks to the Securities Enforcement Forum 2014* (Oct. 14, 2014), available at http://www.sec.gov/News/Speech/Detail/Speech/1370543156675.

[12] Section 912 of the Dodd-Frank Act authorizes the commission to gather information from and communicate with investors or other members of the public, engage in temporary investor testing programs, and consult with academics and consultants in evaluating any rule or program of the Commission or for the purpose of considering or developing new rules or programs.

[13] Milton H. Cohen, *Reflections on the Special Study of Securities Markets* (May 10, 1963), available at http://www.sec.gov/news/speech/1963/051063cohen.pdf.

[14] *See* Executive Order 13579 – Regulation and Independent Regulatory Agencies (July 11, 2011).  *See also* M-11-28 – Memorandum for the Heads of Independent Regulatory Agencies (July 22, 2011).

*Modified: Feb. 20, 2015*

# Tab 2-12

# Exhibit 10



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# SEC Administrative Case Rules Likely Out Of Date, GC Says

By **Daniel Wilson**

Law360, Washington (June 17, 2014, 5:55 PM ET) -- U.S. Securities and Exchange Commission General Counsel Anne K. Small on Tuesday acknowledged attorneys' concerns about the increasing complexity of insider-trading and other administrative cases being brought before the commission, saying suggestions to explore changing the rules for these proceedings were "entirely reasonable."

In a question-and-answer session between Small and members of the District of Columbia Bar, the GC — noting she was speaking only for herself and not on behalf of the commission — said that it was fair for attorneys to question whether the SEC's rules for administrative proceedings were still appropriate, with the rules last revised "quite some time ago."

At that time, the SEC's administrative proceedings dealt with different kinds of cases than the more complex administrative matters it now takes on or expects to take on — given the commission's expanded authority under the Dodd-Frank Act — such as insider-trading actions, she said.

As such, it was "entirely reasonable to wonder" if those rules should be updated to reflect the changed situation, for instance by allowing more flexibility on current limits to trial preparation time or allowing for depositions to be taken, she said.

"We want to make sure the process is fair and reasonable, so [changing] procedures to reflect the changes makes a lot of sense," she said, noting the commission was open to petitions on the issue.

As part of the wide-ranging discussion, Small also spoke on a number of recent court cases involving the commission where she believed courts' guidance had been useful, including the Second Circuit's recent ruling **overturning** U.S. District Judge Jed Rakoff's refusal to sign off on a "no-admit, no-deny" settlement made with Citigroup Inc.

This ruling had put in place "clear lines" on how district courts within that circuit assess SEC settlement deals, Small said, while recognizing — even as the SEC pursues more admissions of wrongdoing under its leader, Mary Jo White — the importance that it has the discretion to not seek admissions when helpful for resolving certain cases.

Earlier decisions from the D.C. Circuit, stretching back to 2005, had also been useful in shaping work her office has done in conjunction with the commission's division of economic and risk analysis on the economic analyses attached to the SEC's rule-making process, according to Small.

These analyses have become "more coherent and systematized" since those decisions, which took the commission to task for deficiencies in its analyses and prompted the SEC to take a hard look at how it assesses the economic effects of its rule-making, the GC said.

This more coherent approach had allowed the commission to put in place a set of best practices that provide a level of certainty — available publicly as a guidance document — ensuring that it provides a consistent approach to economic analysis from rule to rule while also recognizing that each rule is different, according to Small.

"We're trying to stick to the guidance and provide a robust assessment of the impact of rules as much as we can ... not just some after-the-fact rationalization, but from the beginning," she said.

Although only a small number of rules have come from the agency since the process in the guidance had begun to be applied, the tweaks the agency made appear to have had the desired result, with recent court challenges to SEC regulations focusing less on purportedly faulty economic analyses, Small said.

In addition to providing input on economic analyses, the GC said that her office has also given broader attention to providing legal advice on the commission's rule-writing efforts, such as the legal authority the commission has to implement various approaches commissioners are considering.

Further, it spends a significant amount of time helping to provide advice on enforcement cases that the commission is involved in, she said, but she noted that its role in these cases should not be conflated to that of a "shadow enforcement effort."

We're "not out there investigating issues," she said. "[We give] legal advice on cases providing novel claims, or on case with issues [the SEC Enforcement Division] should be aware of."

Small was coy, however, on when the commission would complete its mandatory Dodd-Frank Act rule-making, saying that White was hoping to move forward with the rules as quickly as possible but declining to estimate a date for when this would occur.

She also demurred on questions on potential rule-making on high-frequency trading and "dark pools," saying that the SEC's Division of Trading and Markets was kicking around potential regulatory ideas and the specifics of any such proposals would be up to that unit to make public.

--Editing by Katherine Rautenberg and Jeremy Barker.

All Content © 2003-2015, Portfolio Media, Inc.

# Tab 2-13

# Exhibit 11

**Division of Enforcement Approach to Forum Selection in Contested Actions**

The Commission generally is authorized to bring its enforcement actions in either of two forums – a civil action in federal district court or a Commission administrative proceeding (and/or cease-and-desist proceeding) before an Administrative Law Judge – though it has authority to proceed on certain charges or remedies in only one of those forums.  The Division seeks to further the Commission's mission to protect investors and the integrity of the markets through strong, effective, and fair enforcement of the federal securities laws.  When recommending a contested enforcement action to the Commission, the Division recommends the forum that will best utilize the Commission's limited resources to carry out its mission.  The Division's forum recommendations are in all cases subject to review and approval by the Commission.

There is no rigid formula dictating the choice of forum.  The Division considers a number of factors when evaluating the choice of forum and its recommendation depends on the specific facts and circumstances of the case.  Not all factors will apply in every case and, in any particular case, some factors may deserve more weight than others, or more weight than they might in another case.  Indeed, in some circumstances, a single factor may be sufficiently important to lead to a decision to recommend a particular forum.

While the list of potentially relevant considerations set out below is not (and could not be) exhaustive, the Division may in its discretion consider any or all of the factors in assessing whether to recommend that a contested case be brought in the administrative forum or in federal district court.

- The availability of the desired claims, legal theories, and forms of relief in each forum:  Certain claims, theories, and relief are only available in one forum.

  - For example, charges of failure to supervise or causing another person's violation can only be pursued in the administrative forum; liability as a controlling person or as a relief defendant can only be pursued in district court actions.

  - In situations where there is a need for emergency proceedings or relief – where the alleged violative conduct is ongoing and/or there is a risk that proceeds of the alleged wrongdoing will be dissipated or moved offshore or evidence will be destroyed – only a federal district court can issue the necessary emergency relief to protect investors, such as a temporary restraining order, asset freeze, and/or a document preservation order.

- <u>Whether any charged party is a registered entity or an individual associated with a registered entity</u>:  Registered entities and associated persons have long been subject to the Commission's regulatory oversight, which has long included Commission administrative proceedings.  Although the Commission also may bring actions against them in district court, certain charges and forms of relief applicable to registered entities and associated individuals are available only in the administrative forum.  For example, associational bars and suspensions can only be imposed in an administrative proceeding.  When seeking such remedies, it is often a more efficient and effective use of limited agency resources to seek those remedies directly in an administrative proceeding rather than first commencing a district court action, seeking and obtaining a district court injunction, and then instituting a separate administrative proceeding seeking the remedies based on the injunction.  In addition, as described below, Administrative Law Judges and the Commission develop extensive knowledge and experience concerning issues that frequently arise in matters involving registered entities or associated persons.

- <u>The cost-, resource-, and time-effectiveness of litigation in each forum</u>:  This factor incorporates consideration of the efficient and effective use of the Commission's limited resources.

  - In general, hearings are held more quickly in contested administrative actions than in contested federal court actions.  This may allow the Division to use the Commission's limited resources more effectively.

    - When a matter involves older conduct, this may allow for the presentation of testimony from witnesses who have a fresher recollection of relevant events.

    - This also may permit a more timely public airing, based on evidence offered by all parties to the proceeding, of the facts and circumstances of the conduct and practices at issue in a matter.

  - The ability to seek and obtain relief in a single proceeding may enable the Commission to use its limited resources more efficiently. This may be possible in district court, for example, when the Division is recommending charges against multiple parties, including relief defendants – claims against relief defendants can only be pursued in district court.  This also may be possible in the administrative forum, for example, in the regulated entity/associated person context described above or in situations where we are recommending charges against multiple parties and there may be no

2

single district court that is a permissible venue for an action against each of the parties.

o   There may be potential efficiencies if the case can be decided on, or the disputed issues narrowed by, a motion for summary judgment in federal court (which generally addresses a broad range of claims and issues) or a motion for summary disposition in the administrative forum (which generally requires leave from the Administrative Law Judge to file and typically addresses a narrower range of claims and issues).  For example, district courts more frequently address and resolve elements of claims (such as whether a statement is false or whether an instrument is a "security") on summary judgment.

o   The additional time and types of pre-trial discovery available in federal court may entail both costs and benefits, which should be weighed under the facts and circumstances of a case.  Although pre-trial discovery procedures exist in both administrative proceedings and district court actions, the mechanisms of discovery are different.  For example, in administrative proceedings, the Division must produce to respondents all non-privileged documents from its case file and the Division has *Brady* and *Jencks* obligations, requirements that do not exist in civil district court litigation.  On the other hand, depositions are available in district court but generally not in administrative proceedings. It also is appropriate to consider whether witness testimony that is critical to fair resolution of the matter may be compelled in one forum but not another.

- <u>Fair, consistent, and effective resolution of securities law issues and matters</u>.

  o   Administrative Law Judges, who adjudicate securities law cases, and the Commission develop extensive knowledge and experience concerning the federal securities laws and complex or technical securities industry practices or products.

  o   If a contested matter is likely to raise unsettled and complex legal issues under the federal securities laws, or interpretation of the Commission's rules, consideration should be given to whether, in light of the Commission's expertise concerning those matters, obtaining a Commission decision on such issues, subject to appellate review in the federal courts, may facilitate development of the law.

- o Conversely, where application of state law or other specialized areas of federal law is integral to the matter, district court may be appropriate.

- o If similar charges are being or have been brought against similarly situated parties (*e.g.,* registered entities or associated persons) in the same or closely-related contested matters, it may be preferable to recommend charges against similarly situated parties in the same forum.

This document is U.S. Securities and Exchange Commission (SEC) property.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.  Decisions about particular individual investigations, cases, and charges are made based on the specific facts and circumstances presented.

# Tab 2-14

# Exhibit 12

Case 1:15-cv-01801-LMM   Document 2-14   Filed 05/19/15   Page 2 of 5
Case: 15-12831   Date Filed: 09/15/2015   Page: 47 of 51



  http://nyti.ms/1cIOy6N

# DealB%k

WITH FOUNDER
ANDREW ROSS SORKIN

# Choosing the Battlefield in S.E.C. Cases

MAY 11, 2015

White Collar Watch

**By PETER J. HENNING**

Lawyers are often accused of elevating procedure over substance, emphasizing the need to follow the rules over reaching the proper outcome in a case. In dealing with the **Securities and Exchange Commission**, the focus lately has been arguing about where an action is filed, on the theory that picking the forum can be half the battle.

The issue is straightforward enough: Should charges of securities fraud and other violations be conducted in a federal district court or before an administrative law judge employed by the commission? For cases that have not been settled, defendants generally prefer to litigate in federal court because of the rights afforded there, including broad discovery procedures and an independent federal judge and jury to decide the case. The adoption of the Dodd-Frank Act in 2010 allows the S.E.C. to seek most remedies in the administrative forum, which involves a much more expedited proceeding that generally limits discovery by the parties to the evidence gathered during an investigation.

The S.E.C. has almost unfettered discretion to choose where a case will be litigated, much to the chagrin of defense lawyers who complain that an administrative adjudication deprives their clients of valuable rights. In response to those complaints, the agency's enforcement division, which is responsible for recommending to the five commissioners where to file a case, **issued guidance last week** about which forum it will chose when a case will be contested.

Unfortunately, the considerations outlined by the S.E.C. provide scant concrete information about which forum will decide the case. Indeed, the guidance may cause even greater consternation among defense lawyers who see the agency sending the toughest cases to its own judges to develop the law as it prefers rather than using federal district judges, who may be less amenable to its arguments.

One consideration described by the S.E.C. is whether a particular remedy is available only in federal court or in an administrative hearing. For example, an emergency freezing of assets can be issued only by a federal court, while barring a broker from the securities industry can be ordered only by an administrative law judge. Similarly, a claim of a failure to supervise is limited to an administrative proceeding, while one based on controlling person liability must be filed in federal court. In effect, the S.E.C. has said that if circumstances force it to pick a particular forum, then it will do so – a point so obvious as to be almost unnecessary to explain.

Similarly, cases against brokers and investment advisers, along with their employees, have traditionally been pursued in administrative proceedings. Because certain remedies can be pursued only in that forum, it is the preferred means to litigate a case, even when there are claims of fraud, rather than going to a federal court first and then filing a separate administrative complaint.

Another consideration is the "cost-, resource- and time-effectiveness of litigation in each forum." The benefit of an administrative proceeding is a quicker resolution because the S.E.C.'s rules generally mandate an initial decision within no more than 300 days of filing, far quicker than federal court cases that can take years to resolve.

The S.E.C. appears to view administrative proceedings as roughly equivalent of federal court actions, pointing to the discovery procedures provided in both, even if those available in the administrative context are more limited. Defense lawyers take a different view, however, arguing that discovery is a means to build the defense case and expose weaknesses in the S.E.C.'s evidence, something that is much more difficult to do when the administrative forum is chosen.

Perhaps the greatest complaint on this front is the unavailability of a federal judge to decide the law as an initial matter and a jury to determine whether there was a violation. The S.E.C.'s guidance makes no mention of the absence of a jury, or that the first level of appeal are the five commissioners who approved the filing of the charges in the first place before it ever reaches a federal court.

The persistent complaint lodged by defendants has been that administrative proceedings give the S.E.C. too much of a "home court" advantage. A recent Wall Street Journal study found that the S.E.C. won in 90 percent of its cases before administrative judges from October 2010 to March 2015, compared with 69 percent of the cases filed in federal court during that period.

Whether that demonstrates a major advantage in the administrative forum is open to question because the S.E.C. has in the past tended to pursue smaller cases with narrow issues before administrative judges, especially those involving individual brokers and investment advisers, so the likelihood of success may have been much higher. Nevertheless, the difference feeds the perception – whether true or not – that the S.E.C. picks the forum where it has a better chance of winning if it can.

The S.E.C.'s final consideration in choosing the forum may well add to the belief that it wants to control the process. When there are "unsettled and complex legal issues" in a matter, then it will consider whether "obtaining a commission decision on such issues, subject to appellate review in the federal courts, may facilitate development of the law."

For defense lawyers, this consideration means the S.E.C. wants to decide the scope of the law first rather than a federal district judge with no ties to the agency. The initial analysis can take on added weight under the Supreme Court's decision in Chevron U.S.A. Inc. v. Natural Resources Defense Council, in which the Supreme Court said that interpretations of ambiguous laws by an administrative agency like the S.E.C. should be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."

Last November, Justice Antonin Scalia of the Supreme Court questioned whether the S.E.C.'s interpretation of the securities laws is owed such deference when a violation can result in a criminal prosecution in addition to civil charges for a violation. He noted that "legislatures, not executive officers, define crimes."

But the S.E.C.'s option to file its case in an administrative forum gives it the chance to shape the law before it reaches a federal appeals court, and argue that the judges should defer to its expertise in deciding what constitutes a violation.

Defendants accused of securities violations in administrative proceedings have tried to cut off the S.E.C.'s access to that forum by arguing that the use of administrative judges hired by the agency and the absence of rights to discovery and

a jury violate the Constitution. Federal district courts, however, have rejected those claims on the ground that any challenge must first be decided by an administrative judge and the S.E.C. commissioners before it can be considered by a federal appeals court.

That string of failures has not stopped others from pursuing such claims. Lynn Tilton, who once described herself as the "turnaround queen" and appeared in a reality television show pilot, **"The Diva of Distressed,"** will go before a federal district judge in New York on May 11, seeking to stop the S.E.C. from pursuing administrative charges that she and her firm improperly valued the assets of – not surprisingly – distressed companies.

Defense lawyers will undoubtedly continue to complain about the use of the administrative forum, but until a federal court steps in to curtail the practice, there is little that can be done to challenge the S.E.C.'s choice. The considerations provided by the enforcement division about when it will recommend proceeding before an administrative judge rather than in federal court shed little light on how the decision will be made.

The clearest situation may be when the S.E.C. wants to see the law develop in a particular direction, which means more close cases may go the route of an administrative proceeding to limit the role played by federal judges.

© 2015 The New York Times Company

## CERTIFICATE OF SERVICE

I certify that on September 15, 2015, I filed the foregoing Supplemental

Appendix with the Clerk of the Court for the United States Court of Appeals for

the Eleventh Circuit via the Court's Electronic Case Filing (ECF) system, and that

the document was served on all parties' counsel of record through the ECF system.

s/   Stephen E. Hudson

Stephen E. Hudson
Georgia Bar No. 374692
KILPATRICK TOWNSEND
  & STOCKTON LLP
1100 Peachtree Street, NE Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
shudson@kilpatricktownsend.com

*Counsel for Plaintiff/Appellant*
